## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SSI GROUP HOLDING CORP., *et al.*,[1] | ) | Case No. 11-12917 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

## DECLARATION OF DAN PATEL, VICE PRESIDENT OF FINANCE OF SOUPER SALAD AND GRANDY'S, IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Dharmeshbhai ("Dan") Patel, solely in my representative capacity as Vice President of Finance, hereby declare under penalty of perjury:

1.      I am the Vice President of Finance for the above-captioned debtors and debtors in possession (the "Debtors"). In my capacity as Vice President of Finance, I am necessarily familiar with the Debtors' operations, business affairs, and books and records.

2.      On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

3.      I submit this declaration (the "First Day Declaration") to provide an overview of the Debtors and their chapter 11 cases, and to support the Debtors' chapter 11 petitions and "first day" motions filed contemporaneously herewith (each, a "First Day Motion, and collectively,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: SSI Group Holding Corp. (0158), Souper Salad, Inc. (0941), SSI-Grandy's LLC (4554) and Souper Brands, Inc. (5468). The Debtors' corporate headquarters and the mailing address for each of the Debtors is 4004 Belt Line Rd., Suite 160, Addison, TX 75001.

the "First Day Motions").[2]  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents or reported to me in the ordinary course of business, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

4.     The Debtors own, operate and franchise two distinct restaurant concepts in 14 states across the United States.  The Debtors' brands include (i) Souper Salad, a fresh and healthy buffet style restaurant offering salads, soups, bakery items and hot entrees, and (ii) Grandy's, a quick casual "comfort food" restaurant known for its chicken, vegetables and rolls. As of January 3, 2011, the Debtors had a total of 146 restaurants across both brands (72 company operated and 8 franchised Souper Salad locations, and 3 company operated and 63 franchised Grandy's locations).

5.     Over the last several years, a combination of factors, including, among others, the overall difficult economic environment persisting in the restaurant industry from 2008 through 2011, led to a deterioration of the Debtors' cash flow resulting in increasingly constrained liquidity and reduced profitability.  The Debtors have also been operating, for a significant period of time, without access to a working capital facility, which has compounded their cash flow problems.  As a result of their financial difficulties, the Debtors have been unable to comply

---

[2]  All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the relevant First Day Motion.

with obligations arising under their pre-petition senior secured loan facility (approximately $3,694,382 million in principal amount outstanding plus $290,000 of outstanding letters of credit) and under their subordinated secured loan facility (approximately $37 million in principal amount outstanding).

6. To address their financial and operational issues, the Debtors implemented several initiatives, discussed in more detail below, to reduce overhead and operating expenses (including closing underperforming locations), while also improving restaurant performance and profitability. Within the past several weeks, the company closed an additional 24 underperforming Souper Salad locations, with the Debtors' projecting that the remaining locations (both Souper Salad and Grandy's) will in the aggregate produce positive EBITDA. Notwithstanding these efforts, the Debtors' financial difficulties and resulting cash drain have continued.

7. For several months, the Debtors have also explored various out of court sale or restructuring alternatives, including attempting to secure replacement financing or other sources of liquidity. However, because of the Debtors' financial circumstances and capital structure, no such out of court transaction proved viable.

8. In June 2011, following the expiration of the then extant forbearance agreement, the Debtors' prepetition senior secured lenders declared an event of default under the pre-petition senior secured credit facility. More recently, the Debtors have been faced with a number of threatened and filed lawsuits relating to closed restaurant locations. Given these circumstances, and faced with increasingly diminished cash flow, the Debtors, in consultation with their legal and financial advisors, determined that the best option to maximize the value of their assets for all stakeholders was to commence these Chapter 11 cases.

9. To sustain operations during bankruptcy, the Debtors require access to a debtor-in-possession loan facility. After canvassing the marketplace, the Debtors' pre-petition senior secured lenders emerged as the only viable source for such financing. The proposed financing offered by the pre-petition lenders requires, as a condition to funding, the Debtors to have entered into a stalking horse asset purchase agreement for the sale of substantially all or a substantial portion of their assets on terms and conditions acceptable to the lenders, including commencing and completing the sale process within a specified timeframe. In that regard, after arms length negotiations, the Debtors entered into a stalking horse asset purchase agreement (the "Stalking Horse Agreement") with Captain D's, LLC, an affiliate of Sun Capital Partners ("Sun Capital")[3], for the purchase and sale, as a going concern, of the Grandy's business. While the Debtors have engaged in negotiations with potential purchasers regarding a going concern sale of the Souper Salad business, the Debtors have not entered into an asset purchase agreement at this time. The Debtors, through their investment banker, Morgan Joseph TriArtisan LLC, continue to negotiate with interested parties and will pursue all efforts to locate a buyer for Souper Salad or for the entire business (both Souper Salad and Grandy's) while also exploring alternative restructuring options for Souper Salad.

## BACKGROUND

I. **The Debtors' Corporate Organizational Structure,
Business Operations and Prepetition Capital Structure**

A. **Corporate Structure**

10. SSI Group Holding Corp., a Delaware Corporation, ("SSI Holding") is the parent company of Souper Salad, Inc., a Texas Corporation, ("SSI"), which in turn owns 100% of each

---

[3] Affiliates of Sun Capital own approximately 45% of the equity interests in SSI Group Holding Corp. and also is a lender under the Debtors' pre-petition subordinated secured loan facility. Accordingly, the Debtors believe that both Sun, and its affiliate Captain D's LLC, are "insiders" of the Debtors as that term is defined in the Bankruptcy Code.

of SSI-Grandy's LLC, a Delaware Limited Liability Company, ("SSI-Grandy's") and Souper Brands, Inc., a Texas Corporation ("SBI"), the other Debtors in these cases.

