# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SSI GROUP HOLDING CORP., *et al.*,[1] | ) | Case No. 11-12917 (MFW) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**MOTION OF DEBTORS FOR ORDERS (A) AUTHORIZING DEBTORS
(i) TO OBTAIN POST-PETITION FINANCING AND GRANTING SECURITY
INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS
PURSUANT TO 11 U.S.C. § 364; (ii) TO USE CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363; (iii) TO PROVIDE ADEQUATE PROTECTION PURSUANT TO
11 U.S.C. §§ 361; (iv) MODIFYING THE AUTOMATIC STAY, AND (B) SCHEDULING
A FINAL HEARING AND ESTABLISHING RELATED NOTICE REQUIREMENTS**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"),

submit this motion (the "Motion"), for entry of an interim order on an expedited basis and

substantially in the form attached hereto as Exhibit A (the "Interim Order"), and following a final

hearing to be scheduled by the Court (the "Final Hearing"), entry of a final order (the "Final

Order"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507

of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local

Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),

authorizing, as more fully detailed below, the Debtors to (a) incur senior secured, superpriority,

post-petition financing on the terms set forth below, (b) use cash collateral in which the Debtors'

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: SSI Group Holding Corp. (0158), Souper Salad, Inc. (0941), SSI-Grandy's LLC (4554) and Souper Brands, Inc. (5468). The Debtors' corporate headquarters and the mailing address for each of the Debtors is 4004 Belt Line Rd., Suite 160, Addison, TX 75001.

pre-petition lenders may have an interest and providing adequate protection in connection

therewith, and (c) granting related relief as set forth below.

In support of this Motion, the Debtors rely on the *Declaration of Dan Patel, in Support of*

*First Day Pleadings* (the "Patel Declaration") filed on the Petition Date and incorporated herein

by reference. In further support of this Motion, the Debtors represent as follows:

## I.  SUMMARY OF RELIEF REQUESTED HEREIN

1.  By this Motion (the "Motion")[2], the Debtors seek entry of an Interim

Order and a Final Order (together, such orders are sometimes referred to herein as the "DIP

Financing Orders"):

>   (a)  authorizing, on an interim and final basis, the Debtors to obtain
>        credit and incur debt, pursuant to sections 364(c), (d) and (e) of the
>        Bankruptcy Code, in the form of an $6,054,382.60 debtor-in-
>        possession credit facility (the "DIP Facility") consisting of (i) a
>        $2,360,000.00 revolving credit facility (including a $290,000 letter
>        of credit sub-limit under which all pre-petition letters of credit will
>        be deemed to have been issued under the DIP Facility)(the "DIP
>        Revolver") and (ii) a $3,694,382.60 term loan facility (the "DIP
>        Term Loan") consisting solely of the roll-up, upon entry of the
>        Final Order, of the existing obligations (other than issued and
>        undrawn letters of credit) under the Prepetition Facility, each
>        pursuant to the terms of that certain Debtor-in-Possession Credit
>        Agreement (the "DIP Financing Agreement"), dated as of
>        September 14, 2011, a copy of which is annexed hereto as Exhibit
>        B, by and among Wells Fargo Capital Finance, LLC. ("WFCF"),
>        as Arranger and Administrative Agent (the "DIP Agent") and as a
>        lender, and the other lenders party thereto (collectively, all such
>        lenders, the "DIP Lenders") and the Debtors;

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the DIP
Financing Agreement or the DIP Financing Orders (each as defined below), as applicable. In the event of an
inconsistency between the descriptions contained herein and the DIP Financing Agreement, the terms of the DIP
Financing Agreement shall control. In the event of an inconsistency between the DIP Financing Agreement and the
DIP Financing Orders, the DIP Financing Orders shall control.

(b)     authorizing, pursuant to the Interim Order, the Debtors to borrow funds under the DIP Revolver for general corporate purposes, including to fund working capital needs, and to fund administrative expenses in an aggregate amount not to exceed $1,296,000 (inclusive of reserves to be implemented by the DIP Agent) in accordance with the Budget (as defined in the DIP Financing Agreement), a copy of which is annexed hereto as Exhibit C, on an interim basis through and including the date of the Final Hearing;

(c)     authorizing the Debtors, on a permanent basis, to borrow funds under the DIP Term Loan to repay, in full, the existing obligations (other than issued and undrawn letters of credit) under the Prepetition Facility;

(d)     granting to the DIP Lenders, (i) pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, as security for repayment of all obligations arising under the DIP Facility, security interests in and liens on substantially all assets of the Debtors, in accordance with the DIP Financing Agreement, subject to (x) the Carve-Out (as defined below) and (y) certain other specified permitted liens as more fully described below and in the Interim Order; and (ii) superpriority administrative expense claim status pursuant to Sections 364(c), 503(b) and 507 of the Bankruptcy Code, subject to the Carve Out and certain other claims as more fully described below and in the Interim Order;

(e)     authorizing, pursuant to Sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, the Debtors to use Prepetition Collateral, including Cash Collateral (each as defined in the Interim Order), and to provide certain protections to the Prepetition Agent, for itself and the Prepetition Lenders, and the Subordinated Agent, for itself and the Subordinated Lenders, with respect to any diminution in value of such parties' interest in the Prepetition Collateral resulting from the implementation of the DIP Credit Facility, the use, sale or lease of the Prepetition Collateral or the imposition of the automatic stay pursuant to Bankruptcy Code Section 362;

(f)     approving the terms and conditions of the DIP Financing Agreement and the documents to be executed in connection therewith, and authorizing the Debtors to execute and deliver, from time to time, all such documents, instruments and agreements and perform such other acts as may be required, necessary or desirable in connection with the DIP Financing Agreement including, without limitation, the payment of all fees, interest and charges required under the DIP Financing Agreement;

(g)     modifying the automatic stay under Section 362 of the Bankruptcy Code to the extent necessary to permit the DIP Lenders to implement the terms and other provisions of the DIP Financing Agreement and the DIP Financing Orders;

(h)     scheduling the Final Hearing within 30 days after the commencement of these cases to consider the entry of the Final Order and approving the form of notice with respect to the Final Hearing; and

(i)     waiving any applicable stay as provided in the Bankruptcy Rules and providing for immediate effectiveness of the Interim Order and the Final Order.

## PRELIMINARY STATEMENT

2.      The Debtors respectfully submit that approval of the proposed DIP Facility is critical to their ability to continue to operate as a going concern, and to preserve and protect the value of their assets and operations for the benefit of their stakeholders.  As discussed more fully below, the Debtors require immediate access to working capital to fund and support ordinary business expenditures, including payroll and employee benefits, rent, utilities, and other overhead expenses.  Absent immediate and uninterrupted access to adequate financing, the Debtors will not have sufficient liquidity to sustain ordinary business operations.  Immediate funding is required to continue ordinary course business operations and to preserve and maximize the value of the Debtors' assets and estates.

3.      Moreover, concurrently with this Motion, the Debtors are filing a motion (the "Sale Motion") seeking approval to proceed with a sale process for their Grandy's and/or Souper Salad businesses.  As discussed in the Sale Motion, an expedited sale of the Debtors' assets is critical and necessary to maximize the value of such assets for the benefit of all creditors.  Thus, any inability or delay in obtaining funding pursuant to the DIP Facility will jeopardize not only the Debtors' business operations, but also their proposed sale and auction

4

process, resulting in immediate and irreparable harm to the Debtors' creditors and estates.

