## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| SSI Group Holding Corp., *et al.*, [1] | ) | Case No. 11-12917 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DEBTORS' MOTION FOR AN ORDER: (I)(A) APPROVING BID PROCEDURES RELATING TO SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) SCHEDULING A HEARING TO CONSIDER THE SALE, (C) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION, AND (D) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; AND (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby move (the "Motion") this Court pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for orders authorizing the Debtors to solicit bids for the Debtors' Grandy's and Souper Salad (each as defined below) business segments, to conduct an auction in connection therewith and sell all or any portion of the Debtors' businesses, all on the terms and conditions more fully described below, and granting related relief in connection therewith including approval of bid protections and notice and overbid procedures.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: SSI Group Holding Corp. (0158), Souper Salad, Inc. (0941), SSI-Grandy's LLC (4554) and Souper Brands, Inc. (5468). The Debtors' corporate headquarters and the mailing address for each of the Debtors is 4004 Belt Line Rd., Suite 160, Addison, TX 75001.

## Preliminary Statement

Prior to the Petition Date, the Debtors and their advisors extensively explored multiple restructuring alternatives, including the sale of its operations, a new debt or equity capital infusion, and a balance sheet restructuring. After many months of hard-fought negotiations among the Debtors and their key stakeholders, as well as a third party sales and marketing process undertaken by the Debtors and their advisors, the Debtors determined that the best course of action for the benefit of their estates and stakeholders was to commence a sale process through chapter 11.

The Debtors' ultimate decision to commence these chapter 11 cases was driven by a liquidity shortfall (and attendant need to access capital through the Debtors' proposed Debtor in Possession financing facility) as well as a need to commence and consummate a sale or sales on an accelerated timeline to preserve the value of the Debtors' businesses.

During the discussion with stakeholders and third parties in connection with their evaluation of potential restructuring alternatives, the Debtors determined that the best and highest bid for any of their assets would come in the form of a stalking-horse bid for assets related to their Grandy's business. After attempts to market their assets to third parties failed to generate viable bids, the Debtors entered into negotiations with Captain D's, LLC ("Captain D's"). Captain D's is an affiliate of Sun Capital Partners, Inc. ("Sun"), affiliates of which also own approximately 45% of the equity interests in SSI Group Holdings Corp., are parties to a management agreement with the Debtors and are also lenders under the Debtors' pre-petition subordinated secured loan facility. Although Captain D's and Sun comprise "insiders" of the Debtors under the Bankruptcy Code, all negotiations with Captain D's were conducted on an arm's-length basis, and in good faith. Moreover, notwithstanding Sun's claims against the

Debtors under their pre-petition subordinated secured loan facility, the Debtors successfully negotiated with Captain D's to secure a cash bid for the Grandy's business.

The Debtors believe that the Grandy's stalking-horse bid represents the highest and best offer currently available for the business. The Debtors' pre-petition secured lenders and proposed postpetition lender support the stalking-horse bid.

Nonetheless, the Debtors and their advisors will continue their effort to market the Grandy's business—as well as assets related to the Debtors' Souper Salad segment—through the bidding procedures proposed by this Motion. To preserve the value of the Debtors' businesses and in accordance with the strict timelines required by the Debtors' pre-petition senior lenders and proposed post-petition lender, as well as the Grandy's stalking-horse purchaser, it is critical that the Debtors market and consummate the sale of their assets quickly. Prior to the Debtors' filing these chapter 11 cases, they experienced significant business disruptions due to their tight liquidity position. To minimize the continued effects of these disruptions, the Debtors propose to complete their sale approval process within approximately 45 days of the petition date and proceed to close on the successful bid or bids for their assets shortly thereafter. The Debtors believe that the proposed bidding procedures and sale process, together with their pre-petition marketing efforts, will successfully obtain the highest and best possible offer or offers for the Debtors' businesses.

### Proposed Solicitation and Auction Sale Process

Subject to this Court's approval, and as more fully described below, the Debtors propose to solicit bids as follows:

(i)     With respect to the assets related to solely to the Debtors' Grandy's business (the "Grandy's Assets"), the Debtors entered into a Stalking Horse Asset Purchase Agreement

by and among Captain D's, LLC, as purchaser (the "Grandy's Stalking Horse Purchaser"), and Souper Salad, Inc., Souper Brands, Inc., and SSI-Grandy's, LLC, as sellers thereto, dated as of September 14, 2011 (the "Grandy's Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit B. The Debtors propose soliciting bids for the Grandy's Assets based on the terms of the Grandy's Asset Purchase Agreement. If competing bids are received, the Debtors intend to conduct an auction to determine the highest and otherwise best bid for the Grandy's Assets.

(ii)     With respect to the assets related solely to the Debtors' Souper Salad business (the "Souper Salad Assets"), at this time the Debtors have not entered into a stalking horse agreement. Instead, the Debtors propose to solicit bids for the Souper Salad Assets based on the terms set forth in a form of Asset Purchase Agreement (the "Souper Salad Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit C. As part of that process, the Debtors propose that they be authorized, but not required, to choose a stalking horse and grant certain stalking horse protections to a single bidder prior to the start of the auction. Thereafter the Debtors would conduct an auction to determine the highest and otherwise best bid for the Souper Salad Assets.

(iii)     The Debtors are also requesting authority to solicit bids for the combined assets of the Souper Salad and Grandy's businesses (the "Combined Souper/Grandy's Assets") based on a form of Asset Purchase Agreement (the "Combined Asset Purchase Agreement," and together with the Grandy's Asset Purchase Agreement and the Super Salad Asset Purchase Agreement, the "Asset Purchase Agreements"), a copy of which is attached hereto as Exhibit D. If the Debtors receive a bid for the Combined

Souper/Grandy's Assets, they request authority to conduct an auction with respect thereto.

At the conclusion of the auction process and in accordance with the proposed bidding procedures attached to the Bidding Procedures Order (as defined below) as <u>Exhibit 1</u>, the Debtors will determine which bid, or combination of bids, constitutes the highest and best offer for the Debtors' Combined Souper/Grandy's Assets, or any portion(s) thereof. Upon the conclusion of the Auction process, the Debtors intend to return to this Court to request authority to consummate one or more transactions for the Debtors' assets with the party or parties submitting the highest and best bid(s) at a Sale Hearing (as defined below).

## Proposed Sale Process Time Line

The Grandy's Asset Purchase Agreement, as well as the Debtors' proposed Debtor in Possession financing facility, required that the Debtors complete the solicitation, auction and sale process within specified timeframes. To comply with those requirements, the Debtors propose the following time line for the Sales, subject in all respects to this Court's approval:

(i)     The Debtors request that the Court schedule a hearing to consider the proposed Bidding Procedures so that the Bidding Procedures Order (as defined below) may be entered within fifteen (15) days of the Petition Date;

(ii)     The Debtors propose establishing the last day for the submission of bids on or before twenty (20) days following the date of entry of the Bidding Procedures Order;

(iii)     The Debtors request that the Auction be scheduled for a date that is within twenty-five (25) days following the date of entry of the Bidding Procedures Order;

(iv)    The Debtors request that the Court schedule a hearing to consider the approval of the Sale(s) so that the Sale Order(s) may be entered within thirty (30) days following the date of entry of the Bidding Procedures Order, and;

(V)    The Debtors intend to close the transaction or transactions, as the case may be, as soon as practicable after the approval and entry of the Sale Order(s) but not later than three (3) days after the Sale Order becomes a Final Order.

## Summary of Specific Relief Requested

The Debtors seek entry of an order, substantially in the form annexed hereto as <u>Exhibit A</u> (the "<u>Bidding Procedures Order</u>"):

(a)    approving proposed bidding procedures (the "<u>Bidding Procedures</u>"), substantially in the form annexed to the Bidding Procedures Order as <u>Exhibit 1</u>, as well as proposed bid protections ("<u>Bid Protections</u>"), for the sale of all or substantially all of the Debtors' assets either through separate sales of the Debtors' Souper Salad and Grandy's businesses (the "<u>Souper Salad Sale</u>" and the "<u>Grandy's Sale</u>" respectively), or though one consolidated sale of both businesses (such a sale, the "<u>Combined Souper Salad/Grandy's Sale</u>") and together with the Souper Salad and/or Grandy's Sale, collectively, the "<u>Sales</u>");

(b)    approving the form and manner of notice of the Sales and the assumption and assignment of executory contracts and unexpired leases (the "<u>Contracts and Leases</u>") in connection therewith;

(c)    scheduling one or more auctions (each auction individually, and as the context dictates, collectively the "<u>Auction</u>") and a sale hearing (the "<u>Sale Hearing</u>") to consider approval of the proposed Sales;

(d)     approving the execution of the Grandy's Asset Purchase Agreement with the Grandy's Stalking Horse Purchaser for the sale of the Debtors' Grandy's business, approving the proposed break-up fee and expense reimbursement for the benefit of the Grandy's Stalking Horse Purchaser in connection therewith, and authorizing the Debtors to perform such obligations under the Grandy's Asset Purchase Agreement which arise prior to the Sale Hearing; and

(e)     authorizing, but not requiring, the Debtors in their discretion to enter into a stalking horse agreement (the "Souper Salad Stalking Horse Agreement") with a single bidder for the sale of the Souper Salad business based on the Souper Salad Asset Purchase Agreement, approving a break-up fee in connection therewith, and authorizing the Debtors to perform such obligations under the Souper Salad Stalking Horse Agreement which arise prior to the Sale Hearing.

The Debtors also request entry of one or more orders (the "Sale Order" or the "Sale Orders" as applicable) after the Sale Hearing:

(a)     authorizing and approving the Sale or Sales; and

(b)     authorizing the assumption and assignment of Contracts and Leases to the proposed purchaser or purchasers in connection with such Sale.[2]

In support of this Motion, the Debtors respectfully represent as follows:

### JURISDICTION

1.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

---

[2]     The Debtors anticipate filing a separate motion to authorize and approve of rejection procedures for Contracts and Leases that are not assumed and assigned to the purchaser or purchasers in connection with the Sales.

2.       The statutory bases for the relief requested herein sections 105(a), 363, and 365 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006, and 9014.