11.　　SSI Holding is owned by SBN Soup LLC, a Delaware limited liability company, SBG IV LLC, a Delaware limited liability company, and SCSF Salad LLC, a Delaware limited liability company. Each of SBN Soup LLC and SBG IV LLC are owned by affiliates of SummitBridge National Investments, Inc. ("Summit") and SCSF Salad LLC is owned by an affiliate of Sun Capital.

**B.　　The Debtors' Business Operations**

12.　　As noted above, the Debtors own, operate and franchise two distinct restaurant concepts in 14 states across the United States under the names Souper Salad and Grandy's. On the Petition Date, the Debtors employed a total of approximately 1,300 persons across both brands. Of these employees, approximately 1,100 are hourly employees with the remaining employees holding salaried supervisory and administrative positions.

13.　　As of August 28, 2011, the Debtors reported total assets having a consolidated book value of $ 23.9 million and aggregate liabilities of $47.5 million, of which trade debt constituted approximately $4.3 million. In addition, the Debtors had net revenues from continuous operations of approximately $36.4 million for the eight months ending August 28, 2011.

**i.　　Souper Salad**

14.　　Founded in 1978, Souper Salad offers a health oriented buffet style dining experience to its customers in Texas, Colorado, Arizona, New Mexico, Oklahoma, Nevada, North Carolina, Kansas, Utah, South Carolina, Georgia, Idaho, and Tennessee. One of the largest soup and salad restaurant brands in the country, Souper Salad is known for its fresh

salads, handcrafted soups, variety of bakery items, and hot entrée options, all of which are 100% trans-fat free, with no fried food items.

15.    Historically, Souper Salad operated on an almost exclusively company operated model. Since 2007, the company made a shift in its business model increasing the number of franchised locations for a variety of reasons, including improving profitability and better aligning the incentives of the individuals directly responsible for running a location with the success of the brand. To facilitate this shift in its business model, SBI was created with the express purpose of managing current and future Souper Salad franchised operations.[4]  The Debtors currently operate 48 company owned Souper Salad restaurants and have 8 Souper Salad Franchised locations. The Debtors continue to explore the prospects of opening additional franchised locations and anticipate at least two additional locations opening in the next several months.

16.    A typical Souper Salad restaurant, whether owned or franchised, is approximately 3,800 to 5,000 square feet, and seats anywhere from 120 to 175 customers. All company owned and operated locations are leased from third parties. Presently, three of the eight Super Salad franchisees lease their locations from third parties while the remaining five franchisees sublease their respective locations from the Debtors.

**ii.    Grandy's**

17.    Grandy's, founded in 1973, is a quick-service "comfort food" restaurant chain with 64 locations across Texas, New Mexico, Oklahoma, Kentucky, Georgia, Louisiana, Indiana, and Florida. Grandy's provides home-style quality food in an environment that combines the efficiency of fast food with the ambience of a full service restaurant.

18.    The Grandy's business model continues to be franchise based, with 62 out of a total of 64 restaurants owned and operated by franchisees. This stable and longstanding base of

---

[4] It was also intended that SBI manage current and future Grandy's franchises.

stores has experienced relatively little franchisee turnover. Most Grandy's are free-standing locations, with the typical design incorporating a 2,700 square foot building on a 0.75 to 1 acre site, which can accommodate between 30 and 80 customers. Most of these locations also provide "drive-thru" take-out service.

19.     Twenty franchisees sublease land from SSI-Grandy's, which in turn leases these locations pursuant to a Master Lease arrangement with U.S. Restaurant Properties Operating L.P., an indirect subsidiary of GE Capital Corporation. In addition, the Debtors sublease one property under that Master Lease to an owner of a restaurant under another brand. The Debtors also lease ten additional properties from third-parties and, in turn, sublease those properties to franchisees. The remaining franchisees lease their locations directly from third-parties.

### C.     The Debtors' Prepetition Capital Structure

#### (i)     The Senior Secured Prepetition Facility

20.     In 2008, the Debtors entered into that certain Credit Agreement, dated as of June 19, 2008, by and among SSI Group Holding Corp., as guarantor, SSI, SSI-Grandy's, and SBI each as a borrower and collectively as borrowers, the lenders party thereto, and Wells Fargo Capital Finance, LLC ("Wells Fargo") as Arranger and Administrative Agent (as amended from time to time, the "Prepetition Credit Agreement"). As of the Petition Date, the outstanding obligations under the Prepetition Credit Agreement were approximately $3,694,382.60 plus approximately $290,000 in issued and outstanding letters of credit.

21.     The Debtors' obligations under the Prepetition Credit Agreement are secured by liens on and security interests in substantially all of the Debtors' assets including, without limitation, certain of the stock and other equity interests owned by the Debtors in certain subsidiaries, all accounts; all books; all chattel paper; all interest with respect to any deposit account; all equipment and fixtures; all general intangibles; all inventory; all investment related

property; all negotiable collateral; all rights in respect of supporting obligations; all interest with respect to any commercial tort claims; all money, cash equivalents, or other assets come into the possession, custody, or control of Agent or any other member of the Lender Group; and all of the proceeds and products, whether tangible or intangible, of any of the foregoing, all trademarks, and that certain Ground Lease Agreement dated December 12, 1996, between General Electric Capital Corporation, as successor in interest to USRP Funding 1001-A, L.P. and CNL APF Partners, LP, and SSI-Grandy's LLC, as successor in interest to Grandy's, Inc.

22. Prior to the Petition Date, various events of default occurred under the Prepetition Credit Agreement. To address these defaults, and to provide the Debtors the ability to expand their businesses, the Debtors and Wells Fargo entered several amendments, forbearance agreements and consents which, among other things, waived various events of default, consented to certain new franchise opportunities, and increased the amount of permitted indebtedness under the Debtors' subordinated debt facilities.