Accordingly, and as more fully set forth below, the Debtors submit that the financing

arrangements proposed herein are reasonable and necessary, serve the best interests of the

Debtors' creditors and estates, and should be approved in all respects.

## CONCISE STATEMENT OF DIP FACILITY TERMS

4.    In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, below

is a summary of the terms of the proposed financing arrangements[3]:

(a)    <u>Obligated Parties</u>:  SSI, SSI-Grandy's and SBI (each as defined below) are the Borrowers.  SSI Holding (as defined below) is the Guarantor.

(b)    <u>Agent/Lenders</u>:  WFCF is the Agent and presently is the sole Lender.

(c)    <u>Amount and Type of Facility</u>:  A senior secured, superpriority postpetition credit facility in an aggregate amount of up to $6,054,382.60 consisting of (i) the $2,360,000.00 DIP Revolver (including a $290,000 sublimit for pre-petition letters of credit that shall be deemed to have been issued under the DIP Revolver), and (ii) upon the entry of the Final Order, the $3,694,382.60 DIP Term Loan consisting solely of the roll-up of the existing obligations (other than issued and undrawn letters of credit) under the Prepetition Facility.  DIP Financing Agreement §§2.1 and 2.2; and Interim Order at ¶4.

(d)    <u>Availability</u>:  The Debtors seek authority to borrow up to $1,296,000 (inclusive of reserves to be implemented by the DIP Agent) under the DIP Revolver pursuant to the Interim Order.  Interim Order at ¶4.

---

[3] The summaries and descriptions of the terms and conditions of the DIP Agreement, the Interim Order and the Final Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof.  The summaries and descriptions herein are qualified in their entirety by the terms of the DIP Agreement, the Interim Order and the Final Order.  In the event there is any conflict between this Motion and the DIP Agreement, the Interim Order or the Final Order, the DIP Agreement, the Interim Order or the Final Order, as applicable, will control in all respects.

(e) <u>Use of Proceeds</u>: The proceeds of the loans under the DIP Facility shall be used by the Debtors (a) upon entry of the Final Order, to repay existing obligations under the Prepetition Facility (other than issued and undrawn pre-petition letters of credit which shall be deemed, upon entry of the Interim Order to have been issued under the DIP Facility), (b) to fund post petition general corporate needs, including working capital needs, subject to compliance with the DIP Budgets as set forth in the DIP Loan Documents, (c) to pay (subject to the limitations of the Carve-Out) administrative expenses of the bankruptcy cases, including reasonable fees and expenses of professionals, subject to compliance with the DIP Budgets as set forth in the DIP Loan, (d) pay all fees and expenses due to DIP Agent and the DIP Lenders as provided under the DIP Facility, including, without limitation, all professional fees and expenses (including reasonable legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by DIP Agent and/or any DIP Lender in connection with the preparation, negotiation, documentation and court approval of the DIP Facility (whether incurred before or after the Filing Date) and (e) to pay all adequate protection payments, if any, required with respect to the Prepetition Obligations. Interim Order at ¶10; DIP Financing Agreement at §6.13. The Initial Budget is attached hereto as Exhibit C.[4]

(f) <u>Priority and Security</u>: All obligations and liabilities under the DIP Facility (the "<u>DIP Obligations</u>") will be secured by first priority priming liens against all assets of the Debtors and their estates pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, subject to the Carve-Out and Specified Permitted Liens (and, upon entry of the Final Order, including liens on Avoidance Actions and the proceeds thereof). The DIP Obligations also shall be treated as superpriority administrative expense claims (including, upon entry of the Final Order, with respect to the proceeds of avoidance actions, pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out. Interim Order at ¶¶ 6, 7, and 8.

(g) <u>Maturity Date</u>: The earlier of (a) four (4) months from the Petition Date or (b) the date a sale of all or a substantial portion of the Borrowers' assets (including any discrete business unit sold as a going concern) is consummated under Section 363 of the Bankruptcy Code. DIP Financing Agreement at §3.3.

---

[4] The Initial DIP Budget attached hereto covers the first 4 weeks following the Petition Date. A full 13 week Initial Budget shall be filed with the Court in connection with the entry of the Final Order.

(h)     <u>Interests Rates and Interest Period</u>: 12.50% all-in (LIBOR + 9.50% with a 3.00% floor or Prime + 7.50% with a 5.00% floor), payable monthly. DIP Financing Agreement at §2.6.

(i)     <u>Default Rate</u>: 2% above the otherwise applicable rate for Advances under the DIP Facility and with respect to letters of credit. DIP Financing Agreement at §2.6.

(j)     <u>Carve-Out</u>: As used in the Interim Order, the "<u>Carve Out</u>" shall encompasses the following expenses: (a) upon the occurrence of an Approved Sale (as defined in the DIP Documents) an amount not to exceed $75,000 payable by the Debtors as a transaction fee in connection with such sale to Morgan Joseph TriArtisan LLC ("<u>Morgan Joseph</u>") as required under Morgan Joseph's engagement letter with the Borrowers dated as of July 8, 2011 (the "<u>MJ Transaction Fee</u>"), (b) following the occurrence of a Triggering Event (as defined below), (i) Allowed Fees (as defined below) of professionals retained (X) by the Borrower (other than any MJ Transaction Fee in an aggregate amount not to exceed $150,000 for all such Allowed Fees incurred after the Triggering Event, and/or (Y) by a statutory committee of unsecured creditors in an aggregate amount not to exceed $15,000 for all such Allowed Fees, in each case, to the extent set forth in the DIP Budgets; (ii) fees payable to a chapter 7 trustee in an aggregate amount not to exceed $25,000 (the amounts in items (i) and (ii) being collectively, the "<u>Carve Out Amount</u>" and any such payments being "<u>Carve Out Payments</u>"); and (iii) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court plus (c) without reducing the Carve Out Amount, all Allowed Fees (other than the MJ Transaction Fee) to the extent set forth in the DIP Budgets and incurred prior to such Triggering Event (the "<u>Pipeline Period</u>"). Pursuant to the DIP Financing Orders, the terms: (x) "<u>Allowed Fees</u>" shall mean fees and reimbursement for disbursements of professionals retained by the Debtors and/or a statutory committee of unsecured creditors allowed (or subsequently allowed) pursuant to an order of this Court, including, without limitation, payments made or required to be made pursuant to monthly fee statements as authorized pursuant to any fee procedures order entered by the Bankruptcy Court, that has not been vacated or stayed, under section 327, 328 or 1103 of the Bankruptcy Code, as applicable; and (y) "<u>Triggering Event</u>" shall mean the date the DIP Agent provides notice to the Borrowers, with a copy to Borrower's counsel at the address set forth in the DIP Documents, of the occurrence and continuance of an Event of Default and DIP Agent's termination of the Pipeline Period for purposes of the Carve Out. Interim Order at ¶29(a).

Immediately prior to the consummation of an Approved Sale (as defined in the DIP Documents) the Borrowers shall be permitted to request and receive a DIP Advance (the "Carve Out Prepayment Advance") equal to the sum of (i) the Carve Out Amount (as reduced by any applicable Carve-Out payments made after a Triggering Event) plus (ii) (to the extent set forth in the Budget) the amount of accrued and unpaid Allowed Fees as of such date. The Carve Out Prepayment Advance shall be deposited into an escrow account for the benefit of the professionals and other parties subject to the Carve Out as set forth in paragraph 29(a) above (collectively, the "Carve Out Parties") and used to fund exclusively all applicable Allowed Fees of such Carve Out Parties as and when authorized pursuant to orders of this Court; provided, however, that the amounts deposited into such escrow shall be allocated among, and be deemed to constitute separate escrow accounts for the benefit of, the Carve Out Parties in accordance with the funding amounts allocable to such parties as provided in paragraph 29(a) above and in the Budget. Interim Order at ¶29(b).