**BACKGROUND**

A.       **General**

3.       On the date hereof (the "Petition Date"), the Debtors each filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their affairs as debtors in possession.  An official committee of unsecured creditors has yet to be appointed by the Office of the United States Trustee.

B.       **The Debtors' Corporate Organizational Structure and Business Operations**

         (i)       **Corporate Structure**

4.       SSI Group Holding Corp., a Delaware Corporation, ("SSI Holding") is the parent company of Souper Salad, Inc., a Texas Corporation, ("SSI"), which in turn owns 100% of each of SSI-Grandy's LLC, a Delaware Limited Liability Company, ("SSI-Grandy's") and Souper Brands, Inc., a Texas Corporation ("SBI"), the other Debtors in these cases.

5.       SSI Holding is owned by SBN Soup LLC, a Delaware limited liability company, SBG IV LLC, a Delaware limited liability company, and SCSF Salad LLC, a Delaware limited liability company.  Each of SBN Soup LLC and SBG IV LLC are owned by affiliates of SummitBridge National Investments, Inc. ("Summit"), and SCSF Salad LLC is owned by an affiliate of Sun.

        (ii)       **The Debtors' Business Operations**

6.       The Debtors own, operate and franchise two distinct restaurant concepts in 14 states across the United States under the names Souper Salad and Grandy's.  On the Petition

Date, the Debtors employed a total of approximately 1,300 persons across both brands. Of these employees, approximately 1,100 are hourly employees with the remaining employees holding salaried, supervisory and administrative positions.

7.    As of August 28, 2011, the Debtors reported total assets having a consolidated book value of $23.9 million and aggregate liabilities of $47.5 million, of which trade debt constituted approximately $4.3 million. In addition, the Debtors had net revenues from continuous operations of approximately $36.4 million for the eight months ending August 28, 2011.

### (iii)    **Souper Salad**

8.    Founded in 1978, Souper Salad offers a health oriented buffet style dining experience to its customers in Texas, Colorado, Arizona, New Mexico, Oklahoma, Nevada, North Carolina, Kansas Utah, South Carolina, Georgia, Idaho, and Tennessee. One of the largest soup and salad restaurant brands in the country, Souper Salad is known for its fresh salads, handcrafted soups, variety of bakery items, and hot entrée options, all of which are 100% trans-fat free, with no fried food items. Historically, Souper Salad operated on an almost exclusively company owned model but has been increasing its franchised operations since 2007. The Debtors currently operate 48 company owned Souper Salad restaurants and have 8 Souper Salad Franchised locations.

### (iv)    **Grandy's**

9.    Grandy's, founded in 1973, is a quick-service "comfort food" restaurant chain with 65 locations across Texas, New Mexico, Oklahoma, Georgia, Louisiana, Indiana, and Florida. Grandy's provides home-style quality food in an environment that combines the efficiency of fast food with the ambience of a full service restaurant. The Grandy's business

model continues to be franchise based, with 63 out of a total of 65 restaurants owned and operated by franchisees.

## C.    The Debtors' Prepetition Capital Structure

10.    In 2008, the Debtors entered into that certain Credit Agreement, dated as of June 19, 2008, by and among SSI Group Holding Corp., as guarantor, SSI, SSI-Grandy's, and SBI each as a borrower and collectively as borrowers, the lenders party thereto, and Wells Fargo Capital Finance, LLC ("WFCF," and together with the lenders party thereto, the "Prepetition Lenders") as Arranger and Administrative Agent (as amended from time to time, the "Prepetition Credit Agreement"). The Debtors' obligations under the Prepetition Credit Agreement are secured by liens on and security interests in substantially all of the Debtors' assets. As of the Petition Date, the outstanding obligations under the Prepetition Credit Agreement were approximately $3,676,774.86 plus approximately $290,000 in issued and outstanding letters of credit.

11.    Prior to entry into the Prepetition Credit Agreement, and in connection with SSI's exit from a prior bankruptcy proceeding in 2005, certain of the Debtors entered into two separate term loan credit agreements relating to an aggregate of approximately $21 million of secured indebtedness. Through a series of subsequent amendments, additional term loans were made by the lenders such that, as of the Petition Date, the aggregate principal amount outstanding under the credit agreements was approximately $37,179,943.91.(the "Subordinated Term Loan Agreements"). The lenders party to the Subordinated Term Loan Agreements (the "Subordinated Lenders") assert that the Debtors' obligations under the Subordinated Term Loan Agreements are secured by liens on and security interests in substantially all of the Debtors' assets. The Subordinated Lenders are affiliates of Summit and Sun, the ultimate equity holders in SSI Holding.

12.     The obligations under the Subordinated Term Loan Agreements and the liens granted in connection therewith are subordinated to the obligations under the Prepetition Credit Agreement pursuant to that certain Subordination Agreement, dated as of June 19, 2008 (as amended from time to time, the "Subordination Agreement") which governs the relationship and relative rights by and among the respective agents and the lenders party to both the Prepetition Credit Agreement and the Subordinated Term Loan Agreements.

D.      **Events Leading to These Chapter 11 Cases**

13.     Although the Debtors believe that their businesses are operationally sound, over the course of the last several years a convergence of factors led to these chapter 11 filings. The Debtors' liquidity became increasingly constrained due to, among other factors, the steep rise in food costs, severe and atypical weather in key areas such as Texas in the 2010/11 winter resulting in decreased foot traffic and profitability, the financial drag from underperforming units, above market rent (relative to store performance) for several of the Debtors' locations, and the global economic downturn which has been impacting the restaurant industry since 2008.

14.     To address these difficulties, the Debtors implemented a number of initiatives designed to, among other things, improve customer traffic and reduce overhead in order to stabilize their ongoing businesses. For example, in 2010 the Debtors consolidated and reorganized their corporate operations while at the same time rebuilt their franchise sales team and added key marketing positions. The Debtors also outsourced much of their accounting and payroll functions, consolidated the corporate office in a single location, and expanded the roles of key personnel. These efforts resulted in a net expense reduction of approximately $900,000.

15.     At the same time, the Debtors undertook various traffic building initiatives. For the Souper Salad brand, these efforts included additional promotion for the Souper Fan Club (an

online marketing tool), switching from a set price to a coupon marketing strategy, adding frequency cards to build brand loyalty and launching a new program to improve execution at the restaurant level. For the Grandy's brand, the Debtors introduced new products, attempted new forms of media testing without coupons, initiated a new e-mail marketing club modeled on the Souper Fan Club, instituted a new gift card program and also launched a program to improve execution at the restaurant level.

16.     Despite these efforts, external dynamics affecting the Debtors' businesses continued to strain the Debtors' resources. Exacerbating it liquidity problems, the Debtors have been operating without a working capital facility for over a year. As a result, the Debtors became unable to satisfy obligations under their approximately $40 million of senior and subordinated secured loan facilities.

17.     Given the Debtors' financial difficulties, efforts to locate potential replacement financing or other sources of liquidity were unsuccessful. Faced with increasing liquidity restraints, and after due consideration, the Debtors determined to market and attempt to sell the Grandy's brand, with the intention of using the proceeds to retire the Prepetition Credit Facility and further facilitate the ongoing corporate restructuring of the Souper Salad brand. Accordingly, in the fourth quarter of 2010, the Debtors engaged the investment banking services of Morgan Joseph TriArtisan LLC ("MJ") to explore a sale of all or part of the company.

18.     At the time, Grandy's had positive cash flow before corporate overhead costs. Accordingly, MJ focused its marketing efforts on a select group of strategic and financial buyers that could incorporate the brand into an existing management structure. In December 2010, MJ contacted 54 potential purchasers which resulted in the execution of 25 confidentiality

agreements. By late January 2011, MJ had received several indications of interest but for a number of reasons a sale transaction did not materialize.

19.     Subsequently, in March 2011, MJ began to explore interest in a sale of the entire business (i.e., both the Souper Salad and Grandy's brands). While that effort yielded some preliminary interest, it was ultimately determined that, given the Debtors' financial situation and their over levered capital structure, any such transaction would be impracticable to pursue outside of bankruptcy.

20.     With no prospect of an out of court transaction, the Debtors approached WFCF and other third parties to explore potential restructuring and recapitalization alternatives. These discussions ultimately bore no fruit and in mid-June WFCF called an event of default under the Prepetition Agreement. Most recently, the Debtors have been the subject of a number of threatened and filed lawsuits relating to closed restaurant locations. Given these circumstances, and faced with increasingly diminished cash flow, the Debtors, in consultation with their legal and financial advisors, determined that the best option to maximize the value of their assets for all stakeholders was to commence these Chapter 11 cases.

21.     To sustain operations during bankruptcy, the Debtors require access to a debtor-in-possession loan facility. Indeed, the Debtors' DIP Budget demonstrates that absent an adequate financing facility, the Debtors will not have sufficient cash to maintain operations or to fund administrative expenses beginning in the initial weeks following the Petition Date.

22.     After canvassing the marketplace, the Prepetition Lenders emerged as the only viable source for such financing. The proposed financing offered by the Prepetition Lenders requires, as a condition to funding, the Debtors to have entered into a stalking horse asset purchase agreement on terms and conditions acceptable to the lenders, including commencing

and completing the sale process within a specified timeframe. In that regard, after arms length negotiations, the Debtors entered into Grandy's Asset Purchase Agreement for the purchase and sale, as a going concern, of the Grandy's business. While the Debtors have engaged in negotiations with potential purchasers regarding a going concern sale of the Souper Salad business, the Debtors have not entered into an asset purchase agreement at this time. The Debtors, through their investment banker, MJ, continue to negotiate with interested parties and will pursue all efforts to locate potential buyers for Souper Salad or for the entire business (both Souper Salad and Grandy's) and hope to have a lively and competitive Auction process.

## THE PROPOSED ASSET SALES

### A.     The Grandy's Sale

23.     As noted above, after a thorough sales and marketing process, the Debtors, together with their advisors, undertook an extensive negotiation process which resulted in the Grandy's Asset Purchase Agreement. The Debtors propose to sell the Grandy's Assets to the Grandy's Stalking Horse Purchaser, or such other bidder with the highest or otherwise best bid at the conclusion of the Auction, free and clear of liens, claims, encumbrances and other interests, with such liens, claims, encumbrances and other interests to attach to the proceeds of such Sale.