23. On June 15, 2011, following the expiration of the Debtors' then existing forbearance agreement, Wells Fargo declared an event of default under the Prepetition Credit Agreement including in connection with the Debtors failure to comply with financial covenants as well as the failure to make certain scheduled principal and interest payments.

### (ii)   The Subordinated Prepetition Term Loan Obligations

24. Prior to entry into the Prepetition Credit Agreement, and in connection with SSI's exit from a prior bankruptcy proceeding in 2005, certain of the Debtors entered into two separate term loan credit agreements relating to an aggregate of approximately $21 million of secured indebtedness. In particular, Souper Salad, Inc., as borrower, Summitbridge National Investments, Inc., as Administrative Agent (the "Subordinated Agent") and the lenders party thereto entered into two separate Amended and Restated Credit Agreements each dated as of

November 14, 2005. Through a series of subsequent amendments, additional term loans were made by the lenders such that, as of the Petition Date, the aggregate principal amount outstanding under the credit agreements was approximately $37,179,943.91 (the "Subordinated Term Loan Agreements"). The lenders party to the Subordinated Term Loan Agreements are affiliates of Summit and Sun, the ultimate equity holders in SSI Holding.

25. The Subordinated Lenders assert that the Debtors' obligations under the Subordinated Term Loan Agreements are secured by liens on and security interests in substantially all of the Debtors' assets. The obligations under the Subordinated Term Loan Agreements and the liens granted in connection therewith are subordinated to the obligations under the Prepetition Credit Agreement pursuant to that certain Subordination Agreement, dated as of June 19, 2008 (as amended from time to time, the "Subordination Agreement") which governs the relationship and relative rights by and among Wells Fargo, the Subordinated Agent, and the lenders party to both the Prepetition Credit Agreement and the Subordinated Term Loan Agreements.

## II.     Events Leading to These Chapter 11 Cases

26. Although the Debtors believe that their businesses are operationally sound, over the course of the last several years a convergence of factors led to these chapter 11 filings. As noted above, the Debtors' liquidity became increasingly constrained due to, among other factors, the steep rise in food costs, severe and atypical weather in key areas such as Texas in the 2010/11 winter resulting in decreased foot traffic and profitability, the financial drag from underperforming units, above market rent (relative to store performance) for several of the Debtors' locations, and the global economic downturn which has been impacting the restaurant industry since 2008.

27.     To address these difficulties, the Debtors implemented a number of initiatives designed to, among other things, improve customer traffic and reduce overhead in order to stabilize their ongoing businesses.    For example, in 2010 the Debtors consolidated and reorganized their corporate operations while at the same time rebuilt their franchise sales team and added other key positions.    The Debtors also outsourced much of their accounting and payroll functions, consolidated the corporate office in a single location, and expanded the roles of key personnel.    These efforts resulted in a net expense reduction of approximately $900,000.

28.     At the same time, the Debtors undertook various traffic building initiatives.    For the Souper Salad brand, these efforts included additional promotion for the Souper Fan Club (an online marketing tool), switching from a set price to a coupon marketing strategy, adding frequency cards to build brand loyalty and launching a new program to improve execution at the restaurant level.    For the Grandy's brand, the Debtors introduced new products, attempted new forms of media testing without coupons, initiated a new e-mail marketing club modeled on the Souper Fan Club, instituted a new gift card program and also launched a program to improve execution at the restaurant level.

29.     Despite these efforts, external dynamics affecting the Debtors' businesses continued to strain the Debtors' resources.    The Debtors also have been operating without access to a working capital facility for over a year thereby exacerbating its liquidity problems.    As a result, the Debtors were unable to satisfy obligations under approximately $40 million in the aggregate of their senior and subordinated secured loan facilities.

30.     Given the Debtors' financial difficulties, efforts to locate potential replacement financing or other sources of liquidity were unsuccessful.    Faced with increasing liquidity restraints, and after due consideration, the Debtors determined to market and attempt to sell the

Grandy's brand, with the intention of using the proceeds to retire the Prepetition Credit Facility and further facilitate the ongoing corporate restructuring of the Souper Salad brand. Accordingly, in the fourth quarter of 2010, the Debtors engaged the investment banking services of Morgan Joseph TriArtisan LLC ("MJ") to explore a sale of all or part of the company.

31.     At the time, Grandy's had positive cash flow before corporate overhead costs. Accordingly, MJ focused its marketing efforts on a select group of strategic and financial buyers that could incorporate the brand into an existing management structure. In December 2010, MJ contacted 54 potential purchasers which resulted in the execution of 25 confidentiality agreements. By late January 2011, MJ had received several indications of interest but for a number of reasons a sale transaction did not materialize.

32.     Subsequently, in March 2011, MJ began to explore interest in a sale of the entire business (i.e., both the Souper Salad and Grandy's brands). While that effort yielded some preliminary interest, it was ultimately determined that, given the Debtors' financial situation and their over levered capital structure, any such transaction would be impracticable to pursue outside of bankruptcy.

33.     With no prospect of an out of court transaction, the Debtors approached Wells Fargo and other third parties to explore potential restructuring and recapitalization alternatives. These discussions ultimately bore no fruit and in mid-June Wells Fargo called an event of default under the Prepetition Credit Agreement. In addition, as noted above, the Debtors have been the subject of a number of threatened and filed lawsuits.

### III.     The Debtors Commencement of These Chapter 11 Cases

34.     For all of the reasons set forth above, the Debtors commenced these Chapter 11 cases to facilitate an expedited sale of either or both segments of the Debtors' operations as a going concern and to otherwise explore restructuring alternatives available under Chapter 11. As

noted above, in furtherance of that goal, after arms length negotiations, the Debtors entered into the Stalking Horse Agreement for a sale of the Debtors' Grandy's business and intend to continue to pursue efforts to locate a buyer for Souper Salad or for the entire business, and to explore other restructuring alternatives.