(k)    Conditions Precedent:  The conditions precedent to borrowing under the DIP Facility include customary conditions precedent and also require that the Debtors shall have entered into a stalking horse asset purchase agreement for the sale of all or substantially all of their assets on terms and conditions acceptable to the DIP Lenders, including commencing and completing the sale process within a specified timeframe, that all representations and warranties are accurate and no material adverse event has occurred, and entry of the Interim Order.  DIP Financing Agreement at §§3.1 and 3.2.

(l)    Covenants:  The DIP Agreement contains affirmative, negative and financial reporting covenants customary for facilities of this nature. DIP Agreement at Articles 5 and 6.

(m)    Events of Default:  The occurrence of an "Event of Default" under the DIP Agreement; or the failure of the Debtors to meet the sale Milestones as set forth on Schedule M-1 to the DIP Financing Agreement (and which are detailed below in clause w). DIP Agreement at Article 8; Interim Order at ¶24.

(n)    DIP Facility Fees: (i) Closing Fee - $75,000; (ii) Unused Revolver Fee – 0.50% per annum; (iii) Revolver Serving Fee - $1,000 per month; and (iv)  Letter of Credit Fee – 3.25% per annum plus all fees charged by underlying LC issuer. DIP Financing Agreement at §§2.10 and 2.11.

(o)  Debtors' Stipulations, Waivers and Releases: The Debtors propose to stipulate to the amount, validity and priority of the respective prepetition claims of the Prepetition Agent, the Prepetition Lenders, the Subordinated Agent and the Subordinated Lenders. The Debtors also seek to waive certain rights and causes of action and grant releases in favor of the Prepetition Agent, for itself and the Prepetition Lenders, and the Subordinated Agent, for itself and the Subordinated Lenders as to any and all prepetition claims (including, solely as to the Prepetition Agent and the Prepetition Lenders, the Debtors' rights under section 506(c) of the Bankruptcy Code but only upon entry of the Final Order0. Interim Order at ¶E. The Debtors' stipulations and waivers are subject to challenge by any party in interest or, if a committee is appointed, by such committee, filed within the earlier of (a) sixty (60) days following the formation of such committee, and (b) solely if a committee is not appointed, seventy-five (75) days following entry of the Interim Order. Interim Order at ¶31.

(p)  Waiver or Modification of the Automatic Stay: Subject to 5 days prior written notice, the automatic stay will be vacated in the event of default under the DIP Financing Agreement to permit the exercise of remedies by the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the Subordinated Agent, and the Subordinated Lenders, provided, however, that the Debtors shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing, and seeking other relief in the event it is determined that an Event of Default has not occurred and/or is continuing. DIP Financing Agreement at §§9.1 and 9.2; Interim Order at ¶25.

(q)  Amount of Cash Collateral to Be Used. The Debtors seek to use Cash Collateral in an amount consistent with the expenditures described in the Budget, subject to permitted variances as set forth in the DIP Financing Agreement.

(r)  Parties with an Interest in Cash Collateral. The parties with an interest in the Cash Collateral are the Prepetition Agent, for itself and the Prepetition Lenders, and the Subordinated Agent, for itself and the Subordinated Lenders.

(s)  Use of Cash Collateral. The Prepetition Agent, for itself and the Prepetition Lenders, has consented to the Debtors' use of Cash Collateral in accordance with the terms of the Interim Order and the Budget, and pursuant to the express terms of the Subordination Agreement, the Subordinated Lenders have already consented (or

are deemed to consent), and/or waived any rights to object, to the use of Cash Collateral.

(t)     Termination Date. The Debtors' ability to use Cash Collateral shall end on the earlier of (i) the Maturity Date (as defined in the DIP Agreement) and (ii) the termination of the DIP Lenders' commitments under the DIP Documents by the DIP Agent upon the occurrence and during the continuation of an Event of Default, provided, however, that during the five (5) days after the Termination Declaration Date (as defined in the DIP Agreement), the Debtors may use Cash Collateral in accordance with the terms and provisions of the Budget solely to meet payroll and to pay expenses critical to the preservation of the Debtors and their estates as agreed to by the DIP Agent, in its sole discretion. DIP Financing Agreement at §9.1; Interim Order at ¶¶23 and 25.

(u)     Adequate Protection to Prepetition Lenders. The Debtors have agreed that the Prepetition Agent, for the benefit of itself and the Prepetition Lenders (to the extent any Prepetition Obligations remain outstanding), and, subject to the Subordination Agreement, the Subordinated Agent, for the benefit of itself and the Subordinated Lenders, are each entitled to receive adequate protection on account of their respective interests in the Prepetition Collateral pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral). Pursuant to sections 361, 363, 364 and 507(b), as adequate protection to the extent of any Diminution in Value: (i) the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, will receive (a) adequate protection liens and superpriority claims, (b) current payments of interest, fees and other amounts due under the Prepetition Credit Documents, and (c) ongoing payment of the reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses, of the Prepetition Agent and Prepetition Lenders; and (ii) the Subordinated Agent, for the benefit of itself and the Subordinated Lenders, will receive adequate protection liens and superpriority claims. Interim Order at ¶12, 13, and 14.

(v)     Automatic Perfection. The liens, security interests and adequate protection provided in the DIP Agreement, the Interim Order and the Final Order shall be valid, binding, enforceable, non-avoidable and automatically perfected without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which otherwise may be required under the laws of any jurisdiction to validate or perfect such security interests and liens. Interim Order at ¶19.

(w)     Sale Milestones. The DIP Financing Agreement contains sale process Milestones that are required to be satisfied. Failure to comply with these milestones constitutes an Event of Default under the DIP Facility. DIP Financing Agreement at §8.18 and Schedule M-1. The sale process Milestones are as follows:

(i) On Petition Date: Debtors shall have filed a motion, acceptable to the DIP Agent, seeking entry of a Bid Procedures Order.

(ii) Within 35 days after the Petition Date: The Bid Procedures Order shall have been entered.

(iii) Within 55 days after the Petition Date: An Auction shall have been held in accordance with the Bid Procedures Order.

(iv) Within 65 days after the Petition Date: An order, in form and substance satisfactory to the DIP Agent, shall have been entered confirming the winning bid received at the Auction for the Approved Sale.

(v) Within 85 days after the Petition Date: The Approved Sale shall have been consummated on terms and conditions acceptable to the DIP Agent.