24.     The following paragraphs in this section summarize salient provisions of the Grandy's Asset Purchase Agreement, but are qualified in their entirety by reference to the actual Grandy's Asset Purchase Agreement, which will control in the event of any inconsistency.[3]

(a)     Consideration. Pursuant to Section 3.1 of the Grandy's Asset Purchase Agreement, the aggregate purchase price for the Acquired Assets (the "Purchase Price") is the sum of (a) cash in an amount of Six Million Dollars ($6,000,000) (the "Cash Amount")

---

[3]     Capitalized terms used and not defined in this section shall have the meanings ascribed to them in the Grandy's Asset Purchase Agreement attached hereto as Exhibit B, or the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1, as applicable.

minus (b) the Cure Amounts to be made by Purchaser (it being agreed that amounts owed with respect to post-petition payables that by their terms are not yet due and payable at the Closing shall not be considered Cure Amounts for this purpose) plus (c) Purchaser's assumption of the Assumed Obligations minus (d) the amount of Proration Items attributable to Sellers pursuant to Section 10.9(e) that Sellers fail to pay in accordance with Section 10.9(e) minus (e) the amount of Transfer Taxes in excess of $12,500.

(b)  Grandy's Acquired Assets.  Section 2.1 of the Grandy's Asset Purchase Agreement lists the Grandy's Acquired Assets, and provides that at the Closing Date, the Sellers shall sell, contribute, convey, assign, transfer and deliver to Purchaser, free and clear of all Liens, all the assets of the Seller related to the Grandy's business including, without limitation, the following (as more specifically set forth in the Agreement):  all Accounts Receivable and all claims, including deposits, advances, prepaid and other current assets, rights under warranties and guaranties, rights in respect of promotional allowances, vendor rebates and to other refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether known or unknown or contingent or non-contingent); the right to receive and retain mail, Accounts Receivable payments and other communications of Sellers; and the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing; any rights, claims or causes of action of Sellers against third parties arising out of events occurring prior to the Closing Date (including, for the avoidance of doubt, those arising out of events occurring prior to the Petition Date); all Avoidance Actions; all bank accounts; all inventory; all of Sellers' rights existing under the Facility Leases; the equipment leases; all tangible personal property used or held for use in the Business; all Intellectual Property owned, licensed, used or held for use by Sellers; all rights of Sellers under the Contracts of each Seller; all Books and Records and all advertising, marketing and promotional materials and all other printed or written materials relating to the Business; all Permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies and the rights to all data and records of Sellers held by such permitting, licensing and certifying agencies, to the extent transferrable, relating to the Business; all goodwill of the Business as a going concern and all other intangible property of the Business; all such other properties, assets and rights (contractual or otherwise) of Sellers used or held for use in the Business as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed which are not

15

otherwise expressly set forth above as Acquired Assets and are not Excluded Assets.

(c)     Grandy's Excluded Assets.  Section 2.2 of the Grandy's Asset Purchase Agreement lists the Grandy's Excluded Assets, and provides that the following assets of Sellers shall be retained by Sellers and are not being sold or assigned to Purchaser (as more specifically set forth in the Grandy's Asset Purchase Agreement): all Facility Leases of Sellers other than the Assumed Facility Leases; all equipment leases of Sellers other than the Assumed Equipment Leases; all Contracts of Sellers other than the Assumed Contracts, including, with respect to any Contracts that are to be bifurcated, (1) the bifurcated portions of any such Contracts that are not related to the Grandy's Business and (2) any Contracts that are not so bifurcated;  all cash (including checking account balances, certificates of deposit and other time deposits and petty cash) net of overdrafts and marketable and other securities; all assets, rights, pre-payments, deposits and refunds of any Employee Benefit Plan of each Seller; originals of each Seller's minute books, stock books and corporate seals; all Avoidance Actions other than those Avoidance Actions that are Acquired Assets;  the equity securities or other ownership interest of each of Sellers; all Tax refunds, rebates, credits and similar items attributable to any taxable period that ends on or before the Closing Date and the portion through end of the Closing Date of any taxable period that includes but does not end on the Closing Date or any Tax Return of Sellers; all bank accounts other than those set specifically identified; all Company Systems (other than the data and Books and Records related to the Business stored thereon), all assets of Sellers not used or held for use in, or related to, the Business, including the assets used exclusively in the Souper Salad business and all assets of Sellers located at Sellers' headquarters at 4004 Belt Line Road, Suite 160, Addison, Texas 75201; all rights, claims or causes of action with respect to or arising in connection with any Excluded Assets; and all other assets listed on the Schedules.

(d)     Grandy's Assumed Liabilities.  Section 2.3 of the Grandy's Asset Purchase Agreement provides that Purchaser shall assume from Sellers and thereafter be responsible for the payment, performance or discharge of specified liabilities and obligations of Sellers (as more specifically set forth in the Grandy's Asset Purchase Agreement): Cure Amounts, both pre-petition and post-petition; all obligations under the Assumed Executory Contracts first arising after the Closing Date (but specifically excluding certain specified liabilities); all current liabilities relating to the Business which are both (A) of a type consistent with the current liabilities accrued by

Seller in accordance with GAAP on the Sellers' consolidated historical financial statements and (B) not of a type that would constitute Excluded Liabilities, but, except with respect to clauses certain employee and customer program liabilities, only to the extent incurred by Sellers after the Petition Date and prior to the Closing; all ordinary course payables; all Liabilities pursuant to the WARN Act; with respect to the Rehired Employees, the obligations with respect to any unpaid wages and salaries, bonuses, unused vacation or sick leave earned and accrued (to the extent not paid) as of the Closing Date, but not including any wages, bonus, retention or severance obligations arising from any violation of Law by a Seller prior to the Closing Date; and all Liabilities and obligations relating to the Acquired Assets that first arise after the Closing Date as a result of, or in connection with, Purchaser's ownership or use of the Acquired Assets after the Closing.

(e)     Grandy's Excluded Liabilities. Pursuant to section 2.4 of the Grandy's Asset Purchase Agreement, Purchaser shall not be the successor to any or all of Sellers, and each Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser will not assume, nor in any way be liable or responsible for, any claim or Liability of any Seller (including Liabilities relating to the pre-petition or post-petition operation of the Business, the Excluded Assets or to the Acquired Assets (and the use thereof)), whether relating to or arising out of the Business, the Excluded Assets, the Acquired Assets or otherwise, including any Indebtedness, Employee Benefit Plan, Collective Bargaining Agreement or other Liability of any Seller or any predecessor or Affiliate of any Seller whatsoever or any ERISA Affiliate other than the Assumed Obligations

(f)     Sale Free and Clear. The Grandy's Assets will be transferred by the Debtors free and clear of Interests, including but not limited to, all mortgages, liens, security interests, charges, easements, leases and subleases (subject to certain exceptions), covenants, rights of way, options, claims restrictions or encumbrances or any kind, other than those expressly assumed by the Grandy's Asset Purchase Agreement, and free and clear of all Excluded Liabilities.

(g)     Deposit. Pursuant to Section 3.3 of the Grandy's Asset Purchase Agreement, in order to secure the performance by the Grandy's Stalking Horse Purchaser of its obligations under the Grandy's Stalking Horse Purchase Agreement, the Grandy's Stalking Horse Purchaser has delivered to an Escrow Agent a cash earnest money deposit in the amount of six hundred thousand dollars ($600,000) (the "Deposit"). In the event Sellers properly terminate the Agreement pursuant to a Seller Termination for Purchaser Breach,

then Sellers shall receive the Deposit as liquidated damages and as Sellers' sole and exclusive remedy for the breach by Purchaser of the Agreement.

(h) <u>Breakup Fee and Expense Reimbursement</u>. Pursuant to Section 9.2 of the Grandy's Asset Purchase Agreement, the Grandy's Stalking Horse Purchaser shall be entitled, upon the terms and conditions set forth therein, to a breakup fee in the amount of $100,000, plus up to $200,000 of documented actual, reasonable out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by the Grandy's Stalking Horse Purchaser and/or its Affiliates in connection with the legal, environmental, accounting and business due diligence and the preparation and negotiation of the Grandy's Asset Purchase Agreement. The Breakup Fee and Expense Reimbursement will be paid upon the first to occur of (i) the date any Seller consummates an Alternate Transaction and (ii) the date any Seller consummates a plan under the Bankruptcy Code, and only if the first to occur of (i) and (ii) above shall have occurred on or prior to the date which is the one (1) year anniversary of the date of termination of the Grandy's Asset Purchase Agreement, <u>provided</u>, <u>however</u>, that neither the Breakup Fee nor the Expense Reimbursement shall be payable to Purchaser if the Agreement has been terminated by a Seller Termination for Purchaser Breach.

(i) <u>Closing and Other Deadlines</u>. Closing is conditioned upon satisfaction of conditions precedent set forth in the Grandy's Asset Purchase Agreement including: obtaining entry of a Bidding Procedures Order no later than the date that is fifteen (15) days following the Petition Date, and obtaining approval and entry of the Sale Order and Closing no later than fifty (50) days following the date of entry of the Bidding Procedures Order.