## FIRST DAY MOTIONS

35.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of, these chapter 11 cases.  I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers, employees and advisors.

**A.     Motion of Debtors Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure for Joint Administration and Procedural Consolidation of Cases**

36.     The Debtors are affiliates of each other as that term is defined in section 101(2) of the Bankruptcy Code and as that term is used in Bankruptcy Rule 1015(b).  In light of the multiple financial and operational interrelationships among the Debtors, joint administration of the Debtors' cases is appropriate.  Moreover, the joint administration of the Debtors' chapter 11 cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and will further the interests of judicial economy and administrative expediency.  As most, if not all, pleadings to be filed in these cases will likely affect each Debtor's case, joint administration will permit the Debtors and other parties to combine notices to creditors and other parties-in-interest of the Debtors' respective estates.  Joint administration will also protect

parties-in-interest by ensuring that parties in each of the Debtor's respective chapter 11 cases will be apprised of the various matters before the Court in each case. The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights.

37.     Therefore, the Debtors believe it to be in the best interests of their estates, creditors and other parties in interest that an immediate order be entered providing for the joint administration of the Debtors' chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

**B.     Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (i) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Amounts Due; (ii) Deeming Utility Providers Adequately Assured of Future Performance; (iii) Authorizing the Debtors to Establish the Adequate Assurance Deposit Account and Pay the Adequate Assurance Deposit; (iv) Establishing Procedures for Objection to the Adequate Assurance Procedures; and (v) Granting Certain Related Relief**

38.     In connection with the operation of their business and management of their properties, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, gas, local and long-distance telecom service, data service, waste disposal and other similar services (the "Utility Services"). Uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' sale efforts. A disruption of the Utility Services at any of the Debtors' restaurants would likely be costly to the Debtors and harmful to their business, as the Debtors would be forced from the outset of these chapter 11 cases to focus on finding replacement Utility Providers and services, rather than focusing on the operation and sale of their business. Moreover, the business disruption that would likely result from interruption of the Utility Services would damage customer relationships, revenues, and profits and would adversely affect the Debtors' efforts, to

the detriment of their estates, creditors, and employees. It is therefore critical that all Utility Services currently provided to the Debtors continue uninterrupted.

39.     The Debtors intend to pay all postpetition obligations to the Utility Providers in a timely manner, consistent with the ordinary course of operating their business postpetition. However, to provide adequate assurance of payment for future services to the Utility Providers, the Debtors propose to deposit an initial sum equal to fifty percent (50%) of the Debtors' estimated average monthly cost of Utility Services (the "Adequate Assurance Deposit"), net of any amounts that the Utility Providers currently hold in prepetition deposits or other security from the Debtors for Utility Services ("Prepetition Deposits") and any amounts paid in advance to Utility Providers, into an interest-bearing, newly-created, segregated account (the "Adequate Assurance Account") within twenty (20) days of the Petition Date, pending further order of this Court. The Debtors further propose to maintain the Adequate Assurance Account with a minimum balance equal to fifty percent (50%) of the Debtors' estimated average monthly cost of Utility Services, net of any Prepetition Deposits and advance payments, and request the authority to adjust the amount in the Adequate Assurance Account throughout these chapter 11 cases, to: (i) reflect the termination of Utility Services by the Debtors regardless of any Additional Assurance Requests, (ii) reflect agreements with Utility Providers, and (iii) remove any subsequently discovered Prepetition Deposits.

40.     The Debtors submit that the Adequate Assurance Deposit, taken together with the facts and circumstances of the Debtors' chapter 11 cases, particularly the fact that the Debtors have sufficient liquidity with which to continue to pay for future utility services in the ordinary course of business (together, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers. These protections ensure that all Utility Providers

will have adequate assurance of payment throughout these cases, and the Debtors believe that no other or further assurance is necessary. However, if any Utility Provider believes adequate assurance is required beyond the protections described in the motion, it must request such assurance pursuant to the procedures described in the motion (the "Adequate Assurance Procedures").

41.     The Debtors submit that the relief sought in the motion represents a reasonable means of adequately assuring payment for the Utility Services while ensuring that the Debtors' business is permitted to operate without the prospect of disruptions that would result from the interruption of those services.

**C.      Motion of the Debtors for an Order (i) Approving Use of Existing Cash Management System, (ii) Authorizing Use of Prepetition Bank Accounts and Business Forms, (iii) Waiving the Requirements of 11 U.S.C. § 345(b), and (iv) Granting Administrative Expense Status to Intercompany Claims Between and Among the Debtors and Between and Among the Debtors and their Non-Debtor Affiliates**

42.     In the ordinary course of their operations, the Debtors maintain an integrated network of bank accounts that facilitate the timely and efficient collection, concentration, management and disbursement of funds through three centralized cash management system (the "Cash Management System"). The Debtors maintain five (5) different Bank Accounts for cash and check deposits at the store level; two with Wells Fargo Bank, N.A. ("Wells Bank"), one with J.P. Morgan Chase Bank, N.A. ("JPMC") one with Suntrust Bank ("Suntrust") and one with Commerce Bank ("Commerce", and together with Wells Bank, JPM and Suntrust, the "Cash Management Banks"). The first Wells Bank account is divided into forty-three (43) sub-accounts into which 43 company owned Souper Salad restaurant locations deposit their cash receipts. The second Wells Bank account is divided into two (2) sub-accounts into which two (2) company owned Grandy's Restaurant locations deposit their cash receipts. Credit card

settlements (which include Mastercard, Visa, Discover and American Express) for all locations are deposited into the appropriate Wells Bank depository account. All funds in the Wells Bank deposit accounts, including all sub-accounts, are transferred via Automatic Clearing House ("ACH") into the Concentration/Operating Account (the "SSI Concentration Account") nightly, which is also maintained at Wells Bank. For locations where proximity to the nearest Wells Bank branch makes it impractical to use Wells Bank as a depository, the Debtors' have arrangements for deposit accounts at other banks. Two (2) Souper Salad, Inc. stores utilize a Suntrust bank account for cash and check deposits and one (1) Souper Salad, Inc. store utilizes a Commerce bank account for cash and check deposits. Funds from both the Suntrust and Commerce bank accounts are transferred manually once a week by the Debtors' Treasury Manager into a deposit account maintained with JPMC. That JPMC Account is also utilized by two (2) Souper Salad stores for cash deposits and is used to draft funds from the bank accounts of approximately 50 Grandy's franchisee's and 8 Souper Salad franchisee's bank accounts for amounts due under their various franchise agreements. All amounts in the JPMC account are transferred via ACH pursuant to an automatic standing order transfer into the SSI Concentration Account.