## DISCLOSURES

5.     Pursuant to Bankruptcy Rule 4001(d) and Local Rule 4001-2, a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing. The debtor in possession must also justify the inclusion of such provisions. Set forth below are the disclosures required in accordance with such rules:

(a)     Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to prepetition secured creditors in connection with the debtor's cash collateral usage or additional financing. **The proposed Interim Order does not provide for the granting of cross-collateralization protection to any prepetition secured creditors, other than replacement liens with the same validity and priority as the lenders' prepetition security interests. Upon entry of the Final Order, the DIP Financing Agreement contemplates a complete roll-up of the**

11

Prepetition Obligations (other than pre-petition letters of credit as noted above).  **Interim Order at ¶F(iv).**

(b)  Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001(c)(1)(B)(iii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters.  **The proposed Interim Order, at ¶ E, includes certain stipulations by the Debtors relating to the validity, perfection, enforceability and amount of the Prepetition Lenders' prepetition liens and claims.  Further, the proposed Interim Order, at ¶ 31 contains releases of prepetition claims by the Debtors in favor of the Prepetition Agent, Prepetition Lenders, Subordinated Agent and/or Subordinated Lenders.  The foregoing stipulations, waivers and releases are subject to challenge by any party in interest or, if a committee is appointed, by such committee as set forth in the Interim Order at ¶31.**

(c)  Local Rule 4001-2(a)(i)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code.  **The proposed Interim Order does not provide for a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code as against any parties.  Such provision, solely as to DIP Agent and the DIP Lenders, and the Prepetition Agent and the Prepetition Lenders, is contemplated upon entry of the Final Order.  Interim Order at ¶¶ I and 34.**

(d)  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code.  **The proposed Interim Order, at ¶6, grant liens and superpriority claims in favor of the DIP Agent and the DIP Lenders on actions arising under Section 549 of the Bankruptcy Code or the proceeds thereof.  Liens on and superpriority claims in all Avoidance Actions are contemplated upon entry of the Final Order.  Interim Order at ¶¶ 7 and 8.**

(e)     Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt to be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditors' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code). **The proposed Interim Order, at ¶4, does deem letters of credit issued and outstanding under the Prepetition Facility to be deemed to have been issued under the DIP Facility. Upon entry of the Final Order, the DIP Financing Agreement contemplates that the full amount of the DIP Term Loan shall be funded, the proceeds of which shall be used solely to roll-up of the existing obligations (other than issued and undrawn letters of credit as noted above) under the Prepetition Facility.**

(f)     Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. **The proposed Interim Order, at ¶29, provides for different carve-out amounts for professionals retained by the Debtors and by a committee. The Budget projects that fees and expenses of Committee professionals will be lower than fees and expenses of the Debtors' professionals.**

(g)     Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienholder. **The proposed Interim Order does not provide for the priming of any secured lien without the consent of that lienholder. The Prepetition Lenders consent to the relief requested herein. As to the Subordinated Lenders, such consent is contained in the Subordination Agreement (as defined below).**

(h)     Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case. **The proposed Interim Order, at ¶¶12, 13 and 14, describes the respective forms of adequate protection to be provided to the Prepetition Agent, on behalf of itself and the Prepetition Lenders and the Subordinated Agent, on behalf of itself and the Subordinated Lenders.**

(i)     Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay. **The proposed Interim Order, at ¶25, describes the modification of the automatic stay in the event of default.**

(j) Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate. **The proposed Interim Order, at ¶19, includes provisions that provide for the automatic perfection and validity of the liens, security interests and adequate protection provided in the DIP Financing Agreement and the Interim Order without the necessity of any further filing or recording under the laws of any jurisdiction.**

## II.     JURISDICTION

6.      The Court has jurisdiction over this Motion under 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) in that it is a matter concerning the administration of the Debtors' estates. Venue of these proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.     BACKGROUND

**A.     General**

7.      On the date hereof (the "Petition Date"), the Debtors each filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their affairs as debtors in possession. An official committee of unsecured creditors has yet to be appointed by the Office of the United States Trustee.

**B.** **The Debtors' Corporate Organizational Structure,
Business Operations and Prepetition Capital Structure**

    **(i)**     <u>**Corporate Structure**</u>

    8.     SSI Group Holding Corp., a Delaware Corporation, ("<u>SSI Holding</u>") is the parent company of Souper Salad, Inc., a Texas Corporation, ("<u>SSI</u>"), which in turn owns 100% of each of SSI-Grandy's LLC, a Delaware Limited Liability Company, ("<u>SSI-Grandy's</u>") and Souper Brands, Inc., a Texas Corporation ("<u>SBI</u>"), the other Debtors in these cases.

    9.     SSI Holding is owned by SBN Soup LLC, a Delaware limited liability company, SBG IV LLC, a Delaware limited liability company, and SCSF Salad LLC, a Delaware limited liability company. Each of SBN Soup LLC and SBG IV LLC are owned by affiliates of SummitBridge National Investments, Inc. ("<u>Summit</u>"), and SCSF Salad LLC is owned by an affiliate of Sun Capital Partners ("<u>Sun</u>").

    **(ii)**     **The Debtors' Business Operations**

    10.     The Debtors own, operate and franchise two distinct restaurant concepts in 14 states across the United States under the names Souper Salad and Grandy's. On the Petition Date, the Debtors employed a total of approximately 1,300 persons across both brands. Of these employees, approximately 1,100 are hourly employees with the remaining employees holding salaried, supervisory and administrative positions.

    11.     As of August 28, 2011, the Debtors reported total assets having a consolidated book value of $23.9 million and aggregate liabilities of $47.5 million, of which trade debt constituted approximately $4.3 million. In addition, the Debtors had net revenues from continuous operations of approximately $36.4 million for the eight months ending August 28, 2011.

### (iii) Souper Salad

12.     Founded in 1978, Souper Salad offers a health oriented buffet style dining experience to its customers in Texas, Colorado, Arizona, New Mexico, Oklahoma, Nevada, North Carolina, Kansas Utah, South Carolina, Georgia, Idaho, and Tennessee. One of the largest soup and salad restaurant brands in the country, Souper Salad is known for its fresh salads, handcrafted soups, variety of bakery items, and hot entrée options, all of which are 100% trans-fat free, with no fried food items. Historically, Souper Salad operated on an almost exclusively company owned model but has been increasing its franchised operations since 2007. The Debtors currently operate 48 company owned Souper Salad restaurants and have 8 Souper Salad Franchised locations.

### (iv) Grandy's

13.     Grandy's, founded in 1973, is a quick-service "comfort food" restaurant chain with 65 locations across Texas, New Mexico, Oklahoma, Georgia, Louisiana, Indiana, and Florida. Grandy's provides home-style quality food in an environment that combines the efficiency of fast food with the ambience of a full service restaurant. The Grandy's business model continues to be franchise based, with 63 out of a total of 65 restaurants owned and operated by franchisees.

### C.     Events Leading to These Chapter 11 Cases

14.     Although the Debtors believe that their businesses are operationally sound, over the course of the last several years a convergence of factors led to these chapter 11 filings. The Debtors' liquidity became increasingly constrained due to, among other factors, the steep rise in food costs, severe and atypical weather in key areas such as Texas in the 2010/11 winter resulting in decreased foot traffic and profitability, the financial drag from underperforming

units, above market rent (relative to store performance) for several of the Debtors' locations, and the global economic downturn which has been impacting the restaurant industry since 2008.

15.    To address these difficulties, the Debtors implemented a number of initiatives designed to, among other things, improve customer traffic and reduce overhead in order to stabilize their ongoing businesses. For example, in 2010 the Debtors consolidated and reorganized their corporate operations while at the same time rebuilt their franchise sales team and added key marketing positions. The Debtors also outsourced much of their accounting and payroll functions, consolidated the corporate office in a single location, and expanded the roles of key personnel. These efforts resulted in a net expense reduction of approximately $900,000.