25. The Sale of the Grandy's Assets also includes the Debtors' rights, claims and causes of action, including all causes of action arising under Chapter 5 of the Bankruptcy Code, relating to the Grandy's Business as well as those causes of action that are (i) against or otherwise involving any counterparty to any Assigned Contract, any post-Closing employees, officers or directors of the Business, and/or any of Sellers' lenders, landlords or vendors obligations to whom are assumed by the Grandy's Stalking Horse Purchaser and/or (ii) against or otherwise involving the Grandy's Stalking Horse Purchaser or any of its related persons

**B.**     **The Souper Salad Sale**

26.     As noted above, the Debtors have not entered into an asset purchase agreement

for a going concern sale of the Souper Salad business at this time but, through their investment

banker, they continue to negotiate with interested parties. Accordingly, in order to best facilitate

a lively and competitive Auction, the Debtors intend to solicit bids for the Souper Salad Assets

based on the form of Souper Salad Asset Purchase Agreement which, as noted above, is annexed

hereto as Exhibit C. The salient terms of the proposed Souper Salad Asset Purchase Agreement

are as follows[4]:

     (a)    Consideration. The total consideration to be paid for the Souper
Salad Assets shall be no less than the sum of the minimum cash
purchase price in an amount to be specified by the Debtors on or
before the date of the Bidding Procedures Hearing, plus the
assumption of certain liabilities (as set forth below), plus the
payment of all cure amounts under the Real Property Leases and
the Other Leases and Contracts assumed by Buyer at Closing.

     (b)    Souper Salad Acquired Assets. Section 1 of the Souper Salad
Purchase Agreement lists the Souper Salad Assets, and provides
that at the Closing Date, except with respect to Excluded Assets,
the Sellers shall sell, assign, transfer, convey and deliver to Buyer,
and Buyer shall purchase from Sellers all of Sellers' right, title and
interest as of the Closing Date in and to all of its assets as they
relate to the Souper Salad business, wherever located, including,
without limitation, Sellers' right, title and interest (i) as lessee
under those real property leases, equipment, personal property and
intangible property leases, rental agreements, licenses, contracts,
agreements and similar arrangements, (ii) as franchisor under those
certain franchise agreements, and (iii) as a party to certain other
contracts, leases, orders, purchase orders, licenses, contracts,
agreements and similar arrangements (iv) Sellers' fee simple
ownership interest, if any, in that certain real property and all
improvements located thereon and on real property occupied by
Sellers under the Real Property Leases, (v) certain items of
equipment and tangible personal property owned by Sellers, (vi) all

---

[4] Capitalized terms used and not defined in this section shall have the meanings ascribed to them in the Souper Salad
Asset Purchase Agreement attached hereto as Exhibit C, or the Bidding Procedures attached to the Bidding
Procedures Order as Exhibit 1, as applicable.

intangible personal property owned or held by Sellers and used exclusively in connection with the Business, (vii) all licenses and permits used exclusively in the Business, only to the extent transferable, (viii) all accounts receivable arising out of the operation of the Business and causes of action relating or pertaining to the foregoing, (ix) all prepaid assets and deposits relating to the Business, and (x) all supplies, goods, materials, work in process, inventory and stock in trade owned by Sellers exclusively for use or sale in the ordinary course of the Business (all as may otherwise be limited by or more fully described in the Souper Salad Asset Purchase Agreement and the schedules annexed thereto);

(c)     Souper Salad Excluded Assets. Pursuant to Section 1.2 of the Souper Salad Asset Purchase Agreement, included among the assets not being transferred are (i) cash and cash equivalents; (ii) Inventory transferred or used by Sellers in the ordinary course of the Business prior to the Closing Date; (iv) any lease, rental agreement, contract, agreement, license or similar arrangement terminated or expired prior to the Closing Date in accordance with its terms or in the ordinary course of the Business; (v) any right, property or asset specifically scheduled as excluded; (vi) all preference or avoidance claims and actions of the Sellers, including, without limitation, any such claims and actions arising under Chapter 5 of the United States Bankruptcy Code; (vii) the Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to the Sellers pursuant to the terms and provisions of the agreement; (viii) insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Contract which is not assigned to Buyer at the Closing, or (B) any item of tangible or intangible property not acquired by Buyer at the Closing; (ix) Sellers' corporate books and records relating to its organization and existence (x) any assets related to the Grandy's business.

(d)     Souper Salad Assumed Liabilities. Pursuant to section 2.2 of the Souper Salad Asset Purchase Agreement, it is contemplated that the buyer will assume, pay, perform and discharge and indemnify Sellers in respect of: (i) all liabilities accruing under the Real Property Leases and under the Other Leases and Contracts on and after the Closing Date and or otherwise required to be performed with respect to the property on or after the Closing Date; (ii) all post-petition accounts payable and accrued expenses of Sellers (including accrued salaries, bonuses and other compensation and benefits of employees of Sellers) in the ordinary course and conduct of the Business (excluding any expenses incurred with respect to the administration of the Case) which would qualify as

administrative priority expenses under Section 503(b) of the Bankruptcy Code; (iii) any liabilities for gift cards, coupons or similar promotions, issued by the Sellers; and (iv) any required COBRA continuation coverage to "M&A Qualified Beneficiaries" (as defined in Treasury Regulation Section 54.4980B-9, Q/A-4) resulting from the sale of the Business regardless of whether Buyer is (or becomes) a "successor employer" (as defined in Treasury Regulation Section 54.4980B-9 (Q/A-8(c)).

(e)  Deposit. Section 2.12 of the Souper Salad Asset Purchase Agreement contemplates requiring a cash earnest money deposit in the amount 10% (the "Deposit") of the cash consideration contained in a bid.

(f)  Bid Protections. While the Souper Salad Asset Purchase Agreement does not contain bidder protections, the Debtors are requesting authority to grant a breakup fee to a single qualified bidder as set forth below.

(g)  "AS IS/WHERE IS" Transaction. The transaction contemplated by the Souper Salad Asset Purchase Agreement shall convey the Souper Salad Assets free and clear of all liens, claims, interests and encumbrances, and in their then present condition, as is, with all faults, and without warranty whatsoever, express or implied.

(h)  Closing and Other Deadlines. Any Sale of the Souper Salad business is conditioned upon a simultaneous or prior closing of the Sale on the Grandy's business and entry into a transition services agreement with the successful bidder for the Grandy's Assets.

27.  To facilitate a competitive Auction and in order to entice potential bidders to establish the highest possible floor price and terms at the Auction, the Debtors request that they be authorized (but not required) to offer any single bidder Bid Protections, as more fully described below.

C.  **The Combined Souper Salad and Grandy's Sales**

28.  Similar to the procedures proposed for sale solely of the Souper Salad Assets, and considering that the Debtors have not entered into an asset purchase agreement for a going concern sale of the combined Souper Salad and Grandy's business, to best facilitate a lively and competitive Auction, the Debtors intend to solicit bids for the Combined Souper/Grandy's Assets

based on the form of Combined Asset Purchase Agreement which, as noted above, is annexed hereto as Exhibit D. The salient terms of the proposed Combined Souper/Grandy's Asset Purchase Agreement are as follows[5]:

    (a)   Consideration. The total consideration to be paid for the Combined Souper/Grandy's Assets shall be no less than the sum of (i) the Grandy's Minimum Cash Amount (including, among other things, the full dollar value of the Breakup Fee and the Expense Reimbursement payable to the Grandy's Stalking Horse Purchaser, as detailed above), (ii) the Souper Salad Minimum Cash Amount, (iii) the Souper Salad Breakup Fee, if any, plus (iv) $100,000.

    (b)   Combined Souper/Grandy's Acquired Assets. Section 1 of the Combined Souper/Grandy's Asset Purchase Agreement lists the Combined Souper/Grandy's Assets, and provides that at the Closing Date, except with respect to Excluded Assets, the Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers all of Sellers' right, title and interest as of the Closing Date in and to all of its assets as they relate to the Combined Souper/Grandy's business, wherever located, including, without limitation, Sellers' right, title and interest (i) as lessee under those real property leases, equipment, personal property and intangible property leases, rental agreements, licenses, contracts, agreements and similar arrangements, (ii) as franchisor under those certain franchise agreements, and (iii) as a party to certain other contracts, leases, orders, purchase orders, licenses, contracts, agreements and similar arrangements (iv) Sellers' fee simple ownership interest, if any, in that certain real property and all improvements located thereon and on real property occupied by Sellers under the Real Property Leases, (v) certain items of equipment and tangible personal property owned by Sellers, (vi) all intangible personal property owned or held by Sellers and used exclusively in connection with the Business, (vii) all licenses and permits used exclusively in the Business, only to the extent transferable, (viii) all accounts receivable arising out of the operation of the Business and causes of action relating or pertaining to the foregoing, (ix) all prepaid assets and deposits relating to the Business, and (x) all supplies, goods, materials, work in process, inventory and stock in trade owned by Sellers exclusively for use or sale in the ordinary course of the Business

---

[5] Capitalized terms used and not defined in this section shall have the meanings ascribed to them in the Combined Souper/Grandy's Asset Purchase Agreement attached hereto as Exhibit D, or the Bidding Procedures attached to the Bidding Procedures Order as Exhibit 1, as applicable.

(all as may otherwise be limited by or more fully described in the Souper Salad Asset Purchase Agreement and the schedules annexed thereto);

(c)  Combined Souper/Grandy's Excluded Assets. Pursuant to Section 1.2 of the Combined Souper/Grandy's Asset Purchase Agreement, included among the assets not being transferred are (i) cash and cash equivalents; (ii) Inventory transferred or used by Sellers in the ordinary course of the Business prior to the Closing Date; (iv) any lease, rental agreement, contract, agreement, license or similar arrangement terminated or expired prior to the Closing Date in accordance with its terms or in the ordinary course of the Business; (v) any right, property or asset specifically scheduled as excluded; (vi) all preference or avoidance claims and actions of the Sellers, including, without limitation, any such claims and actions arising under Chapter 5 of the United States Bankruptcy Code; (vii) the Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to the Sellers pursuant to the terms and provisions of the agreement; (viii) insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Contract which is not assigned to Buyer at the Closing, or (B) any item of tangible or intangible property not acquired by Buyer at the Closing; (ix) Sellers' corporate books and records relating to its organization and existence (x) any assets related to the Grandy's business.