43.     In addition to the SSI Concentration Account, the Debtors maintain two other Concentration/Operating Accounts with Wells Bank; one for SSI-Grandy's LLC and one for Souper Brands, Inc. The corporate office of the Debtors collects funds monthly from the Grandy's Franchisees, whose accounts are not being automatically drafted, for various royalty fees, rent and other expenses. Upon receipt, these funds are deposited directly into the SSI-Grandy's Inc Concentration/Operating Account. The Corporate office also collects the funds monthly from the 2 Souper Salad Franchisees, which funds are deposited upon receipt directly

into the Souper Brands, Inc. Concentration/Operating Account. In addition, all funds received by the corporate office on account of services rendered by or other obligations to Souper Salads are deposited directly into the SSI Concentration Account. The three concentration/operating accounts are not co-mingled and intercompany records are kept to track when one company is paying the obligation of another.

44.    The Debtors' disbursements to vendors and other parties are made from one of three Accounts Payable Disbursement Accounts while payments made to employees are made from one of two Payroll Disbursement Accounts. In addition, each of the Debtor's respective concentration/operating accounts is capable of making direct disbursements via wire and/or ACH transfer.

45.    The Debtors maintain three (3) Accounts Payable Disbursement Accounts with Wells Bank, one for each of the Souper Salad, Inc, SSI-Grandy's LLC, and Souper Brands, Inc. Debtors. Each is a zero balance account ("ZBA") and funds are transferred via ACH nightly from the respective Debtor's concentration/operating account to cover cleared items. Also, the Souper Salad, Inc. and SSI-Grandy's LLC Debtors each maintain a ZBA Payroll Disbursement Account with Wells Bank.

46.    The Debtors maintain overnight investment activities through Wells Bank Fargo. At the end of each day, all available funds in each of the Concentration/Operating Accounts are swept nightly through an ACH debit ("Stagecoach Sweep") into an overnight investment account (the "Overnight Investment Account"). Each morning, all the funds are credited back to the appropriate Concentration/Operating Accounts along with a Stagecoach Sweep interest payment.

47.    The Debtors also maintain a standalone Franchise Gift Card Account (the "Franchise Gift Card Account") on behalf of all the Grandy's franchise locations. All of the

funds from the franchise gift card sales are credited to the Franchise Gift Card Account daily and the franchise location that sold the gift card's account is debited. All of the funds from the franchise gift card redemptions are debited to the Franchise Gift Card Account daily and the franchise location that redeemed the gift card's account is credited. None of the aforementioned funds belong to the Debtors. Rather, the Debtors manage the funds for the franchises.

48.     In order for the Debtors to continue operating as a going concern, thereby preserving and protecting the value of their assets and operations for the benefit of all stakeholders throughout the sale process, it is vital that they be permitted to maintain their existing Cash Management System and continue using their current Bank Accounts. Given the size and complexity of the Debtors' operations, the Debtors simply cannot efficiently facilitate their chapter 11 efforts if there is substantial disruption in the Debtors' Cash Management System. Moreover, to comply with the Operating Guidelines, the Debtors would need to, among other things, create a new system for manually issuing checks and paying post-petition obligations.     The delays that would result from opening these accounts, revising cash management procedures and instructing customers to redirect payments would further disrupt the Debtors' business. It is therefore essential that the Debtors be permitted to continue to manage their cash and transfer monies from their various Bank Accounts as needed and in amounts necessary to continue the operation of their business. If the Debtors are required to close their existing Bank Accounts and create a new cash management system, the Debtors will suffer significant harm from the resultant operational paralysis.

49.     The continued use of existing correspondence and other business forms relating to the Bank Accounts will avoid the adverse effects to the Debtors' operations which would be expected to occur if the Debtors were required to suspend essential business functions pending

the production of and transition to new forms. To minimize both the disruption and expense to their estates, the Debtors request authority to continue to use all correspondence and business forms including, but not limited to, checks, letterhead, purchase orders and invoices, as such forms were in existence immediately prior to the Petition Date, provided, however, that upon depletion of the Debtors' business forms stock, the Debtors will obtain new business forms reflecting their status as debtors in possession. Because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession, changing business forms would be unnecessary and unduly burdensome.

50.     Section 345(a) of the Bankruptcy Code authorizes deposits or investments of money "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." For deposits or investments that are not "insured or guaranteed by the United States or by a department agent or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety. It is within the Court's discretion to extend or waive the investment guidelines requirements of Section 345(b) of the Bankruptcy Code for "cause." Given the complexity of the Cash Management System and the mechanisms in place to ensure the security of the Cash Management System, the Debtors respectfully submit that cause exists to grant an interim sixty (60) day waiver of the requirements of section 345(b) of the Bankruptcy Code. In the instant case, because the Debtors anticipate a relatively short period of time between the petition date and the consummation of the proposed transactions, the Debtors submit that their funds will not be sufficiently at risk to necessitate strict adherence to the requirements of section 345(b) of the

19

Bankruptcy Code. Moreover, if granted an interim waiver from such section, the Debtors will not be required to incur the significant administrative difficulty and expense relating to opening new accounts to ensure that all of its funds are fully insured or invested strictly in accordance with the restrictions established by section 345(b) of the Bankruptcy Code.