16.    At the same time, the Debtors undertook various traffic building initiatives. For the Souper Salad brand, these efforts included additional promotion for the Souper Fan Club (an online marketing tool), switching from a set price to a coupon marketing strategy, adding frequency cards to build brand loyalty and launching a new program to improve execution at the restaurant level. For the Grandy's brand, the Debtors introduced new products, attempted new forms of media testing without coupons, initiated a new e-mail marketing club modeled on the Souper Fan Club, instituted a new gift card program and also launched a program to improve execution at the restaurant level.

17.    Despite these efforts, external dynamics affecting the Debtors' businesses continued to strain the Debtors' resources. Exacerbating it liquidity problems, the Debtors have been operating without a working capital facility for over a year. As a result, the Debtors became unable to satisfy obligations under their approximately $40 million of senior and subordinated secured loan facilities.

18. Given the Debtors' financial difficulties, efforts to locate potential replacement financing or other sources of liquidity were unsuccessful. Faced with increasing liquidity restraints, and after due consideration, the Debtors determined to market and attempt to sell the Grandy's brand, with the intention of using the proceeds to retire the Prepetition Credit Facility and further facilitate the ongoing corporate restructuring of the Souper Salad brand. Accordingly, in the fourth quarter of 2010, the Debtors engaged the investment banking services of Morgan Joseph to explore a sale of all or part of the company.

19. At the time, Grandy's had positive cash flow before corporate overhead costs. Accordingly, Morgan Joseph focused its marketing efforts on a select group of strategic and financial buyers that could incorporate the brand into an existing management structure. In December 2010, Morgan Joseph contacted 54 potential purchasers which resulted in the execution of 25 confidentiality agreements. By late January 2011, Morgan Joseph had received several indications of interest but for a number of reasons a sale transaction did not materialize.

20. Subsequently, in March 2011, Morgan Joseph began to explore interest in a sale of the entire business (i.e., both the Souper Salad and Grandy's brands). While that effort yielded some preliminary interest, it was ultimately determined that, given the Debtors' financial situation and their over levered capital structure, any such transaction would be impracticable to pursue outside of bankruptcy.

21. With no prospect of an out of court transaction, the Debtors approached WFCF and other third parties to explore potential restructuring and recapitalization alternatives. These discussions ultimately bore no fruit and in mid-June WFCF called an event of default under the Prepetition Agreement. Most recently, the Debtors have been the subject of a number of threatened and filed lawsuits relating to closed restaurant locations. Given these

circumstances, and faced with increasingly diminished cash flow, the Debtors, in consultation with their legal and financial advisors, determined that the best option to maximize the value of their assets for all stakeholders was to commence these Chapter 11 cases.

22.     To sustain operations during bankruptcy, the Debtors require access to a debtor-in-possession loan facility. Indeed, the Debtors' DIP Budget demonstrates that absent an adequate financing facility, the Debtors will not have sufficient cash to maintain operations or to fund administrative expenses beginning in the initial weeks following the Petition Date.

23.     As discussed below, after canvassing the marketplace, the Prepetition Lenders emerged as the only viable source for such financing. The proposed financing offered by the Prepetition Lenders requires, as a condition to funding, the Debtors to have entered into a stalking horse asset purchase agreement on terms and conditions acceptable to the lenders, including commencing and completing the sale process within a specified timeframe. In that regard, after arms length negotiations, the Debtors entered into a stalking horse asset purchase agreement (the "Stalking Horse Agreement") with Captain D's, LLC, an affiliate of Sun Capital Partners ("Sun Capital")[5], for the purchase and sale, as a going concern, of the Grandy's business. While the Debtors have engaged in negotiations with potential purchasers regarding a going concern sale of the Souper Salad business, the Debtors have not entered into an asset purchase agreement at this time. The Debtors, through Morgan Joseph, continue to negotiate with interested parties and will pursue all efforts to locate a buyer for Souper Salad or for the entire business (both Souper Salad and Grandy's) while also exploring alternative restructuring options for Souper Salad.

---

[5]     Affiliates of Sun Capital own approximately 45% of the equity interests in SSI Group Holding Corp., are parties to a management agreement with the Debtors and are also lenders under the Debtors' pre-petition subordinated secured loan facility. Accordingly, both Sun, and its affiliate Captain D's LLC, are "insiders" of the Debtors as that term is defined in the Bankruptcy Code.

## IV.   THE DEBTOR'S PRE-PETITION DEBT STRUCTURE[6]

24.    The Debtors' primary liabilities consist of: (a) a senior secured credit facility; (b) junior secured term loan obligations; (c) unsecured trade debt; and (d) lease obligations.  The Debtors' prepetition first lien secured credit obligations and junior secured (subordinated) term loan obligations are described below.

**B.    Prepetition First Lien Loan Facility**

25.    Debtors SSI, SSI-Grandy's and SBI are borrowers (the "Borrowers") under a pre-petition Credit Agreement, dated as of June 19, 2008 (as amended from time to time, the "Prepetition Agreement"), with Wells Fargo Capital Finance, LLC (f/k/a Wells Fargo Foothill, LLC), as arranger and administrative agent (the "Prepetition Agent"), and the lenders party thereto (collectively with the Prepetition Agent, the "Prepetition Lenders").  SSI Holding is a guarantor pursuant to that certain General Continuing Guaranty, dated June 19, 2008.

26.    Pursuant to the original terms of the Prepetition Agreement, the Prepetition Lenders provided a revolving credit facility (the "Prepetition Facility") of up to $2,005,000 (including a $2,000,000 subfacility for letters of credit), and a term loan facility of up to $4,500,000  (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Credit Documents, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof,

---

[6]    The description of the Debtors' pre-petition indebtedness contained herein is without prejudice to the Debtors' or other parties' rights, claims and defenses respecting, inter alia, the nature, extent, priority, amount, validity, allowance, avoidance and classification of any such indebtedness, and all such rights, claims and defenses are expressly reserved except to the extent set forth in the DIP Financing Agreement and in any DIP Financing Orders entered by the Court.

the "Prepetition Obligations").  Access to funding under the revolving credit facility was terminated more than a year prior to the Petition Date.

27.     The Prepetition Obligations are secured by first-priority liens on substantially all of the Debtors' assets including, without limitation, certain of the stock and other equity interests owned by the Debtors in certain subsidiaries, all accounts; all books; all chattel paper; all interest with respect to any deposit account; all equipment and fixtures; all general intangibles; all inventory; all investment related property;  all  negotiable collateral; all rights in respect of supporting obligations; all interest with respect to any commercial tort claims; all money, cash equivalents, or other assets come into the possession, custody, or control of Agent or any other member of the Lender Group; and all of the proceeds and products, whether tangible or intangible, of any of the foregoing, all trademarks, and that certain Ground Lease Agreement dated December 12, 1996, between General Electric Capital Corporation, as successor in interest to USRP Funding 1001-A, L.P. and CNL APF Partners, LP, and SSI-Grandy's LLC, as successor in interest to Grandy's, Inc.

28.     As of the Petition Date, the aggregate principal amount owed under the Prepetition Facility was approximately $3,676,774.86, plus $290,000 of issued and outstanding letters of credit.