(d)  Combined Souper/Grandy's Assumed Liabilities.  Pursuant to section 2.2 of the Combined Souper/Grandy's Asset Purchase Agreement, it is contemplated that the buyer will assume, pay, perform and discharge and indemnify Sellers in respect of: (i) all liabilities accruing under the Real Property Leases and under the Other Leases and Contracts on and after the Closing Date and or otherwise required to be performed with respect to the property on or after the Closing Date; (ii) all post-petition accounts payable and accrued expenses of Sellers (including accrued salaries, bonuses and other compensation and benefits of employees of Sellers) in the ordinary course and conduct of the Business (excluding any expenses incurred with respect to the administration of the Case) which would qualify as administrative priority expenses under Section 503(b) of the Bankruptcy Code; (iii) any liabilities for gift cards, coupons or similar promotions, issued by the Sellers; and (iv) any required COBRA continuation coverage to "M&A Qualified Beneficiaries" (as defined in Treasury Regulation Section 54.4980B-9, Q/A-4) resulting from the sale of the Business regardless of whether Buyer is (or becomes) a "successor employer" (as defined in Treasury Regulation Section 54.4980B-9 (Q/A-8(c)).

(e) <u>Deposit</u>. Section 2.12 of the Combined Souper/Grandy's Asset Purchase Agreement contemplates requiring a cash earnest money deposit in the amount 10% (the "<u>Deposit</u>") of the cash consideration contained in a bid.

(f) <u>"AS IS/WHERE IS" Transaction.</u> The transaction contemplated by the Combined Souper/Grandy's Asset Purchase Agreement shall convey the Combined Souper/Grandy's Assets free and clear of all liens, claims, interests and encumbrances, and in their then present condition, as is, with all faults, and without warranty whatsoever, express or implied.

## BIDDING PROCEDURES AND BID PROTECTIONS

29.    To ensure that the Debtors are in a position to maximize the value of these estates for all constituencies, the Debtors believe that it is imperative that they promptly move forward with their postpetition marketing and Auction efforts, to maximize the prospects that higher and better offers are generated for the Grandy's Assets, sustainable bids are received for the Souper Salad Assets, or that bids are received for both business as a single going concern. The proposed Bidding Procedures (as summarized below) were developed consistent with the Debtors' need to expedite the sale process, and with the objective of promoting further active bidding that will result in the highest or best offer for the Debtors' assets while affording appropriate protection to the Grandy's Stalking Horse Purchaser and, to the extent applicable, the Souper Salad Stalking Horse Purchaser. Moreover, the Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, fair, and open fashion that promotes interest in the Debtors' businesses by financially-capable, motivated bidders who are likely to close a transaction.

### A.    <u>Bidding Procedures</u>

30.    The Debtors respectfully submit that the Bidding Procedures proposed herein and set forth more fully on <u>Exhibit 1</u> to the Bidding Procedures Order, contain provisions which are

typical for asset sales of this size and nature and are fair and reasonable under the circumstances.

The following is a summary of the salient terms of the proposed Bidding Procedures :[6]

(a) Due Diligence Participation Requirements.

(i) Confidentiality Agreement. An executed confidentiality agreement in form and substance reasonably acceptable to the Debtors; and

(ii) Proof of Financial Ability to Perform. The most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of the Proposed Sale, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's ability to close the Transaction, the sufficiency of which shall be determined by the Debtors in their reasonable discretion; and

(iii) Due Diligence from Bidders. Must comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction.

(b) Qualified Bid.

(i) Good Faith Deposit:

(x) Solely for Grandy's Assets. Each Bid solely for the Grandy's Assets must be accompanied by a deposit in the amount of $600,000 to an interest bearing escrow account to be identified and established by the Debtors (the "Grandy's Good Faith Deposit" with respect to any Bid solely for the Grandy's Assets). The Deposit (in the amount of $600,000) already provided to the Debtors by the Grandy's Stalking Horse Purchaser pursuant to the Grandy's Asset Purchase Agreement constitutes a Good Faith Deposit.

(y) Solely for Souper Salad Assets. Each Bid solely for the Souper Salad Assets must be accompanied by a deposit in the amount of at least ten percent (10%) of the proposed

---

[6]     The description of the Bidding Procedures contained in this Motion is for informational purposes only. In the event of any inconsistency between this description and the terms of the Bidding Procedures set forth on Exhibit 1 to the Bidding Procedures Order, the Bidding Procedures set forth on Exhibit 1 to the Bidding Procedures Order shall control.

Purchase Price to be deposited into an interest bearing escrow account to be identified and established by the Debtors (the "Souper Salad Good Faith Deposit" with respect to any Bid solely for the Souper Salad Assets).

(z) For Combined Souper/Grandy's Assets. Each Bid for all the Combined Souper/Grandy's Assets must be accompanied by a deposit in the amount of at least the greater of (i) ten percent (10%) of the proposed Purchase Price and (ii) $600,000 to an interest bearing escrow account to be identified and established by the Debtors (the "Combined Souper/Grandy's Good Faith Deposit" with respect to any Bid for all the Combined Souper/Grandy's Assets, and together with the Grandy's Good Faith Deposit and the Souper Salad Good Faith Deposit, the "Good Faith Deposits").

(ii)     Same or Better Terms:

(x) Solely for Grandy's Assets. Each Bid solely for the Grandy's Assets must be on terms that, in the Debtors' business judgment, are the same or better than the terms of the Grandy's Asset Purchase Agreement and must be for all or substantially all of the Grandy's Assets.

(y) Solely for Souper Salad Assets. Each Bid solely for the Souper Salad Assets must be on terms that, in the Debtors' business judgment, are the same or better than the terms of the Souper Salad Asset Purchase Agreement.

(z) For Combined Souper/Grandy's Assets. A Bid for all the Combined Souper/Grandy's Assets must be on terms that, in the Debtors' business judgment, are the same or better than the terms of the Combined Asset Purchase Agreement, and must be for all, or substantially all, of the Combined Souper/Grandy's Assets.

(iii)     Executed Agreement.

(x) Solely for Grandy's Assets. Each Bid solely for the Grandy's Assets must be based on the Grandy's Asset Purchase Agreement and include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternative Transaction (the "Modified Grandy's Asset Purchase Agreement"). A Bid solely for the Grandy's Assets shall also include a copy of the Grandy's Asset

Purchase Agreement marked against the Modified Grandy's Asset Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove all provisions that apply only to the Grandy's Stalking Horse Purchaser as the stalking horse bidder such as the BreakUp fee and Expense Reimbursement provisions that are contained in the Grandy's Asset Purchase Agreement).

(y) <u>Solely for Souper Salad Assets</u>. Each Bid solely for the Souper Salad Assets must be based on the Souper Salad Asset Purchase Agreement and include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternative Transaction (the "<u>Modified Souper Salad Asset Purchase Agreement</u>"). A Bid shall also include a copy of the Souper Salad Asset Purchase Agreement marked against the Modified Souper Salad Asset Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price).

(z) <u>For Combined Souper/Grandy's Assets</u>. Each Bid for all the Combined Souper/Grandy's Assets must be based on the Combined Asset Purchase Agreement and include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternative Transaction (the "<u>Modified Combined Asset Purchase Agreement</u>"). A Bid for all the Combined Souper/Grandy's Assets shall also include a copy of the Combined Asset Purchase Agreement marked against the Modified Combined Asset Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price).

(iv)     <u>Minimum Bid</u>:

(x) <u>Solely for Grandy's Assets</u>. A Bid solely for the Grandy's Assets must propose a minimum cash purchase price equal to or greater than $6,400,000 which is the aggregate of the sum of (i) the purchase price under the Grandy's Asset Purchase Agreement; (ii) the full dollar value of the Breakup Fee payable to the Grandy's Stalking Horse Purchaser, (iii) the full dollar value of the Expense Reimbursement payable to the Grandy's Stalking Horse Purchaser, and (iv) $100,000.

(y) <u>Solely for Souper Salad Assets</u>. A Bid solely for the Souper Salad Assets must propose a minimum cash purchase price in an amount to be specified by the Debtors on or before the date of the Bidding Procedures Hearing, plus the assumption of certain liabilities (as set forth below), plus the payment of all cure amounts under the Real Property Leases and the Other Leases and Contracts assumed by Buyer at Closing.

(z) <u>For Combined Souper/Grandy's Assets</u>. A Bid for all the Combined Souper/Grandy's Assets must propose a cash purchase price equal to or greater than the sum of (i) the Grandy's Minimum Cash Amount (including, among other things, the full dollar value of the Breakup Fee and the Expense Reimbursement payable to the Grandy's Stalking Horse Purchaser, as detailed above), (ii) the Souper Salad Minimum Cash Amount, (iii) the Souper Salad Breakup Fee, if any, plus (iv) $100,000.

(v) <u>Designation of Assumed Contracts and Leases</u>: Any Bid for the Grandy's Assets, the Souper Salad Assets, and/or the Combined Souper/Grandy's Assets must identify any and all executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it pursuant to an Alternative Transaction.

(vi) <u>Assumption of Liabilities</u>:

(x) <u>Solely for Grandy's Assets</u>. A Bid solely for the Grandy's Assets must provide for the payment or assumption of at least all or substantially all of the Assumed Obligations (as defined in the Grandy's Asset Purchase Agreement).

(y) <u>Solely for Souper Salad Assets</u>. A Bid solely for the Souper Salad Assets must provide for the payment or assumption of at least all or substantially all of the Assumed Obligations (as defined in the Souper Salad Asset Purchase Agreement)

(z) <u>For Combined Souper/Grandy's Assets</u>. A Bid for all the Combined Souper/Grandy's Assets must provide for the payment or assumption of at least all or substantially all of the Assumed Obligations under both the Souper Salad Asset Purchase Agreement and the Grandy's Asset Purchase Agreement

(vii) <u>Corporate Authority</u>: Any Bid for the Grandy's Assets, the Souper Salad Assets, and/or the Combined Souper/Grandy's Assets must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Alternative Transaction; <u>provided</u>, <u>however</u>, that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternative Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Alternative Transaction by the equity holder(s) of such Bidder.