**D.** **Motion of the Debtors for Entry of an Order (I) Authorizing, But Not Requiring, the Debtors to Pay Pre- and Post-Petition Wages, Salaries and Other Compensation, (II) Authorizing, but not Requiring the Debtors to Maintain Benefits Programs, and (III) Directing Financial Institutions to Honor all Related Check and Electronic Payment Requests**

51. The Debtors' Employees' are among the Debtors' most valuable assets. Without the continued services of the Employees, an effective sales process will not be possible. To minimize the personal hardship that the Employees will suffer if prepetition employee-related obligations are not paid when due or as expected, as well as to maintain morale and an essential workforce during this critical time, the Debtors, by the motion, seek authority, in accordance with their stated policies, to: (a) pay all prepetition wages, salaries, and other compensation owed to the Debtors' Employees up to $11,725; (b) reimburse all prepetition business expenses to Employees; (c) make all payments for which prepetition payroll and tax deductions were made; (d) honor prepetition obligations under certain employee benefit programs, and continue such programs in the ordinary course; (e) honor workers' compensation obligations; and (f) make all payments to third parties relating to the foregoing payments and contributions. The Debtors further seek an order authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' payroll accounts to make the foregoing payments (collectively, the "Employee Obligations").

52. Any delay in paying any of the Employee-related wages, deductions, reimbursements and benefits described in the motion could severely disrupt the Debtors' relationship with their Employees and irreparably impair the Employees' morale at the very time

that their dedication, confidence, and cooperation are most critical. The Debtors face the risk that their operations may be severely impaired if the Debtors are not immediately granted authority to pay the Employee Obligations. At this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay the Employee Obligations in the ordinary course of their business. If the relief requested in the motion is not granted, the Employees would suffer hardship and, in many instances, financial difficulties, since these monies are needed to enable them to meet their personal obligations. In addition, without the requested relief, the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.

E. **Motion of the Debtors for an Order Authorizing, but not Directing, the Payment of Certain Prepetition Sales, Use, Franchise and Property Taxes, Licensing Fees, and Similar Obligations**

53. In the ordinary course of business, the Debtors incur certain sales and use taxes, trust fund and other similar tax obligations and charges (collectively, the "Sale and Use Taxes") that are payable directly to various state and local taxing authorities (collectively, the "Taxing Authorities") as such payments become due. The Debtors have facilities and operations located throughout the United States; accordingly, they are subject to the payment of Sale and Use Taxes to numerous Taxing Authorities nationwide.

54. The Debtors estimate that, as of the Petition Date, they hold approximately $320,000 in collected but un-remitted Sales and Use Taxes. The relief requested in the motion is necessary to reassure parties with whom the Debtors have agreed to pay Sales and Use Taxes on a transaction that such taxes shall be timely paid and that such parties will not have to pay the Sales and Use Taxes. Although the Debtors believe that their estimates of their tax liabilities set forth in the motion have been accurately and completely prepared, the Debtors request the

authority to pay additional tax liabilities that may be identified by the Debtors, thereby eliminating the need to secure further Court approval for payment of such amounts.

55.     There are several reasons to grant the relief requested in the motion. First, a portion of the Sales and Use Taxes may be entitled to priority status under section 507(a)(8) of the Bankruptcy Code and therefore must be paid in full under any plan of reorganization. Second, certain Taxing Authorities may assert that certain of the Sales and Use Taxes are so-called "trust fund" taxes that the Debtors are required to collect from third parties and hold in trust for the benefit of such Taxing Authorities. Third, some states hold responsible officers personally liable in various circumstances for unpaid sales and use taxes.

**F.     Motion of the Debtors for an Order Authorizing, but not Requiring, the Debtors to Maintain and Honor Certain Prepetition Customer Obligations**

56.     Prior to the Petition Date and in the ordinary course of business, the Debtors maintained several programs and practices designed to foster positive and sustainable relationships with their customers. These programs and practices include, among others, the issuance of pre-paid gift cards and gift certificates as well as the issuance of coupons (collectively, the "Customer Programs"), each of which is described in greater detail in the motion. The common goals of the Customer Programs have been to maintain and increase the patronage and loyalty of their customers and ultimately enhance revenue and profitability.

57.     By the motion, the Debtors seek entry of an order authorizing them, in their discretion, to (i) continue to honor and perform their prepetition obligations related to the Customer Programs, including the payment of any outstanding prepetition amounts with respect thereto, and (ii) continue, renew, replace, and/or terminate any of the Customer Programs, as the Debtors determine advisable, in the ordinary course of business, without further application to this Court. Thus, the Debtors desire to continue during the postpetition period those Customer

Programs that they believe were beneficial to their business and cost-effective during the prepetition period. The Debtors submit that the total operational and administrative cost to the Debtors to continue the Customer Programs is relatively insignificant in comparison to the revenue that such Customer Programs generate. For the reasons set forth in the motion, it is in the best interests of the Debtors and their estates to continue, in the ordinary course of their business, those of the Customer Programs that they determine to be beneficial.

G.   **Motion of the Debtors for Entry of an Order (i) Authorizing the Debtors to (a) Continue Insurance Coverage Entered into Prepetition; (b) Maintain Existing Financing of Insurance Premiums; (c) Enter Into New Postpetition Insurance Policies and Financing Agreements in the Ordinary Course of Business; and (ii) Granting Related Relief**

58.    By the motion, the Debtors seek entry of an order authorizing them to honor their obligations pursuant to the Insurance Policies and Premium Finance Arrangements, and renew the Insurance Policies and Premium Finance Arrangements in the ordinary course of business, without need for further authority or approval from the Court. In addition, the Debtors request that the Court authorize the Debtors' banks and financial institutions to honor and process checks and transfers related to funding their obligations under the Insurance Policies and Premium Finance Arrangements.