**C.     The Prepetition Subordinated Term Loans**

29.     Prior to entry into the Prepetition Agreement, and in connection with SSI's exit from a prior bankruptcy case in 2005, SSI, as borrower, and Summitbridge National Investments, in its capacity as administrative agent for certain lenders (in such capacity, the "Subordinated Agent"), and the lenders party thereto (the "Subordinated Lenders"), entered into (i) that certain Amended and Restated Credit Agreement, dated November 14, 2005, which provide for, among other things, a revolving credit facility in the maximum principal amount of

$4,500,000, a term loan A in the original principal amount of $12,000,000 and a term loan C in

the original principal amount of $7,500,000 (the "Subordinated Credit Agreement A/C") and (ii)

that certain Amended and Restated Credit Agreement, dated November 14, 2005, which provides

for, among other things, a term loan B in the original principal amount of $9,000,000 (the

"Subordinated Credit Agreement B", and together with the Subordinated Credit Agreement A/C,

and as amended, supplemented, restated or otherwise modified prior to the Petition Date, the

"Subordinated Credit Agreement", and together with all other loan and security documents

executed in connection therewith, the "Subordinated Credit Documents"). The Lenders under the

Subordinated Credit Agreement are affiliates of Summit and Sun, the ultimate equity holders in SSI

Holding.

   30.  The Subordinated Lenders assert that the obligations arising under the

Subordinated Credit Documents (the "Subordinated Obligations") are secured by liens on and

security interests in substantially all of the Debtors' assets including, without limitation:

accounts; chattel paper; commercial tort claims; deposit accounts and cash and other monies and

property; documents; equipment; fixtures; general intangibles; goods; instruments; inventory;

investment property; letter-of-credit rights and supporting obligations; and other personal

property whether or not subject to the UCC together with all books, records, ledger cards, files,

correspondence, computer programs, tapes, disks and related data processing software that at any

time evidence or contain information otherwise necessary or helpful in the collection thereof or

realization thereon; together with all proceeds, products, rents, cash and profits of the foregoing.

The Subordinated Obligations and the liens granted in connection therewith are subordinated to

the Prepetition Obligations and the liens granted to the Prepetition Agent in connection therewith

pursuant to that certain Subordination Agreement, dated as of June 19, 2008 (as amended from

time to time, the "Subordination Agreement") which governs the relationship and relative rights

by and among the Prepetition Agent, the Subordinated Agent, and the lenders party to both the Prepetition Agreement and the Subordinated Credit Agreements.

31.    As of the Petition Date, the aggregate amount outstanding on account of the Subordinated Obligations was approximately $37,179,943.91, consisting of approximately $17,725,017.43 under Subordinated Term Loan A; approximately $13,707,178.97 under Subordinated Term Loan B; approximately $3,783,493.04 under Subordinated Term Loan C; and approximately $1,964,254.47 under Subordinated Term Loan D.

## V.    PROPOSED DEBTOR-IN-POSSESSION FINANCING

### A.    The Critical Need for Post-Petition Financing

32.    As described more fully in the Patel Declaration, the Debtors have an immediate need for post-petition financing under the DIP Facility to continue to finance their post-petition operations and pay administrative expenses. Such financing is critical to preserve the going concern value of the Debtors' assets, thereby maximizing the returns to all creditors and stakeholders that will be obtained from the contemplated sale of the Debtors' assets or other restructuring alternatives.

33.    Because virtually all of the Debtors' assets are encumbered by the Prepetition Liens, the Debtors have no unencumbered funds with which to pay ongoing wages, salaries and day-to-day operating expenses, including, but not limited to, rent and utility obligations, all of which are vital to sustain normal course business operations. Due to the nature and magnitude of the Debtors' operations, which are dependent upon uninterrupted access to necessary working capital, the Debtors' immediate access to the DIP Facility is essential to prevent irreparable harm to the Debtors' estates. The DIP Facility also is necessary to provide assurance to employees, landlords, utilities and other parties that they will be paid on a timely basis for post-petition services. Without access to the DIP Facility, the Debtors' day-to-day

restaurant operations could come to a halt, a result that would be devastating as the Debtors attempt to maximize the going concern value of their assets through an expedited sale process.

34.     The Debtors also submit that, other than the DIP Facility, there are no viable financing alternatives available to it under the circumstances.  In that regard, prior to the Petition Date, the Debtors and their advisors contacted several well-known alternative sources of post-petition financing, but no viable alternative financing was forthcoming.  Specifically, the Debtors, with the assistance of their financial advisor, Morgan Joseph TriArtisan, contacted several well-known financing sources to provide either debtor-in-possession or exit financing. These entities are sophisticated financial institutions with more than adequate financial resources to offer debtor-in-possession financing to the Debtors.  However, for a number of reasons, including the size of the financing required, the nature and state of the Debtors' business operations, the existence of the liens granted to the Prepetition Lenders and the Subordinated Lenders, none of the institutions contacted were willing or available to provide financing to the Debtors in the time frame required to address the Debtors' urgent liquidity needs.

35.     Moreover, as noted, virtually all of the Debtors' assets are encumbered by Prepetition Liens.  Thus, even if alternative debtor in possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Prepetition Lenders and the Subordinated Lenders, the results of which could not be predicted with certainty.  Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their Chapter 11 cases at the outset.

36. Thus, the Debtors are unable to obtain alternative post-petition financing through credit allowable as an administrative expense, or credit secured by liens on the Debtors' assets junior to the liens of the Prepetition Lenders and the Subordinated Lenders. In these circumstances, the Debtors, in the exercise of their considered business judgment, have determined that the DIP Facility is the only financing available to them under the circumstances and provides the Debtors with necessary liquidity to maintain the going concern value of their business pending the conclusion of the Debtors' proposed sale process.

37. The DIP Facility, which is the product of arm's length negotiations between the DIP Agent, the DIP Lenders and the Debtors, provides the Debtors with continued financing pursuant to (i) the terms of the DIP Financing Agreement and the other DIP Documents, (ii) the operating Budget annexed hereto as Exhibit C, and (iii) the terms of the proposed Interim Order (pending approval of the DIP Facility on a final basis at the Final Hearing).

38. The Debtors believe that the terms of the DIP Facility pursuant to the DIP Financing Agreement are reasonable and fair under the circumstances and, therefore, that the financing provided under the DIP Facility serves the best interests of the Debtors, their creditors and their estates.

## B. Use of Cash Collateral of Prepetition Revolving Lenders and Prepetition Term Loan Lenders and Proposed Adequate Protection

39. In connection with the proposed DIP Facility, the Debtors require and request authorization, pursuant to Sections 363(c)(2) and (e) of the Bankruptcy Code, to use cash receipts and equivalents constituting Cash Collateral of the Prepetition Lenders and the Subordinated Lenders as contemplated by the DIP Facility and the Interim Order. The Debtors' use of Cash Collateral is required because, as noted above, all borrowings under the DIP Facility

will be secured by and repaid with, among other things, the Debtors' cash receipts that may constitute Cash Collateral of the Prepetition Lenders and the Subordinated Lenders. Additionally, following any repayment of the DIP Obligations in full, the Debtors will require access to cash collateral to fund administrative expense obligations contemplated by the Budget pending the conclusion of the Debtors' proposed sales process and the ultimate disposition of these cases.