(viii) <u>Proof of Financial Ability to Perform</u>: Any Bid for the Grandy's Assets, the Souper Salad Assets, and/or the Combined Souper/Grandy's Assets must include written evidence that the Debtors reasonably conclude demonstrates that the Bidder has the necessary financial ability to close the Alternative Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Alternative Transaction. Such information must include, *inter alia*, the following:

a)  contact names and numbers for verification of financing sources;

b)  evidence of the Bidder's internal resources and proof of unconditional debt or equity funding commitments, from a recognized banking institution in the amount of the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Alternative Transaction;

c)  the Bidder's current financial statements (audited if they exist); and

d)  any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the Alternative Transaction; <u>provided</u>, <u>however</u>, that the Debtors shall determine, in their reasonable discretion, in consultation with the Debtors' advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

(ix)   Contingencies:  No Bid for (i) the Grandy's Assets and/or the Combined Souper/Grandy's Assets may contain representations and warranties, covenants, termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Grandy's Asset Purchase Agreement and (ii) for the Grandy's Assets, the Souper Salad Assets, and/or the Combined Souper/Grandy's Assets may be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

(x)    Irrevocable:  A Bid for the Grandy's Assets, the Souper Salad Assets, and/or the Combined Souper/Grandy's Assets must be irrevocable through the Auction, provided, however, that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(xi)   Bid Deadline:  The following parties must receive a Bid for the Grandy's Assets, the Souper Salad Assets, and/or the Combined Souper/Grandy's Assets in writing, on or before **the date that is twenty (20) days following the date of the Bidding Procedures Order at 4:00 p.m. (prevailing Eastern Time)** or such earlier date as may be agreed to by the Debtors (the "Bid Deadline"): (i) the Debtors, Souper Salad, Inc., 4004 Belt Line Road, Suite 160, Addison, Texas 75201, Attn: Chief Executive Officer; (ii) counsel for the Debtors, Proskauer Rose LLP, 11 Times Square, New York, New York 10036, Attn: Scott K. Rutsky; (iii) counsel to official committee of unsecured creditors appointed in these chapter 11 cases, if any (the "Committee"); (iv) counsel to the Grandy's Stalking Horse Purchaser, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Patrick J. Nash, Jr.; and (v) Morgan Joseph, 3475 Piedmont Road, Suite 260, Atlanta, Georgia 30305, Attn: Alex Fisch.

(c)    Auction.

(i)    Solely for Grandy's Assets.  If one or more Qualified Bids (other than the Grandy's Asset Purchase Agreement submitted by the Grandy's Stalking Horse Purchaser) are received by the Bid Deadline solely for the Grandy's Assets, the Debtors will conduct an auction (the "Grandy's Auction") to determine the highest and best Qualified Bid solely for the Grandy's Assets. If no Qualified Bid (other than the Grandy's Asset Purchase Agreement) is received by the Bid Deadline, the Debtors may determine not to conduct the Grandy's Auction.

(ii)     Solely for Souper Salad Assets. If two or more Qualified Bids are received by the Bid Deadline solely for the Souper Salad Assets, the Debtors will conduct an auction (the "Souper Salad Auction") to determine the highest and best Qualified Bid for the Souper Salad Assets. Prior to the Souper Salad Auction, the Debtors may negotiate with the bidders for the Souper Salad Assets to obtain the highest possible Auction Baseline Bid and may, but are not required to, grant a single bidder bid protections as set forth in the Bidding Procedures Order

(iii)    For Combined Souper/Grandy's Assets. If one or more Qualified Bids are received by the Bid Deadline for all of the Combined Souper/Grandy's Assets, the Debtors may conduct an auction (the "Combined Auction," and such auction and any Grandy's Auction and any Souper Salad Auction conducted by the Debtors are each individually or collectively, as the context dictates, sometimes referred to herein as the "Auction") to determine the highest and best Qualified Bid for the Combined Souper/Grandy's Assets.

(d)     Minimum Overbids and Bidding Increments.

(i)     Solely for Grandy's Assets. Any Overbid solely for the Grandy's Assets after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $100,000. Additional consideration in excess of the amount set forth in the respective Auction Baseline Bid may include cash and/or noncash consideration and, in the case of a Bid by the Grandy's Stalking Horse Purchaser, a credit bid of the Expense Reimbursement and the Breakup Fee.

(ii)     Solely for Souper Salad Assets. Any initial Overbid solely for the Souper Salad Assets after and above the respective Auction Baseline Bid shall be made in an initial increment valued at not less than the sum of (a) the Souper Salad Breakup Fee, if any, plus (b) $50,000. Any subsequent Overbids solely for the Souper Salad Assets shall be made in increments of not less than $50,000. Additional consideration in excess of the initial Overbid for the Souper Salad Assets may include cash and/or noncash consideration, and, in the case of a Bid by any Qualified Bidder granted the Souper Salad Breakup Fee, a credit bid of the Souper Salad Breakup Fee.

(iii)    For Combined Souper/Grandy's Assets. Any initial Overbid for all of the Combined Souper/Grandy's Assets after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $100,000 plus the greater of (a) the sum of highest and best Qualified Bid solely for the Grandy's Assets and

the highest and best Qualified Bid solely for the Souper Salad Assets, or (b) the sum of (i) the Auction Baseline Bid for the Souper Salad Assets, (ii) the Souper Salad Breakup Fee, if any, plus (iii) the Auction Baseline Bid for the Grandy's Assets, or any combination of (a) and (b) as appropriate to maximize the value of the Debtors' assets for the estates. Any subsequent Overbids for all of the Combined Souper/Grandy's Assets shall be made in increments of not less than $100,000. Additional consideration in excess of the amount set forth in the Auction Baseline Bid for all of the Combined Souper/Grandy's Assets may include cash and/or noncash consideration and, in the case of a Bid by the Grandy's Stalking Horse Purchaser, a credit bid of the Expense Reimbursement and the Breakup Fee.

(e)     Closing of Auction. The Auction shall continue until there is (a) only one Qualified Bid for the Grandy's Assets and one Qualified Bid for the Souper Salad Assets or (b) only one Qualified Bid for the Combined Souper/Grandy's Assets that the Debtors determine in their reasonable business judgment, after consultation with their financial and legal advisors and the Committee, is the highest and best Qualified Bid at the Auction for the respective assets. Thereafter, the Debtors shall select one or more of such Qualified Bids, the combination of which produces the highest and best recovery to the estates, as the overall highest and best Qualified Bid or Bids (each such Bid a "Successful Bid," and each Bidder submitting such Successful Bid, a "Successful Bidder"). In making this decision, the Debtors, in consultation with their financial and legal advisors, shall consider the Bid Assessment Criteria. The Auction shall be deemed closed until each Successful Bidder has submitted fully executed sale and transaction Documents memorializing the terms of their respective Successful Bids.

(f)     Sale Hearing. The Sale Hearing shall be conducted by the Bankruptcy Court on or before 30 days from entry of the Bidding Procedures Order.

(g)     Closing with Alternate Bidder. In the event any Successful Bidder fails to consummate the sale as a result of such Successful Bidder's default or breach under the applicable purchase agreement, the Debtors shall: (i) retain such Successful Bidder's Good Faith Deposit; and (ii) be free to enter into a new purchase agreement with the next most appropriate Qualified Bidder at the highest price bid by such Qualified Bidder at the Auction.

31.     The Debtors expressly reserve the right to make reasonable modifications to the Bidding Procedures as may be determined to be necessary and appropriate to maximize the value of the assets for the estates. Moreover, the Debtors reserve the right, upon notice to all Notice Parties and those parties that have demonstrated an interest in bidding on the Grandy's Assets, the Souper Salad Assets, and/or the Combined Souper/Grandy's Assets to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders; (b) impose additional terms and conditions with respect to any or all potential bidders; (c) extend the deadlines set forth herein; (d) cancel the sales of the Grandy's Assets, Souper Salad Assets and/or Sale Hearing in open court without further notice; and (e) amend the Bidding Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

**B.      Approval of Breakup Fees and Expense Reimbursement**

32.     **Grandy's Sale** - The Debtors seek to provide the Grandy's Stalking Horse with certain Bid Protections in recognition of the substantial expenditure of time, energy, and resources, and the benefits to the Debtors' estates of securing a "stalking horse" or guaranteed minimum bid. Accordingly, the Grandy's Asset Purchase Agreement requires (and is subject to termination otherwise) that the Bidding Procedures Order approves the following Grady's Bid Protections, on the terms and conditions set forth in the Grandy's Asset Purchase Agreement: (a) a Breakup Fee in the amount of $100,000; and (b) an Expense Reimbursement, in an amount of up to $200,000 of documented actual, reasonable out-of-pocket costs and expenses (including fees and expenses of counsel). If approved, the Grandy's Bid Protections will be paid to the Grandy's Stalking Horse Purchaser pursuant to the terms of the Grandy's Asset Purchase Agreement in connection with the consummation of an Alternative Transaction. To preserve the benefit to the Debtors' estates provided by the Grandy's Stalking Horse Purchaser in the form of

the Grandy's Asset Purchase Agreement, the Debtors respectfully submit that the Grandy's Bid Protections should be approved.

33.     Pursuant to the Bidding Procedures Order, except for the Grandy's Stalking Horse Purchaser, no other party submitting an offer or Bid solely for the Grandy's Assets or a Qualifying Bid solely for the Grandy's Assets shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment.

34.     **Souper Salad Sale** – To facilitate competitive bidding at the Auction and to entice potential bidders to establish the highest possible floor price and terms at the Auction, the Debtors request that they be authorized, but not required, to offer any single Qualified Bidder Bid Protections in the form of a breakup fee up to 5% of the agreed purchase price (the "Souper Salad Breakup Fee").

35.     The  Debtors propose that if they determine to grant the Souper Salad Breakup Fee, such fee will only be paid if: (1) the bidder chosen to act as the stalking horse is not the Successful Bidder at the Auction with regard to the Souper Salad business (other than because of a breach by such Bidder); and (2) the transaction proposed by the Successful Bidder and/or the Backup Bidder of the Souper Salad assets actually closes.

C.     **Notice of Auction and Sale Hearing**

36.     As noted above, and to ensure compliance with both the Grandy's Asset Purchase Agreement, as well as the requirements of the Debtors' proposed DIP financing, the Debtors seek to have the Auction scheduled for a date no later than 25 days from the entry of the Bidding Procedures Order.