59.    The Insurance Policies are essential to the preservation of the value of the Debtors' business, property, and assets. Not only are some of the Insurance Policies required by the various regulations, laws, and contracts that govern the Debtors' commercial activities, but the Bankruptcy Code provides that failure to maintain appropriate insurance that poses a risk to the estate or to the public is cause for mandatory conversion or dismissal of a chapter 11 case.

60.    In addition to providing ample support to continue the Debtors' Insurance Policies, the Bankruptcy Code provides sufficient authority for the Debtors to continue their Premium Finance Arrangements, including making payments on account of prepetition amounts

owing under the Premium Finance Arrangements. Generally, lenders are unwilling to finance insurance premiums on an unsecured basis. The Debtors' business judgment is that the postpetition renewal of the Premium Financing Arrangements is in the best interests of their estates. The Debtors are not aware of any insurance premium finance company that will provide insurance premium financing to the Debtors on an unsecured basis.

61. If the Debtors are not able to meet the obligations required under the Insurance Policies and the Premium Finance Arrangements, the Insurance Providers and AFCO may seek relief from the automatic stay to terminate the Insurance Policies and recover unearned premiums to recoup their losses. The Debtors would then be required to obtain replacement insurance on an expedited basis and at tremendous cost to the Debtors' estates. If the Debtors were required to obtain replacement insurance and pay a lump-sum premium for the insurance policy in advance, this payment would likely be greater than what the Debtors currently pay. Therefore, any interruption of payment would have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

62. In addition, because the Insurance Policies and Premium Finance Arrangements may expire during the course of these chapter 11 cases, the Debtors seek authority to renew them in the ordinary course of business without further Court approval. In view of the importance of maintaining insurance coverage throughout the entire duration of these chapter 11 cases with respect to their business activities and preserving their liquidity by financing certain insurance premiums, the Debtors believe it is in the best interests of their estates to authorize the Debtors to honor their obligations under the Premium Finance Arrangements and the Insurance Policies and to renew and/or modify such Premium Finance Arrangements and the Insurance Policies or enter

into new premium financing arrangements and insurance policies in the ordinary course of the Debtors' business.

**H.**    **Debtors' Motion for Authority to Pay Prepetitoin Claims under the Perishable Agricultural Commodities Act and Establish Procedures Related Thereto**

63.    Prior to the Petition Date, certain of the Debtors' vendors sold goods to the Debtors that may be deemed (i) "perishable agricultural commodities," as such term is defined under the Perishable Agricultural Commodities Act of 1930 ("PACA"). I am informed that PACA regulates trading in perishable agricultural commodities; PACA was amended in 1984 upon a finding by Congress that a burden on commerce in these goods was caused by certain financial credit arrangements, whereby dealers would receive delivery of goods without having made payments for them. I am further informed that the 1984 amendment provides that upon delivery of goods to the purchaser, a statutory trust automatically arises on behalf of unpaid suppliers or sellers.

64.    By the motion, the Debtors request entry of an Order, pursuant to section 105(a) of the Bankruptcy Code, authorizing them to timely and fully pay all valid claims under PACA (the "PACA Claims") to the venders of produce and other goods protected under this federal statute in the ordinary course of business and consistent with the Debtors' historical practices. The Debtors submit that the relief requested in this Motion is in the best interest of their estates and all parties in interest.

**I.**    **Motion of the Debtors for an Order Pursuant to Section 105(a) and 365(a) of the Bankruptcy Code Authorizing Debtors to Reject Certain Unexpired Nonresidential Real Property Leases as of the Petition Date**

65.    By the motion, the Debtors request entry of an Order, pursuant to section 105(a) and 365 of the Bankruptcy Code, authorizing them to reject certain unexpired nonresidential real property leases (the "Leases") *nunc pro tunc* to the Petition Date. Prior to the Petition Date, the

Debtors closed the restaurants located at these locations and have since returned the premises to the respective landlords under the Leases. Accordingly, the premises subject to the Leases will no longer serve any benefit to the Debtors and the Debtors submit that the relief requested in this Motion is in the best interest of their estates and all parties in interest.

J. **Debtors' Motion for Entry of an Order Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f) and Local Bankruptcy Rule 2002-1(f) Authorizing the Retention of EPIQ Bankruptcy Solutions, LLC. as Claims, Noticing and Balloting Agent to the Debtors and Debtors-in-Possession**

66.     By the motion, the Debtors request the entry of an order authorizing them to retain and employ EPIQ Bankruptcy Solutions, LLC., as Claims, Noticing and Balloting Agent in these chapter 11 cases as of the Petition Date to, among other things: (a) serve as the Court's noticing agent to mail notices to the Debtors' creditors and parties in interest, (b) provide computerized claims, objection and balloting database services, (c) provide expertise, consultation and assistance in claim and ballot processing and other administrative information, and (d) provide disbursement services with respect to the Debtors' chapter 11 cases, if requested.

67.     Pursuant to 28 U.S.C. § 156(c), this Court is authorized to utilize facilities other than the Clerk's Office for the administration of bankruptcy cases, including such matters as giving notice of hearings and orders filed in these chapter 11 cases, the meeting of creditors pursuant to section 341 of the Bankruptcy Code and claims bar dates, and providing record keeping and claims docketing assistance. In addition, under Bankruptcy Rule 2002(f), the Court may direct that a person other than the Clerk's Office give notice of the various matters described therein. Moreover, Local Rule 2002-1(f) requires a debtor to file an application to retain a notice and/or claims clerk within ten (10) days of the petition date in all cases with more than 200 creditors. The Debtors believe that the number of creditors in these cases will greatly exceed that number.