40.    Pursuant to the Interim Order, as adequate protection of for any Diminution in Value[7] of the interests of the Prepetition Lenders and the Subordinated Lenders resulting from the use of Cash Collateral, such lenders shall be granted, pursuant to Section 361, 363(e) and 364(d) of the Bankruptcy Code, the following protections, as applicable:

(a)    **Prepetition Replacement Liens.** The Prepetition Lenders and the Subordinated Lenders shall be granted, subject to the terms and conditions set forth in the Interim Order, additional and replacement security interests and liens in the Collateral (as defined in the Interim Order) (hereinafter, the "Prepetition Replacement Liens"), which shall be junior only to the (i) Carve Out; (ii) DIP Liens; (iii) Prepetition Facility Liens; and (iv) Specified Permitted Liens, as provided in the Interim Order. The Prepetition Replacement Liens shall be valid, perfected, enforceable and effective as of the date of entry of the Interim Order without any further action by the parties and without the necessity of the filing of any mortgages or financing statements or the taking of any other actions. The Prepetition Replacement liens granted to the Prepetition Lenders shall be senior to the Prepetition Replacement liens granted to the Subordinated Lenders.

---

[7] Pursuant to the Interim Order, Diminution in Value is defined as the diminution in the value of Prepetition Lender and the Subordinated Lenders interests in the Prepetition Collateral (including Cash Collateral)(each as defined in the Interim Order) resulting from the subordination to the Carve Out (as defined herein) and to the DIP Liens, the Debtors' use, sale or lease of such Prepetition Collateral, and the imposition of the automatic stay.

(b) **Prepetition Superpriority Claim.** The Prepetition Lenders and the Subordinated Lenders shall also be granted allowed superpriority administrative expense claims (the "Prepetition Superpriority Claims") which shall have priority (except with respect to the Carve-Out, and the DIP Superpriority Claims, each of which shall be senior in priority to the Prepetition Superpriority Claims) under Sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code.

41. In addition to the Prepetition Replacement Liens and the Prepetition Superpriority Claim, as further adequate protection, to the extent any Prepetition Obligations remain outstanding, the Debtors propose to provide adequate protection to the Prepetition Agent and Prepetition Lenders, in the form of: (i) monthly payments of interest, fees and other amounts due under the Prepetition Credit Documents; and (ii) ongoing payment of the Prepetition Agent's and Prepetition Lenders' reasonable fees, costs and expenses, including, without limitation, reasonable legal and other professionals' fees and expenses.

42. The Debtors believe that the proposed use of Cash Collateral and adequate protection described above and set forth in the Interim Order, is reasonable and necessary and should be approved by the Court. In that regard, the Debtors understand that the Prepetition Lenders have consented to the Debtors' use of Cash Collateral as contemplated by the DIP Facility, subject to the provisions and protections outlined above and contained in the Interim

Order.  In addition, pursuant to the express terms of the Subordination Agreement, the

Subordinated Lenders have already consented (or are deemed to consent), and/or waived any

rights to object, to the DIP Facility, the use of cash collateral and the proposed adequate

protection to be provided therefor pursuant to the Interim Order.

## VI. BASIS FOR APPROVAL OF THE DIP FACILITY AND THE GRANTING OF SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE CLAIMS IN CONNECTION THEREWITH

### A. The Granting of Senior Liens and Superpriority Administrative Claim Status DIP Agent and the DIP Lenders in Connection with the DIP Facility is Warranted

43.     Section 364 of the Bankruptcy Code authorizes this Court to allow the

Debtors to obtain post-petition financing from the DIP Lenders in the manner proposed in the

DIP Financing Agreement.  As described above, as security for all borrowings under the DIP

Facility, the Debtors propose to grant the DIP Lenders a superpriority administrative claim, and a

first priority lien on and security interest in all of the assets of the Debtors, subject to certain

permitted liens and claims specified in the Interim Order.

44.     The granting of superpriority administrative claim status is governed by

Section 364(c) of the Bankruptcy Code.  Specifically, Section 364(c) provides:

> if the trustee is unable to obtain unsecured credit allowable under section
> 503(b)(1) of this title as an administrative expenses, the court, after notice and a
> hearing, may authorize the obtaining of credit or the incurring of debt—
> (1) with priority over any and all administrative expenses of the kind specified in
> section 503(b) and 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a
> lien;
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

45.     As noted above, substantially all of the Debtors' assets are encumbered by

liens granted to the Prepetition Lenders and the Subordinated Lenders.  Furthermore, the Debtors

are otherwise unable to obtain unsecured financing. Accordingly, Section 364(c) of the

Bankruptcy Code is satisfied, and the Court is authorized to grant the DIP Lenders superpriority

administrative claim status as provided in the Interim Order.

46.    Because the DIP Facility also contemplates the granting of priming liens

to the DIP Lenders (subject to the Carve Out and other Specified Permitted Liens), the DIP

Facility also is subject to approval under the requirements of Section 364(d) Bankruptcy Code.

Section 364(d)(1) provides:

> The court after notice and a hearing, may authorize the obtaining of credit or the
> incurring of debt secured by a senior or equal lien on property of the estate that is
> subject to a lien only if—
>
> (A)    the trustee is unable to obtain such credit otherwise; and
>
> (B)    there is adequate protection of the interest of the holder of the lien
> on the property of the estate on which such senior or equal lien is proposed to be
> granted.

11 U.S.C. § 364(d)(1).

47.    The Debtors submit that this Court should grant the DIP Lenders senior

liens and security interests as provided in the Interim Order. First, as discussed above,

Section 364(d)(1)(A) of the Bankruptcy Code is satisfied because the Debtors are unable to

obtain credit sufficient to sustain their day-to-day business operations or to maintain the going

concern value of their assets other than by the granting to the DIP Lenders a first priority lien and

security interest in the Debtors' assets as provided in the Interim Order. Moreover, the Debtors

negotiated the DIP Financing Agreement at arm's length and have determined, in the exercise of

their business judgment and in consultation with their professional advisors, that such financing

is the best and only viable financing available under the circumstances. Bankruptcy Courts grant

a debtor considerable deference in acting in accordance with its business judgment. See, e.g.,

Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir.

1986); In re Ames Dep't Stores, Inc. 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

48.    Second, Section 364(d)(1)(B) of the Bankruptcy Code is satisfied because the Debtors propose to provide adequate protection to the Prepetition Lenders and the Subordinated Lenders in the manner set forth above.  As also discussed above, the Debtors are informed that the Prepetition Lenders support and consent to the proposed DIP Facility in its entirety.  Moreover, the Subordinated Lenders have already consented (or are deemed to consent) to the proposed financing and cash collateral arrangements pursuant to the terms of the Subordination Agreement.

49.    Thus, for all of the reasons set forth above, the Debtors submit that the circumstances of these cases require the Debtors to obtain financing pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code.  The Debtors further submit that the terms of the DIP Facility and the Interim Order are fair, reasonable and necessary under the circumstances, and should be approved in their entirety.

**B.    The Use of Cash Collateral and Proposed Adequate Protection Should be Approved**

50.    Pursuant to Section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use ... in accordance with the provisions of this section." 11 U.S.C. §363(c)(2).  In addition, Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used ... or proposed to be used ... by a [debtor in possession], the court, with or

without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interests. 11 U.S.C. §363(e).

51.    Here, the Debtors require use of cash collateral in connection with the financing provided under the DIP Facility. Absent such relief, the Debtors would be unable to generate availability under the DIP Facility in amounts necessary to sustain ordinary course business operations. Simply stated, without access to cash collateral, the Debtors will not be able to access financing under the DIP Facility, in which event their operations would be brought to a grinding halt, resulting in immediate and irreparable harm to the Debtors and their stakeholders.