37.     Not later than three business day after the entry of the Bidding Procedures Order, the Debtors will serve copies of the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1, and the Bidding Procedures Order by mail, postage

prepaid to: (i) all entities known to have expressed a *bona fide* interest in acquiring the Acquired Assets (by overnight mail); (ii) the Office of the United States Trustee (the "U.S. Trustee"); (iii) the official committee of unsecured creditors (the "Committee") if one has been appointed, and if the Committee has not been appointed, the Debtors twenty (20) largest unsecured creditors; (iv) counsel to the Debtors' DIP lenders and their pre-petition secured lenders; (v) all taxing authorities having jurisdiction over any of the Grandy's Assets and the Souper Salad Assets subject to the sale, including the Internal Revenue Service; (vi) the Environmental Protection Agency; (vii) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (viii) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; (ix) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Acquired Assets; (x) all contract parties; (xi) all landlords; (xii) counsel to the Grandy's Stalking Horse Purchaser; and (xiii) all potential bidders previously identified or otherwise known to the Debtors.

38.     The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, by a date no later than six (6) days prior to the Sale Hearing (the "Objection Deadline"): and (d) be served so as to be received by the Objection Deadline by:

> (i) the Debtors, c/o SSI Group Holding Corp., 4004 Belt Line Rd., Suite 160, Addison, TX 75001, Attn: Ward Olgreen, Chief Executive Officer;
>
> (ii) counsel to the Debtors, (a) Proskauer Rose LLP, Eleven Times Square, New York, NY 10036-8299, Attn. Scott K. Rutsky, Esq., and (b) Cozen O'Connor, Chase Manhattan Centre, 1201 North

Market Street, Suite 1400, Wilmington, DE 19801, Attn: Mark E. Felger, Esq.;

(iii) counsel to the Grandy's Stalking Horse Purchaser, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, IL 60654, Attn. Patrick J. Nash, Jr.;

(iv) counsel to the Committee if and when appointed; and

(v) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, DE 19801.

(the "Objection Service Parties")

**D.    Procedures to Determine Cure Amounts and Deadlines for Objection to Assumption and Assignment of the Contracts and Leases**

39.    To facilitate and effectuate the Sales, the Debtors will be required to assume and assign the certain executory contracts and unexpired leases to the Grandy's Stalking Horse Purchaser and/or the Successful Bidder or Bidders for the Grandy's Assets, the Souper Salad Assets or the Combined Souper/Grandy's Assets, as applicable. The Contracts and Leases to be assumed and assigned will likely be a subset of the executory contracts and unexpired leases to which one or more of the Debtors is a party.

40.    The Debtors cannot be certain which of the Contracts and Leases will be assumed and assigned until either the Grandy's Stalking Horse Purchaser and/or the Successful Bidder or Bidders for the Grandy's Assets, the Souper Salad Assets or the Combined Souper/Grandy's Assets, as applicable, make such designations. Given the number of potential Contracts and Leases, the Debtors seek to establish (a) procedures for determining cure amounts (the "Cure Amounts"); and (b) deadlines for objections to the potential assumption and/or assignment of the Contracts and Leases in connection with the Sales (collectively, the "Assumption and Assignment Procedures").

41. To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Contracts and Leases, the Debtors propose the following deadlines and procedures:

(a) The Debtors propose to mail, on or before three (3) business days after the entry of the Bidding Procedures Order, a notice substantially in the form annexed to the Bidding Procedures Order as Exhibit 3, (the "Cure Notice"), to all non-Debtor parties to the Contracts and Leases. The Cure Notice shall identify (i) all executory contracts and unexpired leases that the Debtors may seek to assume and assign to either the Grandy's Stalking Horse Purchaser and/or the Successful Bidder or Bidders, as applicable, and (ii) provide the cure amount (if any) that the Debtors propose to pay the counterparties to such contracts and leases pursuant to section 365 of the Bankruptcy Code in the event that the Debtors ultimately seek to assume and assign such contracts or leases (the "Cure Amounts"). The Debtors reserve the right to supplement or modify the list of Cure Amounts for the Contracts and Leases at any time prior the commencement of the Sale Hearing

(b) Unless the non-Debtor party to any of the Contracts and Leases files an objection (the "Cure Amount Objection") to its scheduled Cure Amount or to the assumption and assignment of a Contract or Lease, and serves a copy of the Cure Amount Objection **so as to be received no later than the Sale Objection Deadline** on the same day to: (a) the Debtors, Souper Salad, Inc., 4004 Belt Line Road, Suite 160, Addison, Texas 75201, Attn: Chief Executive Officer; (b) counsel for the Debtors, Proskauer Rose LLP, Eleven Times Square, New York, New York 10036, Attn: Scott K. Rutsky and Cozen O'Connor, 1201 N. Market Street, Suite 1400, Wilmington, Delaware 19801, Attn: Mark E. Felger; (c) counsel to the Committee; (d) counsel to the Grandy's Stalking Horse Purchaser, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Patrick J. Nash, Jr.; and (e) the Office of the United States Trustee; such non-Debtor party should be forever barred and estopped from objecting (i) to the Cure Amount and from asserting that any additional amounts are due or defaults exist, (ii) that any conditions to assumption and assignment must be satisfied under such Contract or Lease before it can be assumed and assigned or that any required consent to assignment has not been given or (iii) that the Grandy's Stalking Horse Purchaser has not provided adequate assurance of future performance.

(c) With respect to Contracts and Leases relating to the Souper Salad Assets, and with respect to Contracts and Leases relating to the

Grandy's Assets only if the Grandy's Stalking Horse Purchaser is not the Successful Bidder for the Grandy's Assets, the non-Debtor parties to the Contracts and Leases shall have until one (1) day prior to the Sale Hearing to object to the assumption and assignment of a Contract or Lease solely on the issue of whether the Successful Bidder for the Grandy's Assets (if not the Grandy's Stalking Horse Purchaser), the Successful Bidder for the Souper Salad Assets or the Successful Bidder for all of the Acquired Assets can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code (each an "Adequate Assurance Objection"); provided, however, that if the Grandy's Stalking Horse Purchaser is the Successful Bidder, all Adequate Assurance Objections must be filed by the Sale Objection Deadline; provided, further, however, that all objections to the assumption and assignment of Contracts and Leases that do not relate to the issue of whether the Successful Bidder can provide adequate assurance of future performance must be filed by the Sale Objection Deadline.

(d) In the event of a timely filed objection and dispute regarding: (a) any Cure Amount with respect to any of the Contracts and Leases; (b) the ability of the Successful Bidder for the Grandy's Assets (including the Grandy's Stalking Horse Purchaser or such other Successful Bidder for the Grandy's Assets), the Souper Salad Assets and/or the Acquired Assets to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, if applicable, under a Contract or Lease; or (c) any other matter pertaining to assumption, the Cure Amounts shall be paid as soon as reasonably practicable after the Closing and following the entry of a final order resolving the dispute and approving the assumption of such Contract of Lease; provided, however, that the Debtors are authorized to settle any dispute regarding the amount of any Cure Amount or assignment to the Successful Bidder (including the Grandy's Stalking Horse Purchaser) without any further notice to or action, order or approval of the Court.

(e) Except as may otherwise be agreed to by all parties to a Contract or Lease, on or before the Closing, the cure of any defaults under Contracts and Leases necessary to permit assumption and assignment thereof in accordance with Bankruptcy Code section 365(b), shall be by (i) payment of the undisputed Cure Amount, (ii) payment of the Cure Amount judicially determined by the Bankruptcy Court to be the correct amount, and/or (iii) establishment of a reserve with respect to any disputed Cure Amount that has not been resolved at or prior to the Sale Hearing.

(f)     Within two (2) business days after the Closing Date, the Debtors
        will file a complete list (the "Assumption Notice") of the Contracts
        and Leases that were assumed and assigned as Assumed Executory
        Contracts, as of the Closing Date, in connection with the sales of
        the Grandy's Assets and/or the Souper Salad Assets, separately or
        as a combined transaction.

42.     For the avoidance of doubt, none of the Contracts and Leases will be assumed and

assigned until such time as the Sale Order has been entered and the transaction contemplated

thereby has been consummated. The Debtors respectfully submit that the aforementioned

Assumption and Assignment Procedures provide a full and fair opportunity for the Contract and

Lease counterparties to be heard with respect to the assumption and assignment of their

agreements with the Debtors.

## BASIS FOR RELIEF REQUESTED

**B.      The Sales are Within the Sound Business Judgment of the
         Debtors and Should be Approved**

43.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor

in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy

Code does not set forth a standard for determining when it is appropriate for a court to authorize

the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in

this Circuit and others have required that the decision to sell assets outside the ordinary course of

business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of*

*Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *see also Myers* v. *Martin (In re Martin),*

91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel*

*Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd.* v. *Montgomery Ward*

*Holding Corp., (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999); *In*

*re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991).

44. The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. *Abbotts Dairies,* 788 F.2d 143; *Titusville Country Club* v. *Pennbank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel,* 722 F.2d at 1071; *Montgomery Ward,* 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

45. Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus* v. *Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may

fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian* v. *Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Term. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

46. For all the reasons set forth above, and given the Debtors' current circumstances, the Debtors have determined, in the exercise of their business judgment, that the Sales, as set forth herein, constitute the best method to maximize recoveries to the estates. Maximizing the value of the Debtors' assets for the benefit of their creditors constitutes a sound business purpose forming the basis to authorize the proposed Sales.

47. The Sales will be subject to a competitive bidding process, thereby enhancing the Debtors' ability to receive the highest or otherwise best value for the assets. Accordingly, the Notice of Auction and the Sales are designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets. Indeed, the Debtors and their professionals have marketed and will continue to market the Grandy's Assets and the Souper Salad Assets, and have solicited (and will continue to solicit) the most likely interested competing bidders. Accordingly, the proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

48. The Debtors respectfully submit that the Bidding Procedures also are designed to maximize the value received for their assets. The process proposed by the Debtors allows for a

41

timely and efficient auction process under the circumstances, while providing bidders with ample time and information to submit a timely bid and to perform diligence. The Bidding Procedures are designed to ensure that the Grandy's Assets and the Souper Salad Assets will be sold for the highest or otherwise best possible purchase price by subjecting them to market testing and permitting prospective purchasers to bid on the such Assets. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Grandy's Assets and the Souper Salad Assets will be fair and reasonable, and, therefore, the third prong of the *Abbotts Dairies* standard is satisfied. As discussed below, the "good faith" prong of the *Abbotts Dairies* standard is also satisfied here.