68.     The Debtors anticipate that there will be hundreds of entities that the Debtors will be required to serve with the various notices, pleadings, and other documents filed in these chapter 11 cases. In consideration of the number of anticipated claimants and other parties-in-interest, the Debtors respectfully submit that the appointment of EPIQ will expedite the distribution of notices and relieve the Clerk's Office of the administrative burden of processing such notices. EPIQ is a data processing firm that specializes in claims processing, noticing, balloting, disbursement and other administrative tasks in chapter 11 cases. The Debtors believe that the appointment of EPIQ as the Claims, Noticing and Balloting Agent is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

**K.      Motion of the Debtors for entry of an Order Pursuant to Section 363(c)(1) and 503(b)(1)(A) of the Bankruptcy Code (I) Granting Administrative Expense Status to Undisputed Obligations of Vendors Arising from The Postpetition Delivery of Goods and Rendering of Services Ordered Prepetition and (II) Authorizing the Debtors to Pay Such Obligations in the Ordinary Course of Business**

69.     As is common in the restaurant and consumer product industries, in connection with the normal operation of their businesses, the Debtors rely on various vendors (collectively, the "Vendors") to provide the Debtors with the goods and services necessary for the Debtors to serve their restaurant and consumer products customers.

70.     As of the Petition Date, the Debtors have certain prepetition purchase orders outstanding with various Vendors for goods and services ordered by the Debtors (the "Prepetition Orders"). As a consequence of the commencement of these chapter 11 cases, Vendors may be concerned that the obligations arising from goods shipped or services ordered prepetition and delivered or rendered postpetition, pursuant to the Prepetition Orders, will be treated as general unsecured claims against the Debtors' estates.

71.     Without the benefit of an order authorizing the Debtors to pay for postpetition deliveries of goods and performances of services governed by the Prepetition Orders, Vendors may refuse to ship such goods (or may recall shipments thereof) or perform services under Prepetition Orders unless the Debtors issue substitute purchase orders postpetition. These requests would unnecessarily delay the delivery of goods and rendering of services and create uncertainty in the vendor community. The granting of the Motion would allay concerns and facilitate a smooth transition into chapter 11.

L.      **Debtor in Possession Financing and Cash Collateral Motion**

72.     By the motion, the Debtors seek entry of an interim order on an expedited basis and substantially in the form attached thereto, and following a final hearing to be scheduled by the Court, entry of a final order, pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, authorizing the Debtors to (a) incur senior secured, superpriority, post-petition financing, (b) use cash collateral in which the Debtors' pre-petition lenders may have an interest and providing adequate protection in connection therewith, and (c) granting related relief.

73.     The Debtors respectfully submit that approval of the proposed DIP Facility is critical to their ability to continue to operate as a going concern, and to preserve and protect the value of their assets and operations for the benefit of their stakeholders. The Debtors require immediate access to working capital to fund and support ordinary business expenditures, including payroll and employee benefits, rent, utilities, and other overhead expenses. Absent immediate and uninterrupted access to adequate financing, the Debtors will not have sufficient liquidity to sustain ordinary business operations. Immediate funding is required to continue

ordinary course business operations and to preserve and maximize the value of the Debtors' assets and estates.

74.    The Debtors also submit that, other than the DIP Facility sought by the motion, there are no viable financing alternatives available to it under the circumstances. In that regard, prior to the Petition Date, the Debtors and their advisors contacted several well-known alternative sources of post-petition financing, but no viable alternative financing was forthcoming. Specifically, the Debtors, with the assistance of their financial advisor, MJ, contacted several well-known financing sources to provide either debtor-in-possession or exit financing. These entities are sophisticated financial institutions with more than adequate financial resources to offer debtor-in-possession financing to the Debtors. However, for a number of reasons, including the size of the financing required, the nature and state of the Debtors' business operations, the existence of the liens granted to the Prepetition Lenders and the Subordinated Lenders, none of the institutions contacted were willing or available to provide financing to the Debtors in the time frame required to address the Debtors' urgent liquidity needs.

75.    Moreover, as noted, virtually all of the Debtors' assets are encumbered by prepetition liens. Thus, even if alternative debtor in possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Prepetition Lenders and the Subordinated Lenders, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their Chapter 11 cases at the outset.

76.     Thus, the Debtors are unable to obtain alternative post-petition financing through credit allowable as an administrative expense, or credit secured by liens on the Debtors' assets junior to the liens of the Prepetition Lenders and the Subordinated Lenders.    In these circumstances, the Debtors, in the exercise of their considered business judgment, have determined that the financing provided by the DIP Facility is the only financing available to them under the circumstances and provides the Debtors with necessary liquidity to maintain the going concern value of their business pending the conclusion of the Debtors' proposed sale process.    Accordingly, the Debtors submit that the financing arrangements proposed in the motion are reasonable and necessary, serve the best interests of the Debtors' creditors and estates, and should be approved in all respects.

**M.     <u>Motion to Extend Time to File Schedules and Statement of Financial Affairs</u>**

77.     By the motion, the Debtors seek entry of an order extending through October 31, 2011 (an extension of 17 days beyond the combined thirty days that the Debtors receive automatically pursuant to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Delaware) the time within which the Debtors must file their schedules of assets and liabilities, statements of financial affairs and lists of executory contracts and unexpired leases (collectively, the "<u>Schedules</u>").    Additional time is needed to ensure that these documents when filed represent the most accurate and complete data in order to facilitate the ongoing administration of these chapter 11 cases.

78.     The Debtors and their professional advisors are working diligently to prepare the Schedules to reflect accurately the financial circumstances of the Debtors as of the Petition Date. However, due to the other pressing activities in which the Debtors and their professionals are engaged at this time, the Debtors submit that additional time to finalize the Schedules is warranted under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are correct.

By: _____
Dan Patel
Vice President of Finance
Souper Salad, Inc.