52.    To adequately protect the interests of the Prepetition Lenders and the Subordinated Lenders for the Debtors' use of Cash Collateral, the Debtors propose to provide such parties with the protections described above and in the Interim Order. Additionally, as discussed above, (i) the Prepetition Lenders consent to the use of Cash Collateral on the terms set forth herein and in the Interim Order, and (ii) the Subordinated Lenders have consented (or are deemed to consent) to such relief by virtue of the terms of the Subordination Agreement. Accordingly, the Debtors' request to use Cash Collateral as provided herein and in the Interim Order should be approved.

C.    **Modification of the Automatic Stay**

53.    The Interim Order provides that the automatic stay shall be modified to permit the Debtors to: (i) grant the security interests, liens and superpriority administrative expense claims described above with respect to the DIP Lenders and the Prepetition Lenders, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) implement the Interim Order (and, if granted, the Final Order); and (iii) permit the DIP Lenders and the Prepetition Lenders, among others, to exercise, upon the occurrence of and during the continuance of an Event of Default (as defined in

the Interim Order), all rights and remedies under the DIP Documents and the Prepetition Credit Documents, subject to providing 5 days' prior written notice of the occurrence of such event of default in the manner specified in the Interim Order, provided, however, that the Debtors shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing, and seeking other relief in the event it is determined that an Event of Default has not occurred and/or is continuing. The Debtors submit that stay modifications of the kind provided in the Interim Order are ordinary and standard features of debtor-in-possession financing facilities, are reasonable and appropriate under the circumstances that exist here, and should be approved.

**D.      Payment (Roll-Up) of Prepetition Obligations Should be Approved**

54.      The Debtors submit that the post-petition financing proposal submitted by the DIP Lenders is the best available under the circumstances and that entry into the DIP Financing Agreement is in the best interests of the Debtors and their estates. Substantially all of the Debtors' assets are encumbered by the liens and security interests securing the Debtors' Prepetition Obligations. None of the potential lenders approached by the Debtors were willing to extend credit on a junior priority or unsecured basis. Thus, absent payment in full of the Prepetition Obligations, the Debtors would be required to attempt to prime the liens of the Prepetition Lenders. Even if the Debtors had been able to locate a debtor in possession lender willing to provide a priming facility, the Debtors would have risked further harm to their business if they had chosen to engage in that sort of expensive, time-consuming and uncertain litigation.

55.      Moreover, as set forth above, the Debtors engaged in good-faith negotiations with the DIP Lenders prior to determining to enter into the DIP Financing

Agreement. Given the Debtors' immediate liquidity needs, the DIP Lenders' ability to act quickly was a significant factor in the Debtors' determination.

56.     Finally, repayment of the debt owed to the Prepetition Lenders (but only upon entry of the Final Order) will not prejudice other creditors because the Interim Order provides that the approval of the DIP Facility is without prejudice to the right of any official committee appointed in these cases (or, if none, parties in interest) to contest or challenge the validity of the Prepetition Revolving Lenders' liens. Interim Order ¶31. For the foregoing reasons, the Debtors respectfully submit that the repayment of the Prepetition Obligations is appropriate in light of the circumstances of these cases.

57.     Courts have approved debtor in possession financing facilities that provided for the repayment of pre-petition indebtedness owed pursuant to secured pre-petition credit facilities. See, e.g., In re Goody's Family Clothing, Inc., Case No. 08-11133 (CSS) (Bankr. D. Del. June 11, 2008); In re Sharper Image Corporation, Case No. 08-10322 (KG) (Bankr. D. Del. February 20, 2008); In re Radnor Holdings Corp., Case No. 06-10894 (PJW) (Bankr. D. Del. September 22, 2006); In re Ultimate Electronics, Inc., Case No. 05-10104 (PJW) (Bankr. D. Del. Feb. 14, 2005).

## VII.   REQUEST FOR IMMEDIATE INTERIM APPROVAL OF RELIEF REQUESTED HEREIN

58.     Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), a minimum of fifteen (15) days notice is required before a final hearing on this Motion may commence. Upon request, however, the Court may conduct a preliminary expedited hearing on the Motion to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. Fed. R. Bankr. P. 4001(c)(2). In accordance with Bankruptcy Rules 4001(b) and (c), the Debtors respectfully request that the Court conduct an expedited preliminary hearing on the Motion and

authorize the Debtors to use Cash Collateral and borrow under the DIP Facility on an interim basis, pending entry of a final order. The Debtors submit that such relief is vital in order to maintain and finance the Debtors' ongoing operations, preserve the going concern value of the Debtors' assets pending the conclusion of the proposed sale process, and, therefore, to prevent immediate and irreparable harm to the Debtors' estates. The Debtors further request that the Court schedule a hearing to consider entry of a Final Order as soon as possible but not later than forty five (45) days from the Petition Date.

59.     As discussed above, it is essential to the continued operation of its business that the Debtors be authorized to obtain emergency financing under the DIP Facility on an interim basis pending the Final Hearing. Funds are urgently needed to meet the Debtors' immediate and considerable working capital and other liquidity needs, and to pursue their Chapter 11 cases in an orderly manner. In the absence of emergency access to interim financing, the Debtors' sale efforts and Chapter 11 cases would be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' creditors and estates.

60.     The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm, Bankruptcy Rule 6003 has been satisfied. Furthermore, to successfully implement the foregoing, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten day stay under Bankruptcy Rule 6004(h).

## VIII.  NOTICE WITH RESPECT TO EMERGENCY INTERIM FINANCING REQUEST AND FINAL HEARING

61.     The Debtors submit that the exigencies of this case and the Debtors' immediate need for financing do not permit broad notice of the Debtors' request for emergency interim financing pursuant to the Interim Order. Additionally, as of the date hereof, no statutory

creditors' committee has been appointed in these cases. Therefore, the Debtors have or will give notice of this Motion and the interim relief sought herein, by hand delivery, fax or telephonic notice to (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' list of the twenty (20) largest unsecured creditors; (v) counsel to the Prepetition Agent for itself and for the Prepetition Lenders; and (vi) the Agent for the Subordinated Lenders (collectively, the "Initial Notice Parties"). The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and the Debtors submit that no other or further notice is or should be required.

62.     The Debtors further request that the Court schedule the Final Hearing and authorize them to mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of objections, to the Initial Notice Parties and (i) any party that has filed prior to such date a request for notices with this Court; and (ii) counsel for any official committee(s), if any.

63.     In light of the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

64.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Interim Order authorizing, inter alia, the Debtors to obtain financing pursuant to the DIP Facility on an emergency interim basis through the conclusion of the Final Hearing on the terms set forth herein and in the DIP Financing Agreement, (ii) enter a Final Order authorizing the Debtors to obtain financing under the DIP Facility on a permanent basis on the terms set forth herein and in

the DIP Financing Agreement, (iii) grant all related relief requested in this Motion, and (iv) grant

the Debtors such other or further relief as may be just and proper.

Dated:  September 14, 2011

COZEN O'CONNOR

Mark E. Felger (No. 3919)
1201 N. Market St., Ste. 1400
Wilmington, DE  19801
Telephone:  (302) 295-2000
Facsimile:  (302) 295-2013

- and -

**PROSKAUER ROSE LLP**
Scott K. Rutsky, Esq.
Adam T. Berkowitz, Esq.
Richard J. Corbi, Esq.
Eleven Times Square
New York, NY  10036-8299
Telephone:  212-969-3000
Facsimile: 212-969-2900

Proposed Counsel for Debtors and Debtors-in-Possession