C.   The Sale is Proposed in "Good Faith" Under Section 363(m) of the Bankruptcy Code

49.   The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

50.   Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale ... of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. §363(m).

51.   Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Acquired Assets.

52. The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Grandy's Asset Purchase Agreement was intensely negotiated and at arm's-length, in which the Grandy's Stalking Horse Purchaser, although an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, acted in good faith. For example, Debtors and the Grandy's Stalking Horse Purchaser had separate legal counsel negotiate the transaction. The Debtors' financial advisor in the transaction is an independent investment banker retained for the sole purposes of helping the Debtors to explore their strategic alternatives, market their business and assets and negotiate a sale the transaction. Accordingly, the Debtors request that the Court make a finding that the Grandy's Stalking Horse Purchaser has purchased the Grandy's Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

53. With respect to a sale of the Souper Salad business or the combined assets of Souper Salad and Grandy's, the Debtors further submit that the proposed Bidding Procedures are designed to ensure that any Qualified Bidder chosen as the Successful Bidder will be a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. Accordingly, the Debtors request that such a finding be made with respect to any such Successful Bidder for the Souper Salad Assets or the combined assets of Souper Salad and Grandy's.

**D.    The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code**

54. Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be

compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc.* v. *Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Because the Debtors expect that they will satisfy, at minimum, the second and fifth of these requirements, if not others as well, approving the Sales free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically identified in section 363(f). *See, e.g., In re Trans World Airlines, Inc.,* 2001 WL 1820325 at *3, 6 (Bankr, D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

**E.** **The Bid Protections are Reasonable and Appropriate**

55. Approval of the Bid Protections is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O 'Brien Envtl. Energy, Inc. (In re O 'Brien Envtl. Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999) (hereinafter *In re O'Brien*). In *In re O'Brien,* the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re O'Brien,* 181 F.3d at 535. Here, the Bid Protections should be approved because they will provide a benefit to the Debtors' estates.

56. The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, expense reimbursements may be necessary to preserve the value of

the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id* at 537. Second, if the availability of an expense reimbursement were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *Id.*

57. In *In re O'Brien,* the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of break-up fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." *See In re O'Brien,* 181 F.3d at 536.

58. After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees as a percentage of the purchase price as being appropriate under the facts and circumstances of the case. *See In re Chi-Chi's Inc.,* Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); *In re Riverstone Networks,* Case No. 06-10110 (Bankr. D. Del. February 24, 2006) (fee of 3% permitted); *In re Radnor Holdings,* Case

No. 0610894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); *Tama Beef Packing, Inc.*, 312 B.R. 192 (Bankr. N.D. Iowa 2004) (court noted that typical break-up fees are calculated at 3 to 4% of purchase price and upheld fee of 3.2%); *In re Great Northern Paper, Inc.*, Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld); *Integrated Resources*, 147 B.R. 650, 662 (S.D.N.Y. 1992) (break-up fee representing up to 3.2% of bidder's out-of-pocket expenses or 1.6% of the proposed purchase price; expert testified that outside of bankruptcy break-up fees average 3.3%).

59.     Whether evaluated under the "business judgment rule" applied by many courts or the Third Circuit's "administrative expense" standard, the Bid Protections should be approved because they are necessary to obtain the maximum return for the benefit of the Debtors' estates. Respecting the Grandy's Sale, all negotiations between the Debtors and the Grandy's Stalking Horse Purchaser have been conducted on a good faith, arm's-length basis. The Debtors' ability to continue to shop the Grandy's Assets for a higher or better offer without risk of losing the Grandy's Stalking Horse Purchaser, a "bird-in-the-hand," would be eliminated if the Debtors are not authorized to remit the Bid Protections. Therefore, absent authorization of the payment of the Grandy's Bid Protections, the Debtors might lose the opportunity to obtain the highest and best available offer for the Grandy's Assets and the downside protection that is afforded by the Grandy's Asset Purchase Agreement.

60.     Payment of the Bid Protections are not likely to diminish the Debtors' estates, rather the Grandy's Stalking Horse Purchaser's offer will form the basis upon which other bids will be submitted and evaluated. The establishment of the Bid Protections permits the Debtors to insist that competing bids for the Grandy's Assets be higher or otherwise better than the purchase

price under the Grandy's Asset Purchase Agreement, which is a clear benefit to the Debtors' estates. Thus, even if the Grandy's Stalking Horse Purchaser is offered the Bid Protections and is ultimately not the Successful Bidder, the Debtors will still have benefited from the higher floor established by the improved bid and thereby increase the likelihood that the price at which the Grandy's Assets are sold reflects their true worth.

61.     Similarly, the requested Bid Protections associated with the Souper Salad Sale are designed to obtain the highest possible floor price to begin an Auction. The ability to offer such Bid Protections will essentially facilitate a multiple round auction, affording the Debtors the best possible chance to maximize the value of the Souper Salad business and its assets.

62.     Given the exigencies of the Debtors' financial condition and the current state of the national credit markets, the Bid Protections are not only necessary, but reasonable. Paying the Grandy's Breakup Fee of $100,000 and up to $200,000 of documented actual, reasonable out-of-pocket costs and expenses is reasonable since the Grandy's Stalking Horse Purchaser's bid includes, among other things, the assumption of a large portion of the Debtors' liabilities in addition to the cash purchase price. Similarly, the Souper Salad Breakup fee of up to five (5%) of the proposed purchase price is justified in that it will provide the highest possible floor for the Auction. In light of the benefit to the Debtors' estates that will be realized by having a signed purchase agreement, enabling the Debtors to preserve the value of their estates and promote more competitive bidding, ample support exists for the approval of the Bid Protections.

63.     The Debtors' payment of the Grandy's Bid Protections and the Souper Salad Breakup Fee under the circumstances described herein would be: (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code; (ii) of substantial benefit to the Debtors' estates; and (iii) with respect to the

Grandy's sale, reasonable and appropriate in light of the efforts and the significant costs and expenses that have been and will be expended by the Grandy's Stalking Horse Purchaser.

64.     The Debtors believe that they have demonstrated a sound business justification for authorizing the Bid Protections and their clear necessity and benefit to these estates. Thus, the Debtors request that this Court approve and authorize both the payment of the Bid Protections, pursuant to the terms of the Grandy's Asset Purchase Agreement and, with respect to the Sale of the Souper Salad business, pursuant to the terms hereof.

F.     **The Assumption and Assignment Procedures Provide Adequate Notice and Opportunity to Object and Should be Approved**

65.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc, Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors* v. *Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel Corp.,* 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp.* v. *West Penn Power Co. (In re Wheeling- Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc,* 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective

assignee of lease from debtors has financial resources and has expressed willingness to devote

sufficient funding to business in order to give it strong likelihood of succeeding). Additionally,

section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the

administration of a case under title 11. Section 105(a) provides that "[t]he court may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of [title

11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable

powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section

105(a) power is proper. *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993);

*Pincus* v. *Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).

Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect

the value of a debtor's assets. *See, e.g., In re Chinichian,* 784 F.2d 1440, 1443 (9th Cir. 1986)

("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant

to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc., 61* B.R.

531, 537 (Bankr. W.D. Term. 1986) (noting that bankruptcy court is "one of equity and as such it

has a duty to protect whatever equities a debtor may have in property for the benefit of their

creditors as long as that protection is implemented in a manner consistent with the bankruptcy

laws").

      66.     The Debtors respectfully submit that the proposed Assumption and Assignment

Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Contracts

and Leases with adequate notice in the form of the Cure Notice. Such non-Debtor parties to the

Contracts and Leases will then be given an opportunity to object to such notice. The Assumption

and Assignment Procedures further provide that, in the event an objection is not resolved, the

Court will determine the disputed issues (including any issues regarding adequate assurance of

future performance). Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these cases.

## G. **Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rule 6004(h) is Appropriate**

67. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the fourteen (14) day stay under Bankruptcy Rule 6004(h) is waived.

68. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, the leading Bankruptcy treatise suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6004.10 at 6004-18 (L. King, 15th rev. ed. 2008). The treatise further provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

69. As described above, time is clearly of the essence. The Grandy's Stalking Horse Asset Purchase Agreement, as well as the Debtors' contemplated debtor-in-possession financing facility, contains certain sale milestones. With respect to the financing, failure to meet such milestones constitutes an event of default under the proposed debtor-in-possession loan facility. Moreover, the Debtors' assets and business are at significant risk of losing value if a prompt closing of the Sales cannot be accomplished. A prompt closing of the Sales is therefore of

critical importance and the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h).

## **NOTICE**

70.     Notice of this Motion has been given to: (a) the Office of the United States Trustee; (b) the creditors on each of the Debtors' lists of twenty (20) largest unsecured creditors; (c) the Debtors' DIP lenders and their pre-petition secured lenders; (d) counsel to the Debtors' DIP lenders and their pre-petition secured lenders; (e) counsel to the Debtors' pre-petition subordinated secured lenders; (f) all financial institutions at which the Debtors maintain deposit accounts; (g) the Grandy's Stalking Horse Purchaser; and (h) all other parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## CONCLUSION

**WHEREFORE,** the Debtors respectfully request: (i) entry of the proposed Bidding Procedures Order; (ii) after the Sale Hearing entry of the Sale Order (or Orders, as applicable) and (iii) such other and further relief as the Court deems just and proper.

Dated: September 14, 2011

**COZEN O'CONNOR**

Mark E. Felger (No. 3919)
1201 N. Market St., Ste. 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013

- and -

**PROSKAUER ROSE LLP**
Scott K. Rutsky, Esq.
Adam T. Berkowitz, Esq.
Richard J. Corbi, Esq.
Eleven Times Square
New York, NY 10036-8299
Telephone: 212-969-3000
Facsimile: 212-969-2900

Proposed Counsel for Debtors and Debtors-in-Possession