**Souper Salad Only**

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (the "Agreement") is made and entered into as of this 8th day of November, 2011, by and between JLMF LLC, a Texas limited liability company (the "Buyer"), on the one hand, and Souper Salad, Inc. ("Souper Salad"), a Texas corporation, and Souper Brands, Inc. ("Souper Brands"), a Texas corporation, each a Debtor and Debtor in Possession (Souper and Souper Brands collectively, the "Sellers"), on the other hand, under Case No. 11-12917 (the "Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") filed on September 14, 2011.

**RECITALS**

A.    Sellers are the owner, operator and franchisor of the restaurant concept known as Souper Salad (the "Business").

B.    In connection with the Case, Sellers wish to sell to Buyer, following the entry of the Approval Order (as defined in Attachment A), substantially all of the assets that it uses in connection with the Business at the price and on the other terms and conditions specified in detail below and Buyer wishes to so purchase and acquire such assets from Sellers and to assume the Assumed Liabilities (as defined below).

C.    Terms initially capitalized herein but not otherwise defined have the meaning ascribed on Attachment A.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Transfer of Assets

1.1    Purchase and Sale of Assets. On the terms and subject to the conditions set forth in this Agreement, at the Closing, as hereinafter defined, Sellers shall sell, contribute, assign, transfer, convey and deliver to Buyer (or its designee), and Buyer (or its designee) shall purchase, acquire and accept from Sellers, free and clear of all Liens (other than Liens created by Buyer and Permitted Liens), all of Sellers' right, title and interest in, to and under any and all of the assets, properties, rights and claims of any kind or nature, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of any Seller, which are used in or held for use in connection with the operation of the Business, excluding only the Excluded Assets expressly identified in Section 1.2 (such assets, properties, rights and claims to be acquired hereunder, collectively the "Property").  The Property shall include the following:

1.1.1    Leases and Contracts. Sellers' right, title and interest:

(i)    as lessee under those real property leases, subleases, licenses,

concessions and other agreements (written or oral) and all amendments, modifications, extensions, renewals, guarantees and other agreements with respect thereto, pursuant to which a Seller holds a leasehold or subleasehold estate in, or is granted the right to use or occupy, a Leased Facility, as described on **Exhibit "A-1"** to this Agreement (collectively, the "Real Property Leases");

(ii)    as lessee under those equipment, personal property and intangible property leases, rental agreements, licenses, contracts, agreements and similar arrangements described on **Exhibit "A-2"** to this Agreement (collectively, the "Other Leases");

(iii)    as franchisor under those franchise agreements described on **Exhibit "A-3"** to this Agreement (collectively, the "Franchise Agreements"); and

(iv)    subject to bifurcation as applicable and as set forth in Section 8.4 below, as a party to those other contracts, leases, orders, purchase orders, licenses, contracts, agreements and similar arrangements described on **Exhibit "A-4"** (collectively, the "Other Contracts" and together with the Franchise Agreements and the Other Leases, the "Other Leases and Contracts").

(v)    For the purposes of this subparagraph (v), Real Property Leases and the Other Leases and Contracts listed on the respective Exhibit As attached to this Agreement, to the extent assignable pursuant to section 365 of the Bankruptcy Code, will be referred to as "Buyer Assumed Contracts." Notwithstanding the foregoing, Buyer may elect to remove any of the Real Property Leases listed on Exhibit A-1 and any Other Leases and Contracts listed on Exhibits A-2, A-3 and A-4, respectively, (each, a "Removed Contract"), for any reason, by giving written notice thereof to Sellers and the non-debtor counter-party, no later than thirty (30) days after the selection of the Buyer as the successful bidder at the Auction (the "Review Period"); provided, however, that notwithstanding the foregoing, (a) the Review Period with respect to Real Property Leases and Franchise Agreements shall end at midnight on December 7, 2011 ET, and therefore Buyer shall provide notice to Sellers and the non-debtor counter-party of its election to remove any Real Property Lease(s) or Franchise Agreements(s) no later than midnight ET on December 7, 2011 as to any Real Property Leases or Franchise Agreements that Buyer is electing to remove from the Buyer Assumed Contracts, (b) Buyer may request an extension of the time period for reviewing the Real Property Leases up until the Closing Date, which extension shall be granted only if Sellers, in their sole discretion, consent, and (c) with respect to the Franchise Agreements on Exhibit A-3, Buyer may only elect to remove the franchises for the

Tulsa, Oklahoma and Augusta, Georgia locations (and the related real property leases, subleases and area development agreements, as applicable), and may not remove any other Franchise Agreement. Upon designation in accordance with the foregoing, each Removed Contract shall cease to be a Buyer Assumed Contract for the purposes of this Agreement and the Approval Order and may thereafter be rejected at Sellers' discretion without any additional notice to or consent from Buyer.

1.1.2 **[Intentionally Omitted]**

1.1.3 <u>Personal Property</u>. All tangible personal property owned by Sellers used or held for use in the conduct of the Business, including all machinery, equipment (including all transportation and office equipment), vehicles, computers, mobile phones, personal digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, kitchen equipment, kitchen supplies, spare parts, other miscellaneous supplies and other tangible personal property of any kind owned by Sellers, wherever located, including all such items which are located in any building, warehouse, office, store or other space leased, owned or occupied by Sellers or any other space where any of Sellers' properties and or any other assets may be situated, including, those items of equipment and tangible personal property owned by Sellers and listed in **Exhibit "B"** attached to this Agreement and any other tangible personal property acquired by Sellers after the date hereof but prior to the Closing Date and used exclusively in connection with the Business (collectively, the "Personal Property"). As used in this Agreement, the Personal Property shall not include the Inventory.

1.1.4 <u>Intangible Property</u>. All Intellectual Property owned, licensed, used or held for use by Sellers, along with all income, royalties, damages and payments due or payable to Sellers as of the Closing or thereafter, including damages and payments of past, present or future infringements or misappropriations thereof or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof or other conflicts therewith and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including all copies and tangible embodiments of any such Intellectual Property in Sellers' possession or control, and all intangible personal property owned or held by Sellers and used exclusively in connection with the Business, but in all cases only to the extent of Sellers' interest therein and only to the extent transferable, together with all books, records, advertising, marketing and promotional materials and all other printed or written materials and like items pertaining and/or relating exclusively to the Business, (collectively, the "Intangible Property"), including the items identified on **Exhibit "C"** hereto. Notwithstanding the foregoing, Sellers shall have the right to use, without cost, the Names after the Closing Date until the conclusion of the Case for the sole and limited purpose of remaining corporate governance purposes and for purposes of administering the Case. As used in this Agreement, Intangible Property shall in all events exclude: (i) any materials containing privileged communications or information about employees, disclosure of which would violate an employee's reasonable expectation of privacy and any other materials which

are subject to attorney-client or any other privilege or requirement to maintain confidentiality (including any rights to assert privilege); and (ii) Sellers' corporate books and records relating to its organization and existence;

1.1.5    Permits.  All of the rights and benefits accruing under any Permits held, used or made by any Seller in the Business, to the extent assignable, except any such Permit that is an Excluded Asset.

1.1.6    Receivables. (i) All Receivables, and (ii) with respect to all Buyer Assumed Contracts and all of the Critical Vendors listed on **Exhibit "A-5"**, attached hereto, all claims, including deposits, advances, prepaid and other current assets, rights under warranties, notes and guarantees, rights in respect of credits, allowances, rebates and to other refunds, causes of action (subject to Section 1.2 below), rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether known or unknown or contingent or non-contingent), together with unpaid financial charges accrued thereon, other than any accounts and notes receivable or other rights to payment arising out of or relating to any Excluded Asset; the right to receive and retain mail, Receivable payments and other communications of Sellers; and the right to bill and receive payment for products shipped or delivered and services performed by unbilled or unpaid as of the Closing, except as provided in Section 1.2(viii), 1.2(x) or1.2(xii).

1.1.7    Prepaid Assets; Deposits.  Those prepaid assets, including prepaid rent for the month in which the Closing occurs, and security deposits posted by Sellers only with respect to locations covered by Real Property Leases to be assumed by Buyer, except as provided in Section 1.2(x).

1 1.8    Inventory. All inventory of any kind or nature, whether or not prepaid and wherever located, held or owned by any Seller for use in the Business, including all raw materials, work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, goods, materials, inventory and stock in trade, in transit or consigned inventory, fuels and other and similar items owned by Sellers exclusively for use or sale in the ordinary course of the Business (collectively, the "Inventory").

1.1.9    Third Party Causes of Action.  Except as set forth in Section 1.2(ix) below, any rights, claims or causes of action of Sellers against any party to a Buyer Assumed Contract and/or against any Critical Vendor as listed on Exhibit A-5arising out of events occurring prior to the Closing Date (including, for the avoidance of doubt, those arising out of events occurring prior to the Petition Date and those rights, claims or causes of action arising out of the Bankruptcy Code (including chapter 5 thereof)) relating to the Business, including (i) all Avoidance Actions against or otherwise involving (A) the Buyer; (B) trade vendors with respect solely to matters related to the Business; (C) counterparties to all Other Leases and Contracts; (D) current and former employees of the Sellers who become Rehired Employees; and (E) any party with which the Buyer does business regarding the Property or that is associated with the Business after the Closing Date with respect solely to matters related to the Business provided, however, Sellers shall retain such claims only to the extent such claims can be applied as a defense or offset against any claim asserted against Sellers by

4

any party identified in (A), (B), (C), (D) or (E) above, further provided, however, that Sellers shall not be entitled to use such claims in accordance with section 502(d) of the Bankruptcy Code to effect the disallowance of a claim; and (ii) any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers; provided, that the assigned Avoidance Actions shall not include actions against insiders (as such term is defined in 11 U.S.C. § 101(31)) of the Sellers, and provided, further, that no Rehired Employee or any directors or officers of any Seller who continues to be employed by or affiliated with Buyer or its Affiliates in connection with the Business or provide services to the Business following the Closing Date shall be considered an Insider for such purposes. Buyer covenants and agrees not to sue or otherwise bring any action against any person with respect to any and all Avoidance Actions being acquired under this Agreement or assert any Avoidance Action being acquired under this Agreement defensively against any person.

1.1.10 Documents. All Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business, including Documents relating to marketing, advertising, promotional materials, Intellectual Property, personnel files for Rehired Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause 1.1.1 above, but excluding (i) personnel files for employees who are not Rehired Employees, (ii) such files as may not be transferred under Applicable Law regarding privacy, (iii) Documents which any Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party and (iv) Documents relating to an Excluded Asset or Excluded Liability; provided, however, to the extent such Documents relate in any way to the conduct of the Business, Buyer shall receive copies thereof.

1.1.11 Confidentiality Agreements. All rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the Business or the Property (or any portion thereof).

1.1.12 Insurance. Any rights to third party property and casualty insurance proceeds, in each case to the extent receivable in respect of the Business or the Property (or to any portion thereof) at and/or after the Closing.

1.1.13 **[Intentionally Omitted]**

1.1.14 Goodwill. All goodwill of the Business as a going concern and all other intangible property of the Business.

1.1.15 Catch-All. All other assets, properties, rights and claims of Sellers of any kind or nature which relate to the Business, which are used or held for use in the Business, or which relate to the Property (in each case, other than the Excluded Assets) not otherwise described in this Section 1.1, including all of Sellers' assets related to, located at, or used in connection with (i) the operation of all of Sellers' Restaurants and (ii) Sellers'

franchise business.

       1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, the Property shall not include the following (collectively, the "Excluded Assets"):

       (i)    All Excluded Contracts and Leases, including any accounts receivable arising out of or in connection with any Excluded Contracts and Leases;

       (ii)    all cash and cash equivalents (for the avoidance of doubt, credit card receivables are <u>not</u> deemed to be cash or cash equivalents);

       (iii)    Inventory transferred or used by Sellers in the ordinary course of the Business prior to the Closing Date;

       (iv)    any right, property or asset listed on **Exhibit "D"** hereto;

       (v)    the Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to the Sellers pursuant to the terms and provisions hereof;

       (vi)    any (A) confidential personnel and medical records pertaining to any employee of Sellers not permitted to be transferred to Buyer under Applicable Law; (B) books and records that Sellers are required by Law to retain, that relate exclusively to the Excluded Assets or the Excluded Liabilities, including Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Buyer shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Property or Assumed Liabilities; and (C) corporate charters, qualifications to do business, taxpayer and other identification numbers, corporate seals, minute books, stock ledgers, stock certificates and any other documentation related to governance, organization, maintenance or existence of Sellers; provided, that Buyer shall have the right to make copies of any portions of such documents and records;

       (vii)    all insurance policies and all insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Excluded Contracts and Leases, or (B) any item of tangible or intangible property or any other claim or cause of action not acquired by Buyer at the Closing;

       (viii)    any claim, right or interest of any Seller in or to any deposit, refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(ix)    all claims or causes of action of Sellers against third parties, including, but not limited to, any potential claim in the litigation against VISA or MasterCard, other than those included in the Property pursuant to Section 1.1.9;

(x)    all lease and utility deposits relating to locations other than those covered by Real Property Leases to be assumed by Buyer, all adequate assurance deposits provided to or on behalf of utilities, all deposits with respect to income or other taxes and all prepaid insurance premiums;

(xi)    all bank accounts, safety deposit boxes, lock boxes and the like, and the cash therein; and

(xii)    credit card receivables (and payments thereon), if any, in excess of $150,000 as of the Closing Date.

1.3    <u>Instruments of Transfer</u>. The sale, assignment, transfer, conveyance and delivery of the Property to Buyer and the assumption of the Assumed Liabilities provided herein by Buyer shall be made by assignments, bill of sale, deed, and other instruments of assignment, transfer and conveyance provided for in Section 3 below and such other instruments as may reasonably be requested by Buyer or Sellers.  None of the foregoing documents shall increase in any material way the burdens imposed by this Agreement upon Sellers or Buyer.

2.    <u>Consideration</u>.

The consideration for the Property is set forth in this Section 2.

2.1.1    The cash consideration to be paid by Buyer to Sellers for the Property (the "Purchase Price") shall be (a) an amount equal to $1,600,000 (subject to subparagraph (i) below), plus (b) the Cure Costs associated with the assumption of those Other Leases and Contracts that are Buyer Assumed Contracts pursuant to Section 1.1.1(v) above, provided, however, that any Cure Costs will be paid by Buyer directly to the applicable vendor as set forth in Section 2.1.3 below, plus (c) the amount of all prepaid assets and deposits acquired by Buyer pursuant to Section 1.1.7.

(i)    Notwithstanding the foregoing, if Buyer elects to assume less than a total of forty-three (43) Real Property Leases, which it may do in its sole discretion, then the Purchase Price will be increased by an amount that is equal to $10,000 per Real Property Lease not so assumed.  For illustration purposes, if the total number of Real Property Leases that are assumed by Buyer is 39, then the Purchase Price would increase by $40,000 such that the adjusted Purchase Price would be $1,640,000.

2.1.2    Prior to or concurrently with the mutual execution and delivery of this

Agreement (the date of such mutual execution and delivery is sometimes referred to herein as the "Execution Date"), Buyer shall deposit into escrow (the "Deposit Escrow") with an escrow agent (the "Deposit Escrow Holder") reasonably designated by Sellers $160,000 (the "Deposit") in immediately available, good funds (funds delivered in this manner are referred to herein as "Good Funds"), pursuant to joint escrow instructions to be delivered to and acknowledged by the Deposit Escrow Holder on or before the Execution Date. Such escrow instructions shall include the provisions set forth in this Section 2.1.2. Upon receipt of the Deposit, the Deposit Escrow Holder shall immediately deposit the Deposit into an interest-bearing account. The Deposit Escrow Holder shall return to Buyer the Deposit (and any interest accrued thereon) upon the earlier of:

    (i)    Buyer's termination of this Agreement under Section 4.3.2 as a result of the failure of a condition to Buyer's obligations, as set forth in Section 4.2 (a "Sellers Default Termination"),

    (ii)    Sellers' termination of this Agreement at its election under Section 4.3.2 unless there has been a Buyer Default Termination (as defined below),

    (iii)    Buyer's or Sellers' termination of this Agreement at its election under Section 4.3.3,

    (iv)    at the Outside Date, as extended pursuant to Section 3.2, and no Closing or Buyer Default Termination has occurred as of such date,

    (v)    upon closing of a sale of the Property to a third-party overbidder at the Auction, or

    (vi)    mutual termination of this Agreement under Section 4.3.1.

The Deposit Escrow Holder shall deliver the Deposit (and any interest accrued thereon) to Sellers upon the earlier of (A) Sellers' termination of this Agreement under Section 4.3.2 as a result of the failure of a condition to Sellers' obligations set forth in Section 4.1.1 (a "Buyer Default Termination") or (B) at the Closing of the sale to Buyer. The Escrow Holder's escrow fees and charges shall be paid one-half by Sellers and one-half by Buyer, in which respect Sellers and Buyer shall not be jointly liable since each shall only by liable for its own part (one-half) of the said fees and charges.

       2.1.3   On the Closing Date, Buyer shall (i) pay and deliver to Sellers, by wire transfer in Good Funds, the Purchase Price less the Deposit (and interest accrued thereon) and (ii) instruct the Deposit Escrow Holder to deliver the Deposit (and any interest accrued thereon) to Sellers, by wire transfer of Good Funds. Within two (2) business days of expiration of the Review Period, Buyer shall deliver to Sellers substantiation with respect to payment by Buyer of the applicable Cure Costs related to the Buyer Assumed Contracts that are not Removed Contracts pursuant to Section 1.1.1(v) above.

    2.2   <u>Assumed Liabilities</u>. Buyer shall, effective as of the Closing Date with the exception of subsection (i) below which shall be effective as of the expiration of the Review Period, assume, pay perform and discharge and indemnify Sellers in respect of:

    (i)    all liabilities accruing under the Real Property Leases and under the Other Leases and Contracts on and after the Closing Date and or

otherwise required to be performed with respect to the property on or after the Closing Date, including the Cure Amounts as set forth in Section 2.4 below and including the obligation to return the amount of any security deposit provided to Sellers by any tenant of a Real Property Lease assumed by Buyer as landlord (Buyer acknowledging that Sellers are retaining those deposits), but specifically excluding any and all liability or obligation relating to or arising out of such Real Property Leases and/or Other Leases and Contracts as a result of (A) any breach of such Real Property Leases and/or Other Leases and Contracts occurring on or prior to the Closing Date (other than Cure Costs payable by Buyer pursuant to Section 2.4), (B) any violation of any law, rule or regulation, breach or warranty, tort or infringement occurring on or prior to the Closing Date, or (C) any charge, complaint, action, suit, proceeding hearing, investigation, claim or demand based on any occurrence prior to the Closing Date;

(ii)     all post-Closing accounts payable and accrued expenses of Sellers including accrued salaries and bonuses and all unused vacation or sick leave earned and accrued (to the extent not paid) of Rehired Employees as of the Closing Date (but not including any wages, bonus, retention or severance obligations arising from any violation of law by a Seller prior to the Closing Date) in the ordinary course and conduct of the Business (excluding any expenses incurred with respect to the administration of the Case) which would qualify as administrative priority expenses under Section 503(b) of the Bankruptcy Code, provided, that such liabilities are of a type consistent with the current liabilities accrued by Seller in accordance with GAAP on the Sellers' consolidated historical financial statements;

(iii)    any liabilities for gift cards, coupons or similar promotions, issued by the Sellers; and

(iv)    any required COBRA continuation coverage to "M&A Qualified Beneficiaries" (as defined in Treasury Regulation Section 54.4980B-9, Q/A-4) resulting from the sale of the Business regardless of whether Buyer is (or becomes) a "successor employer" (as defined in Treasury Regulation Section 54.4980B-9 (Q/A-8(c)) (items (i)-(iii) collectively, the "Assumed Liabilities").

2.3     Excluded Liabilities.   Other than the liabilities and obligations of Sellers expressly assumed by Buyer hereunder, Buyer is not assuming and shall not be liable for any liabilities or obligations of Sellers, including any and all liabilities:

(i)     arising out of any proceeding of any kind and nature commenced against Sellers or any predecessor or Affiliate of any Seller after the Closing and arising out of or relating to any occurrence or event happening prior to the

Closing;

(ii)     under any Other Lease and/or Contract and/or Real Property Lease which arises after Closing but arises out of or relates to any breach that occurred prior to Closing;

(iii)    arising out of or relating to any infringement or misappropriation of, or other conflict with, the Intellectual Property of a third party arising out of or related to the conduct of the Business or any act or omission of any Seller or any predecessor or Affiliate of any Seller prior to the Closing;

(iv)    arising out of or relating to any Excluded Contracts and Leases including any Removed Contract, except as provided in Section 1.1.1(v);

(v)     arising out of, or relating to, any indemnification obligations of any Seller, including indemnification obligations pursuant to supply agreements, service agreements, purchase agreements, leases and any other type of contract, and all liabilities to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Sellers;

(vi)    with respect to sales or use or other Taxes of Sellers (but not including any Taxes assumed by Buyer pursuant to Section 2.2.(ii) above) that (A) result from sales and use Tax audits or examinations of Sellers for periods prior to the Closing Date or (B) for which any director, officer or employee of a Seller may be personally liable under Applicable Law; and

(vii)   with respect to the employees (including Rehired Employees) or former employees or both (or their representatives) of any Seller arising prior to the Closing Date, including, payroll, wages, salaries, bonuses, commissions, benefits, retention or stay bonus arrangements, other compensation, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or befits or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind, including liabilities arising under any collective bargaining agreements, the WARN Act or employment, severance, retention or termination agreement with any employee, consultant or contractor (or their representatives) of any Seller, except for liabilities assumed pursuant to Section 2.2.(ii) above.

2.4     <u>Cure Amounts</u>.   Within two (2) business days after the expiration of the Review Period as provided in Section 1.1.1(v) above, Buyer agrees to pay to the applicable vendor all negotiated cure amounts then due and payable under the Other Leases and Contracts assumed by Buyer in accordance with the applicable Bankruptcy Court orders related to Sellers' assumption and assignment to Buyer of the Other Leases and Contracts in accordance with section 365 of the Bankruptcy Code (the "Cure Costs" or "Cure Amounts"). For the avoidance of doubt, Sellers, out of the proceeds of the Purchase Price, shall pay any

and all cure amounts due and payable with respect to all Real Property Leases that are assumed by Buyer prior to the expiration of the Review Period.

3.    Closing Transactions.

3.1    Closing.  The Closing of the transactions provided for herein (the "Closing") shall take place at the offices of Proskauer Rose LLP, 11 Times Square, New York, New York 10036.

3.2    Closing Date.  The Closing shall be held within five (5) business days after satisfaction or waiver of the conditions to closing in Section 4 (the "Closing Date") but in no event later than December 31, 2011 (the "Outside Date").   In the event the conditions to Closing (other than the condition in Section 4.1.6 and 4.2.4) have not been satisfied or waived by the Outside Date, then any party who is not in default hereunder may terminate this Agreement.  Alternatively, the parties may mutually agree to an extended Closing Date. Until this Agreement is either terminated or the parties have agreed upon an extended Closing Date, the parties shall diligently continue to work to satisfy all conditions to Closing.

3.3    Sellers' Deliveries to Buyer at Closing.  On the Closing Date, Sellers shall make the following deliveries to Buyer:

3.3.1    An Assignment and Assumption Agreement substantially in the form and content attached as **Exhibit "E"** hereto, duly executed by Sellers, pursuant to which Sellers assign the Real Property Leases and the Other Leases and Contracts and Buyer agrees to perform and discharge the Assumed Liabilities and indemnify Sellers in respect thereof (the "Assignment Agreement").  Any modification to the attached **Exhibit "E"** must be acceptable to Buyer.  For the avoidance of doubt, it is Sellers' responsibility to pay all cure amounts due and owing with respect to the Real Property Leases that are Buyer Assumed Contracts and Sellers shall indemnify Buyer in respect thereof.

3.3.2    A bill of sale, duly executed by Sellers, in the form and on the terms of the bill of sale attached hereto as **Exhibit "F,"** pursuant to which Sellers transfers the Property other than the Real Property Leases and the Other Leases and Contracts to Buyer (the "Bill of Sale").

3.3.3    Intellectual Property assignments in the forms attached hereto as **Exhibit "H"** each duly executed by the applicable Seller or Sellers and each in recordable form to the extent necessary to assign such rights.

3.3.4    A certified copy of the Approval Order.

3.3.5    An assignment and assumption agreement, in a form acceptable to Buyer, with respect to Sellers' Permits, to the extent transferrable, whereby Sellers shall assign to Buyer all of their respective rights in and to any Permits (directly or indirectly) to the Property or the Business.

3.3.6   Certified copies of the resolutions of the board of directors of each Seller authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby.

3.3.7   An affidavit from each Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the United States Internal Revenue Code of 1986, as amended (the "Code") stating that such Seller is not a foreign person as defined in Section 1445 of the Code.

3.3.8   Copies of any third party approvals and governmental approvals obtained as required herein including with respect to any bifurcation as provided in Section 8.4.

3.3.9   All of the books and records pertaining to the Business as set forth in Section 1.1.4 above and originals (or to the extent that originals are not available, copies) of all Real Property Leases and Other Leases and Contracts (together with all amendments, supplements or modifications thereto).

3.3.10  Such other instruments as are necessary to transfer all of Sellers' rights and title in and to the Property to Buyer in accordance with the provisions hereof and/or that Buyer reasonably requests prior to the Closing Date to effect the transactions contemplated hereby.

3.4   Buyer's Deliveries to Sellers at Closing.  On the Closing Date, Buyer shall make or cause the following deliveries to Sellers:

3.4.1   The Deposit (together with all interest accrued thereon) to be paid and delivered by the Deposit Escrow Holder to Sellers as provided in Section 2.1.

3.4.2   The Purchase Price (excluding any Cure Costs, if any), less the Deposit (together with all interest accrued thereon), to be delivered by Buyer directly to Sellers at the Closing under Section 2.1.

3.4.3   The Assignment Agreement, duly executed by Buyer.

3.4.4   The Bill of Sale, duly executed by Buyer.

3.4.5   An assignment and assumption of the Transition Services Agreement with the purchaser of the Grandy's business in substantially the form attached as **Exhibit "I".**

3.5   Sales, Use and Other Taxes.  In the event that any: (a) real estate transfer taxes or similar taxes or charges are required to be paid in order to record the Deeds to be delivered to Buyer in accordance herewith, or in the event any such taxes are assessed at any time thereafter; or (b) sales, use, transfer or other similar taxes or charges are assessed at Closing

or at any time thereafter on the transfer of any other Property, then in each instance such taxes or charges incurred as a result of the transactions contemplated hereby shall be paid by Buyer.

3.6     Possession. Right to possession of the Property shall transfer to Buyer on the Closing Date. Sellers shall transfer and deliver to Buyer on the Closing Date such keys, lock and safe combinations and other similar items as Buyer shall require to obtain immediate and full occupation and control of the Property, and shall also make available to Buyer at their then existing locations the originals of all documents in Sellers' possession that are required to be transferred to Buyer by this Agreement.

4.     Conditions Precedent to Closing.

4.1     Conditions to Sellers' Obligations. Sellers' obligation to make the deliveries required of Sellers at the Closing Date shall be subject to the satisfaction or waiver by Sellers of each of the following conditions.

4.1.1     All of the representations and warranties of Buyer contained herein shall continue to be true and correct at the Closing in all material respects, all covenants and obligations to be performed by Buyer prior to the Closing shall have been performed in all material respects and Buyer shall have certified the foregoing to Sellers in writing.

4.1.2     Buyer shall have executed and delivered to Sellers all of those documents, instruments and agreements required to be executed by Buyer to Sellers under Section 3.4 thereof.

4.1.3     Sellers shall have received the total Purchase Price (excluding Cure Costs, if any) in immediately available funds.

4.1.4     Buyer shall have delivered to Sellers appropriate evidence of all necessary organizational action by Buyer in connection with the transactions contemplated hereby, including: (i) certified copies of resolutions duly adopted by Buyer's managing member approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by Buyer of this Agreement; and (ii) a certificate as to Buyer's authority to execute this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

4.1.5     No action, suit or other proceedings shall be pending before any court, tribunal or Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Authority having appropriate jurisdiction.

4.1.6     The Buyer shall have been the successful bidder at the Auction and the Bankruptcy Court shall have entered the Approval Order and the Approval Order shall have been entered on the docket of the Bankruptcy Court and shall become effective immediately,

notwithstanding Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, and unless otherwise waived by Sellers, with respect to the Approval Order, (i) the time to appeal, petition for certiorari or motion for re-argument or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding or motion for re-argument or rehearing shall then be pending or (ii) if any appeal, writ of certiorari, motion for re-argument or rehearing thereof has been filed or sought, such Approval Order of the Bankruptcy Court shall not have been stayed.

4.1.7    The Closing shall occur simultaneously with the closing of the sale of the assets of SSI-Grandy's LLC, a subsidiary of Souper Salad, Inc.

4.2    Conditions to Buyer's Obligations. Buyer's obligation to make the deliveries required of Buyer at the Closing shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

4.2.1    All representations and warranties of Sellers contained herein shall continue to be true and correct at the Closing in all material respects, all covenants and obligations to be performed by Sellers prior to the Closing shall have been performed in all material respects and Sellers shall have certified the foregoing to Buyer in writing.

4.2.2    Sellers shall have executed and delivered to Buyer all of those documents, instruments and agreements required to be executed by Sellers to Buyer under Section 3.3 hereof.

4.2.3    No action, suit or other proceedings shall be pending before any court, tribunal or Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Authority having appropriate jurisdiction.

4.2.4    The Buyer shall have been the successful bidder at the Auction and the Bankruptcy Court shall have entered the Approval Order and the Approval Order shall have been entered on the docket of the Bankruptcy Court and shall become effective immediately, notwithstanding Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, and unless otherwise waived by Buyer, with respect to the Approval Order, (i) the time to appeal, petition for certiorari or motion for re-argument or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding or motion for re-argument or rehearing shall then be pending or (ii) if any appeal, writ of certiorari, motion for re-argument or rehearing thereof has been filed or sought, such Approval Order of the Bankruptcy Court shall not have been stayed.

4.3    Termination.    Either or both parties, as applicable, may terminate this Agreement only under the circumstances set forth below:

4.3.1    Sellers and Buyer may terminate this Agreement by written mutual consent at any time prior to the Closing.

4.3.2    If all conditions to Closing required to obligate a party to close the transactions set forth herein have been satisfied (or waived) and such party has not tendered performance of its Closing obligations or deliveries hereunder on or before the Closing Date, then the party who is not then in default hereunder may terminate this Agreement by delivering to the other written notice of termination.  Any waiver of a condition shall be effective only if such waiver is stated in writing and signed by the waiving party; *provided, however,* that the consent of a party to the Closing shall constitute a waiver by such party of any conditions to Closing not satisfied as of the Closing Date.

4.3.3    Either Sellers or Buyer may terminate this Agreement by written notice to the other if the Closing has failed to occur on or before the close of business on the Outside Date, as extended pursuant to Section 3.2 (or such later date as Sellers and Buyer may agree upon in writing); *provided however*, that neither Sellers nor Buyer may terminate this Agreement by delivery of such notice of termination while such party is in breach or default of its obligations hereunder.

4.3.4    This Agreement shall terminate upon consummation of an Alternate Transaction including the closing of a transaction with a third-party overbidder at the Auction.

4.4    Consequences of Termination

4.4.1    In the event this Agreement is terminated under Section 4.3.1 or 4.3.3 above, all rights and obligations of the parties hereunder shall terminate without any liability of any party to any other party; *provided however*, that Section 2.1.2 relating to return of the Deposit hereof shall survive such termination.

4.4.2    In the event this Agreement is terminated by Sellers under Section 4.3.2 because of a Buyer Default Termination, the Deposit Escrow Holder shall deliver to Sellers the Deposit, together with all interest accrued thereon and the Sellers shall retain all of their rights against the Buyer resulting from the Buyer Default Termination.

4.4.3    In the event this Agreement is terminated by Buyer under Section 4.3.2 above, the Deposit Escrow Holder shall deliver to Buyer the Deposit together with all interest accrued thereon, and Sellers shall pay to Buyer the Break-Up Fee in accordance with Section 8.6 as liquidated damages and as Buyer's sole remedy in respect of such termination.

4.4.4    In the event this Agreement is terminated under Section 4.3.4, the Deposit Escrow Holder shall deliver to Buyer the Deposit together with all interest accrued thereon, and Buyer shall be entitled to the Break-Up Fee as liquidated damages and as Buyer's sole remedy in respect of such termination.

5.    Sellers' Representations and Warranties. Sellers hereby make the following representations and warranties to Buyer:

5.1    Validity of Agreement. Upon obtaining the Approval Order, this Agreement shall constitute the valid and binding obligation of Sellers enforceable in accordance with its terms.

5.2    Organization, Standing and Power.    Each of the Sellers is a corporation or limited liability company duly organized, validly existing and in good standing under its jurisdiction of organization.  Subject to the applicable provisions of bankruptcy law, Sellers have all requisite corporate power and authority to own, lease and operate their properties, to carry on their business as now being conducted and, subject to the Sellers' obtaining the Approval Order, to execute, deliver and perform this Agreement and all writings relating hereto.

5.3    No Conflicts or Violations.    Upon obtaining the Approval Order, the execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Sellers do not and will not: (i) conflict with or result in a breach of the articles of incorporation or the by-laws or certificate of formation or operating agreement, as the case may be, of Sellers; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or Governmental Authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Sellers is a party or by which Sellers or its assets or properties may be bound.

5.4    Title to Property.    To the Sellers' knowledge (which consists of matters actually known to Sellers' President or Chief Financial Officer), Sellers have good and marketable title to the Property.  At the Closing, Buyer will acquire all of Sellers' right, title and interest in and to all the Property, free and clear of any Liens, subject to Sections 2.2 and 3.5 hereof.

5.5    Labor.    None of Sellers is a party to any labor or collective bargaining agreement.  There are no (i) strikes, work stoppages, work slowdowns or lockouts pending or threatened against or involving Seller, or (ii) material unfair labor practice charges, grievances or complaints pending or, threatened by or on behalf of any employee or group of employees of Seller.

5.6    Litigation.    Except for matters before the Bankruptcy Court involving Sellers or any of their Affiliates and any matters that will otherwise be resolved by the Approval Order without any Liability or restriction applicable to Buyer or the Property, there are no material Legal Proceedings pending or threatened against any Seller, or relating to the Business or any of the Property or Assumed Liabilities, before any Governmental Authority.

5.7    Financial Information.

5.7.1    Sellers have delivered to Buyer copies of (i) the audited consolidated balance sheet of Sellers as of January 3, 2010 and the related audited consolidated statement of income and cash flow of Sellers for the year then ended and (ii) the unaudited consolidated balance sheet of Sellers as of the end of Seller's fiscal year 2010 and the nine (9) periods ended as of October 2, 2011 and the related consolidated statement of income of Sellers (such audited and unaudited statements, including the related notes and schedules thereto, are referred to herein as the "Financial Statements").  Each of the Financial Statements is complete and correct in all material respects, has been prepared in accordance with GAAP

consistently unapplied throughout the periods indicated without modification of the accounting principles used in the preparation thereof throughout the periods presented and presents fairly in all material respects the consolidated financial position and results of operations of Sellers as of the dates and for the period indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements. For the purposes hereof, the unaudited consolidated balance sheet of Sellers as of October 2, 2011 is referred to as the "Balance Sheet and October 2, 2011 is referred to as the "Balance Sheet Date."

5.7.2 No Seller has any Liabilities that would have been required to be reflected in, reserved against or otherwise described in the Balance Sheet or the notes thereto in accordance with GAAP, other than Liabilities incurred in the Ordinary Course of Business since the Balance Sheet Date, Liabilities under this Agreement or Liabilities of Sellers that will not be Assumed Liabilities.

5.8    Taxes.

To the Sellers' knowledge:

5.8.1    (i) Sellers have timely filed (or have caused to be timely file) with the appropriate Taxing Authorities all material Tax Returns required to be filed with respect to the Property (taking into account any extension of time to file granted or obtained with respect to such entity); (ii) all such Tax Returns are complete and accurate in all material respects; and (iii) all income and other material Taxes due, regardless of whether shown on a filed Tax Return, have been timely paid.

5.8.2    No Tax audits, investigations or administrative or judicial proceedings are pending or in progress or have been threatened in writing with respect to the Property.

5.8.3    Each of Sellers has complied in all material respects with all Applicable Laws relating to the payment and withholding of Taxes and has duly and timely withheld and paid over to the appropriate Taxing Authorities all amounts required to be so withheld and paid over under all Applicable Laws.

5.8.4    No Seller has been a party to any "listed transaction" as defined in Treasury Regulation Section 1.6011-4 or subject to any similar provision of state, local or foreign law.

5.8.5    No Seller is a foreign person within the meaning of Section 1445 of the Code.

5.8.6    No agreement, waiver, or other document or arrangement extending or having the effect of extending the period for assessment or collection of Taxes (including any applicable statute of limitations) or the period for filing any Tax Return, has been executed or filed with any Taxing Authority by or on behalf of any Seller.

5.8.9    No Tax elections have been made with respect to the Property or the Business that would, in any manner, bind, obligate or restrict Buyer.

5.8.10  No power of attorney with respect to any Tax matter is currently in force with respect to the Property or the Business that would, in any manner, bind, obligate or restrict Buyer.

5.8.11  Other than with respect to customary provisions related to a Tax pass-through, employee gross-up or other similar arrangements entered into in the Ordinary Course of Business, no Tax allocation, Tax sharing or Tax indemnity or similar agreement or arrangement is currently in effect with respect to the Property or the Business that would, in any manner, bind, obligation or restrict Buyer.

5.9    Compliance with Laws; Permits.

5.9.1    Sellers have (i) conducted and continue to conduct the Business in accordance in all material respect with all Applicable Laws including Environmental Laws; (ii) complied in all material respects with and continue to comply with all Laws applicable to the Property and the Assumed Liabilities; (ii) are not in violation in any material respect of any such Law; and (iv) no Seller has any material Environmental Liabilities or Obligations and no facts exist or event have occurred that could reasonably be expected to give rise to any such material Environmental Liabilities or Obligations.  Sellers have not received any written notice of or been charged with the violation of any Laws including Environmental Laws and there are no facts that would reasonably be expected to give rise to any such violations.

5.9.2    Sellers currently have all material Permits which are required for the operation of the Business as presently conducted.  Sellers are not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a material default or violation) in any material respect of any term, condition or provision of any Permit to which it is a party.

5.10    Accuracy of Schedule of Material Contracts.  To Sellers' knowledge, Sellers have provided Buyer with a complete and accurate schedule of all Real Property Leases and Other Leases and Contracts that are material to the Business, which schedule is attached hereto as **Exhibit "J"**.

5.11    No Real Property.  Sellers represent and warrant that it has no fee simple ownership interest in any real property.

6.    Buyer's Representations and Warranties.    Buyer hereby makes the following representations and warranties to Sellers:

6.1    Validity of Agreement.    All action on the part of Buyer necessary for the authorization, execution, delivery and performance of this Agreement by Buyer, including the performance of Buyer's obligations hereunder, has been duly taken. This Agreement, when executed and delivered by Buyer, shall constitute the valid and binding obligation of Buyer

enforceable in accordance with its terms.

        6.2     Organization, Standing and Power.  Buyer is a limited liability company duly organized, validly existing and in good standing under its jurisdiction of organization. Buyer has all requisite corporate power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

        6.3     No Conflicts or Violations.  The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer do not and will not: (i) conflict with or result in a breach of the [articles of incorporation or by-laws] of Buyer; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or Governmental Authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a party or by which Buyer or its assets or properties may be bound.

        6.4     Financing.  Buyer has received (and will have as of the Closing Date) $2.5 million in equity from its members and Buyer has delivered evidence of such funding to Sellers.

7.     "AS IS" Transaction.  BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 5 ABOVE, THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PROPERTY OR BUSINESS INCLUDING INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PROPERTY, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE PROPERTY OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS WHICH ARE THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY BUYER AT THE CLOSING, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PROPERTY (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PROPERTY (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PROPERTY FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PROPERTY OR BUSINESS OR ANY PORTION THEREOF.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PROPERTY.  BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PROPERTY AND ALL

SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PROPERTY AND THE BUSINESS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PROPERTY, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 5, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE PROPERTY AND THE BUSINESS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

8.     Conduct and Transaction Prior to Closing.

8.1     Access to Records and Properties of Sellers.  From and after the date of this Agreement until the Closing Date, Sellers shall, upon reasonable advance notice, afford to Buyer's officers, independent public accountants, counsel, lenders, consultants and other representatives, reasonable access during normal business hours to the Property and all records pertaining to the Property or the Business. Buyer, however, shall not be entitled to access to any materials containing: (i) privileged communications or information about employees, disclosure of which might violate an employee's reasonable expectation of privacy; or (ii) information in respect to any items excluded from the Intangible Property under Section 1.1.4.  Buyer shall have no right hereunder to conduct any environmental or other assessment of the Property other than visual inspection and document review.  Buyer expressly acknowledges that nothing in this Section 8.1 is intended to give rise to any contingency to Buyer's obligations to proceed with the transactions contemplated herein.

8.2     Operation of Sellers' Business Pending Closing. Unless Buyer otherwise consents, during the period prior to the Closing Date, subject to the jurisdiction of the Bankruptcy Court, Sellers shall use commercially reasonable efforts to operate the Business as currently operated and only in the Ordinary Course of Business and, consistent with such operation, shall use commercially reasonable efforts to preserve intact the Business and its relationships with employees and persons having dealings with it. Further, Sellers shall (i) use commercially reasonable efforts to maintain all of the tangible assets and tangible properties of the Sellers in their current condition, ordinary wear and tear excepted, and maintain insurance upon all of the assets and proprieties of the Sellers in such amounts and of such kinds comparable to that in effect on the date of this Agreement; (ii) maintain the books, accounts and records of the Sellers in the ordinary course of business, continue to collect accounts receivable and pay accounts payable utilizing normal procedures and without discounting or accelerating payment of such accounts, except discounting and accelerating payment in the ordinary course of business and comply with all contractual and other obligations applicable to the operation of the Business; and (iii) comply in all material respects with Applicable Laws.  Sellers shall not (x) directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Property other than the sale of Inventory in the Ordinary Course of Business; (y) make any promise or representation, oral or written or otherwise, to increase the annual level of compensation payable or to become payable by Sellers to any of their directors or employees, to grant or establish or modify any targets, goals, pools or similar provisions in respect of any bonus, benefit or other direct or indirect compensation to or for any director or employee or

increase the coverage or benefits available under any (or create any new) employee benefit plan or to enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller is a party or involving a director or employee of Sellers, except in each case, as required by law or as required by any plans, programs or agreements existing on the Effective Date; or (z) except in the Ordinary Course of Business, enter into any contract that would be required to be listed on Exhibit "A-4" or assume, amend, modify or terminate any Real Property Lease and/or Other Lease and Contract to which any Seller is a party or by which it is bound and that is used in or related to the Business or the Property.

8.3    <u>Bankruptcy Court Matters</u>.  The Debtors have filed a motion (the "Sale Motion") requesting entry of the Approval Order.  In no event shall Buyer have the right to terminate this transaction by reason of the failure to assign any of the Real Property Leases and Other Leases and Contracts.  Following the filing of the Sale Motion, the Sellers shall use reasonable efforts to obtain entry of the Approval Order.  Both Buyer's and Sellers' obligations to consummate the transactions contemplated in this Agreement which the Buyer and Sellers may hereafter enter into shall be conditioned upon the Bankruptcy Court's entry of the Approval Order.

If the Sellers receive any other bid for the Business, the Sellers shall promptly give notice (i.e., within 24-hours of receipt but no later than 24-hours prior to the commencement of the Auction) (and a copy) of such bid to the Buyer.  In addition, Sellers shall promptly give to Buyer all amendments, modifications and supplements for all bids for the Business.  The Sellers also shall inform the Buyer whether the Sellers consider any other bid to be a Qualified Bid no later than one day prior to the Auction.

8.4    <u>Bifurcation of Contracts</u>.  Certain of the Other Contracts relate to both the Business and the Grandy's business operated by affiliates of Sellers (the "Combined Contracts"); a complete list of all Combined Contracts is attached as **Exhibit "K"**.  Sellers shall use commercially reasonable efforts to obtain a bifurcation of each Combined Contract between the Business (to be assigned to Buyer) and the other business (to be assigned to the purchaser of the Grandy's business).  During any post-Closing period that Sellers are continuing to seek such bifurcation, Sellers shall make goods and services available under the Combined Contracts available to Buyer at Buyer's expense.  If Sellers are unable to obtain a bifurcation of any Combined Contract, notwithstanding anything to the contrary in this Agreement, that Combined Contract shall be an Excluded Asset.

8.5    <u>Further Actions</u>.  Buyer and Sellers each agree to use all commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable to consummate the transactions contemplated hereby by the expected Closing Date.

8.6    <u>Break-Up Fee</u>.

8.6.1    Upon the first to occur of (i) termination of this Agreement by Buyer as a result of Seller's failure to perform pursuant to Section 4.3.2, (ii) termination of this Agreement pursuant to Section 4.3.4 above,  and/or (iii) the date any Seller consummates a

plan under the Bankruptcy Code, and only if the first to occur of (i), (ii) or (iii) above shall have occurred on or prior to the date which is one (1) year anniversary of the date of termination of this Agreement, Sellers, jointly and severally, shall immediately pay (in cash) to Buyer an amount equal to $80,000 (the "Break-Up Fee").

8.6.2   Sellers' obligation to pay the Break-Up Fee shall survive termination of this Agreement and shall constitute an administrative expense (which shall be a super-priority administrative expense claim senior to all other administrative expense claims and payable out of Sellers' cash or other collateral securing Sellers' obligations to its senior secured lenders, prior to any recovery by such lenders) of Sellers under section 364(c)(1) of the Bankruptcy Code.

9.   <u>Post-Closing Covenants.</u>

9.1   <u>Post-Closing Maintenance of and Access to Information</u>.   Without limiting Sellers' rights under Section 10.2 with respect to the Case, Buyer will also comply with the following provisions:

(a)   The parties acknowledge that after Closing, Sellers or its successors may need access to information or documents in the control or possession of Buyer for the purposes of concluding the transactions herein contemplated, preparing or filing tax returns or responding to audits, Contracts and to satisfy other legal requirements, and to prosecute or defend third party claims.

(b)   Buyer shall not dispose of or destroy any of the records and files of the Business prior to the fourth anniversary of the Closing Date.   If Buyer wishes to dispose of or destroy such records and files after that time, it shall first give sixty (60) days' prior written notice to Sellers, and Sellers shall have the right, at their option and expense, upon prior written notice to Buyer within such sixty-day period, to take possession of the records and files within ninety (90) days after the date of the notice from Sellers.

(c)   Buyer shall cooperate fully in connection with, and make available for inspection and copying by, Sellers, their successors, and their respective employees, agents, counsel and accountants and/or Governmental Authorities, upon written request, such books, records documents and other information to the extent reasonably necessary to facilitate the purposes set forth in subsection (a) above and for other legitimate corporate purposes.   In addition, Buyer shall cooperate with, and shall permit and use its commercially reasonable efforts to cause, its former and present directors, officers and employees (including Rehired Employees) to cooperate with Sellers on and after Closing in furnishing information, evidence, testimony and other assistance in connection with any action, proceeding, arrangement or dispute of any nature with respect to the Business or the Property and pertaining to periods prior to the Closing Date.

0059/69794-001 current/25799634v3

(d)     Sellers shall be entitled to retain any records that relate to events or periods prior to Closing for purposes of pending litigation involving matters to which such records refer.

9.2     <u>WARN Act and Employment Matters</u>.

9.2.1     <u>Offer of Employment</u>.  Prior to or at the Closing, Seller shall terminate the employment of all employees of the Business.  Buyer shall, immediately prior to the Closing (but contingent on the occurrence of the Closing), make offers of employment to substantially all of Sellers' employees that are actively employed or engaged principally in the Business as of the Closing Date and who meet Buyer's objective hiring standards (such employees who accept such offer of employment and commence active employment with Buyer, the "Rehired Employees") on an at-will basis (except to the extent otherwise expressly agreed in a writing signed by Buyer and such Rehired Employee) and on such other terms and conditions as Buyer may determine; *provided, however*, that Buyer shall have the right to conduct customary employee background checks prior to offering employment to any such employee.  Buyer will grant to all Rehired Employees service credit for previous service recognized by Sellers for purposes of vacation and other benefits (whether or not accrued on the financial statements of Sellers), and will credit Rehired Employees with their prior service (whether or not accrued on the financial statements of Sellers) for purposes of calculating vacation time earning in the period following the Closing Date.  Nothing contained in this Agreement shall confer upon any Rehired Employee any right to any term or condition of employment (other than as set forth in the immediately preceding sentence) or to continuance of employment by Buyer or any of its affiliates, nor shall anything herein interfere with the right of Buyer or any of its affiliates to terminate the employment of any employee, including any Rehired Employee, at any time, with or without notice and for any or no reason, or restrict Buyer or any of its affiliates in modifying any of the terms or conditions of employment of any employee, including any Rehired Employee, after Closing.  Sellers are responsible for and shall jointly and severally indemnify and hold Buyer harmless from and against any and all wages, bonuses, commissions, employee benefits, retention or stay bonus arrangements and other compensation (including, all obligations under any employee benefit plan) due to the employees of Sellers arising out of their employment with Sellers prior to and as of the Closing.

9.2.2     <u>WARN Act</u>.  Provided that Sellers provide Buyer with a true and accurate list, by date and location, of employee layoffs implements by Sellers in the ninety (90) days preceding the Closing, Buyer shall indemnify and hold Sellers harmless from any liability under the WARN Act (a) relating to the termination of employees of the Business by Sellers immediately prior to or at the Closing or the hiring of the Rehired Employees by Buyer at the Closing or (b) due, in whole or in part, to Buyer's actions or omissions occurring on or after the Closing Date.

9.2.3     <u>Employee Benefits</u>.  Effective as of the Closing Date, Buyer shall establish a medical plan for the Rehired Employees and their dependents and beneficiaries, without preexisting condition exclusions, waiting times to commence coverage, or other lapses in coverage.  In addition, commencing on the Closing Date, Buyer shall provide the Rehired Employees and their dependents and beneficiaries coverage under any other pension,

retirement, welfare and fringe benefit plans, programs, policies or arrangements that may be established by Buyer for such persons, who for all purposes of this sentence will be credited, to the extent permissible under Applicable Law, with all service with Sellers or its affiliates. Sellers shall not have any liability or responsibility for any benefits or other amounts that may become payable to Rehired Employees and their dependents or beneficiaries on or after the Closing Date under any pension, retirement, welfare and fringe benefit plans, programs, policies or arrangements established or maintained by Buyer, except to the extent that Sellers has an obligation to make a direct roll-over described in Section 401(a)(31) of the Internal Revenue Code.

9.2.4 **Intentionally Omitted**.

10. Miscellaneous.

10.1 Attorneys' Fees. In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

10.2 Reasonable Access to Records and Certain Personnel. Following Closing and for so long as Sellers' Chapter 11 Cases are pending or twenty-four (24) months after Closing, whichever is longer (the "Access Period"), Buyer and Sellers agree to permit their respective representatives to have access, at reasonable times and in a manner so as not to unreasonably interfere with normal business operations, to the books and records acquired pursuant to this Agreement (or, in the case of Buyer, books and records relating to the Business that constitute Excluded Assets, to the extent permissible under applicable law). Such access to such books and records shall be for any purpose in connection with the administration of Sellers' Chapter 11 Cases or to allow the Buyer and Sellers, as the case may be, to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities and to prosecute and defend legal actions or for other similar purposes and shall entitle Sellers or Buyer, as the case may be, to make copies of any such books and records at the requesting parties expense. Buyer shall not destroy any books and records without having provided Sellers with at least thirty (30) days prior written notice and the opportunity to make copies thereof at Sellers' cost and expense. During the Access Period, on reasonable terms and conditions, Sellers shall have, at no cost to Sellers, reasonable access to Rehired Employees, which access shall be provided for the purpose of facilitating Sellers' administration and closing of the Chapter 11 Cases, including, but not limited to, their preparation of final tax returns.

10.3 Notices. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either party to the other may be effected by personal delivery in writing, or by registered or certified mail, postage prepaid, return receipt requested, and shall be deemed communicated as of the date of mailing. Mailed notices shall be addressed as set forth below, but each party may change his address by written notice in

accordance with this paragraph.

| | |
|---|---|
| To Sellers: | Souper Salad<br>4004 Beltline Road, Suite 160<br>Addison, Texas  75201<br>Attn:  Ward Olgreen, President |
| With a copy to: | Proskauer Rose LLP<br>11 Times Square<br>New York, New York<br>Attn: Scott K. Rutsky, Esq. |
| | And |
| | Morgan Joseph TriArtisan LLC<br>600 Fifth Avenue, 19th Floor<br>New York, NY 10020<br>Phone: 212-218-3700<br>Attn: Alex C. Fisch |
| To Buyer: | JLMF LLC<br>5551 Anderson County Road 468<br>Montalba, Texas 75853<br>Attn: John Antioco |
| With a copy to: | M.Brown PLLC<br>11629 Mirage Lane<br>Frisco, TX 75033<br>Attn:  Melitha L. Brown |
| | And |
| | Akin Gump Strauss Hauer & Feld LLP<br>1700 Pacific Avenue, Suite 4100<br>Dallas, Texas 75201-4624<br>Attn:  Sarah Link Schultz |

10.4    <u>Entire Agreement.</u>  This instrument, the schedules and exhibits attached hereto and the documents to be executed pursuant hereto contain the entire agreement between the parties relating to the sale of the Property. Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the party to be charged.

10.5     Modification.  This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the parties hereto.

10 6     Closing Date.    All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or affected until all such actions, documents and transactions have been taken, delivered or effected.

10.7     Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive except that, if Buyer cannot acquire and Sellers cannot sell substantially all of the Property, either party may terminate this Agreement, and it shall be of no further force and effect, unless both parties agree in writing to the contrary.

10.8     Captions.  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

10.9     Further Assurances.  Each party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other party hereto for the purpose of giving effect to the transactions contemplated herein or the intentions of the parties with respect thereto.

10.10    Waiver.   No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

10.11    Brokerage Obligations.    Sellers is represented by Morgan Joseph as its exclusive sale agent with respect to the transactions contemplated herein pursuant that certain order entered by the Bankruptcy Court on October 6, 2011 and Morgan Joseph's commission, fees and expenses are to be paid by the Sellers at Closing as a cost of the transactions contemplated herein in accordance with the terms and provisions of such order. The Sellers and the Buyer each represent and warrant to the other that, except for Morgan Joseph, such party has incurred no liability to any broker or agent with respect to the payment of any commission regarding the consummation of the transaction contemplated hereby.  Except for any claims of Morgan Joseph (which are to be handled and satisfied by Sellers in accordance with the above referenced order), it is agreed that if any claims for commissions, fees or other compensation, including brokerage fees, finder's fees, or commissions are ever asserted against Buyer or the Sellers in connection with this transaction, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify, defend (with counsel reasonably satisfactory to the party entitled to indemnification), protect, and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transaction contemplated hereby.

10.12    Payment of Fees and Expenses.  Except as provided in Sections 8.6 and 10.1 above, each party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

10.13    Survival.  Except for the covenants and agreements to be performed after the Closing Date, none of the  respective representations, warranties, covenants and agreements of Sellers and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall survive the Closing.

10.14    Assignments.  This Agreement shall not be assigned by either party hereto without the prior written consent of the other party hereto.

10.15    Binding Effect.  Subject to the provisions of Section 10.14 above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the parties hereto.

10.16    Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regard to its conflicts of laws provisions.

10.17    Good Faith.  All parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

10.18    Construction.  In the interpretation and construction of this Agreement, the parties acknowledge that the terms hereof reflect extensive negotiations between the parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either party hereto.

10.19    Counterparts.  This Agreement may be signed in counterparts. The parties further agree that this Agreement may be executed by the exchange of facsimile signature pages.

10.20    Time is of the Essence.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

10.21    Tax Effect.  None of the parties (nor such parties' counsel or accountants) has made or is making in this Agreement any representation to any other party (or such party's counsel or accountants) concerning any of the tax effects or consequences on the other party of the transactions provided for in this Agreement.  Each party represents that it has obtained, or may obtain, independent tax advice with respect thereto and upon which it, if so obtained, has solely relied.

10.22    Employee Withholding. The parties agree that, pursuant to the "Alternative Procedure" provided in Section 5 of Revenue Procedure 96-60, 1996-2 C.B. 399, with respect

to filing and furnishing IRS Forms W-2, W-3, and 941, (a) Sellers shall report on a "predecessor-successor" basis, as set forth therein, (b) Sellers shall be relieved from furnishing Forms W-2 to any of the employees of Sellers who become employees of Buyer, and (c) Buyer shall assume the obligations of Sellers to furnish such Forms W-2 to such employees for the year in which the Closing occurs.

10.23 <u>Confidentiality Agreement</u>. Except as provided herein, the Confidentiality Agreement dated as of December 24, 2010 between Buyer and Sellers (the "Confidentiality Agreement") shall remain in full force and effect during the term specified therein.

10.24 <u>Bankruptcy Court Jurisdiction.</u>  BUYER AND SELLERS AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING; TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE BUSINESS OR THE PROPERTY AND/OR ASSUMED LIABILITIES, AND BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

0059/69794-001 current/25799634v3

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

Buyer:

JMLF LLC, a Texas limited liability company

By: _____
Name: _John Antioco_
Its: _Managing Member_

Sellers:

SOUPER SALAD, INC., a Texas corporation

By: _____
Name: _____
Its: _____

SOUPER BRANDS, INC., a Texas corporation

By: _____
Name: _____
Its: _____

0059/69794-001 current/25799634v3

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the day and year first above written.

Buyer:

JMLF LLC, a Texas limited liability company

**By:** _____
**Name:** _____
**Its:** _____

Sellers:

SOUPER SALAD, INC., a Texas corporation

**By:** _~~signature~~_
**Name:** _WARD OLGREEN_
**Its:** _PRESIDENT + CEO_

SOUPER BRANDS, INC., a Texas corporation

**By:** _~~signature~~_
**Name:** _WARD OLGREEN_
**Its:** _PRESIDENT + CEO_

0059/69794-001 current/25799634v3

# ATTACHMENT A

## Definitions

For the purposes of this Agreement, the following terms shall have the meanings specified in this Attachment A:

"Action" means any action, suit, arbitration, claim, inquiry, proceeding or investigation by or before any Governmental Authority of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"Affiliate" (and, with a correlative meaning "affiliated") means, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directory, or through one or more intermediaries, controls or is controlled by or is under common control with such Person. As used in this definition, "control" (including with correlative meanings, "controlled by" and "under control with") means possession, directly or indirectly, of power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise).

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers (a) accept a Qualified Bid (as defined in the Bidding Procedures Order entered by the Bankruptcy Court on October 6, 2011), other than that of Buyer, as the highest or best offer or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including a Bankruptcy Court-approved stand-alone plan of reorganization or refinancing, all or a substantial portion of the Property in a transaction or series of transactions to a party or parties other than Buyer.

"Applicable Law" means, with respect to any Person, any Law applicable to such Person or its business, properties or assets. "Approval Order" means the Order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer, to be entered by the Bankruptcy Court pursuant to sections 363, 365 and 1146(c) of the Bankruptcy Code and (a) approving this Agreement and the transactions contemplated hereby; (b) approving the sale of the Property to Buyer free and clean of all Liens (other than Permitted Liens) pursuant to section 363(f) of the Bankruptcy Code (except as provided in this Agreement); (c) approving the assumption and assignment to Buyer of the Buyer Assumed Contracts pursuant to section 365(f)(2) of the Bankruptcy Code, subject to Buyer's right to assume or reject any such Contract prior to the expiration of the Review Period as set forth in the Asset Purchase Agreement; (d) transferring and assigning the Buyer Assumed Contracts such that the Buyer Assumed Contracts will be in full force and effect from and after the Closing, subject to Buyer's right to assume or reject any such Contract prior to the expiration of the Review Period as set forth in the Asset Purchase Agreement, with non-debtor parties being barred and enjoined from asserting against Buyer, among other things, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing; (e) finding that Buyer is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy

Code; (f) confirming that Buyer is acquiring the Property free and clear of the Excluded Liabilities and providing for a full release of Buyer with respect to the Excluded Liabilities; (g) confirming that, to the extent the Buyer is owed funds from Sellers pursuant to this Agreement, the cash proceeds received by Sellers from Buyer in connection with the transactions contemplated hereby shall be subject to (and junior in right of payment to) Buyer's right to recover such funds (including with respect to any claims Sellers' senior lenders may have to such proceeds); (h) providing that the provisions of Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived and there will be no stay of execution of the Approval Order under Rule 62(a) of the Federal Rules of Civil Procedure; (i) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement; and (j) authorizing and approving the results of the Auction.

"Avoidance Actions" means any causes of action arising under chapter 5 of the Bankruptcy Code, including any and all preference or avoidance claims and actions of any of the Sellers, including all such claims and actions arising under Sections 544, 547, 548, 549 and 550, respectively, of the Bankruptcy Code.

"Bankruptcy Code" means chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq*.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close. Any event the scheduled occurrence of which would fall in a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"Contract" means any written contract, indenture, note, bond, loan, instrument, lease, license, commitment or other agreement.

"Documents" means all files, documents, instruments, papers, books, reports, manuals, records, tapes, microfilms, hard drives, databases, compilations of information, photographs, letters, budgets, accounts, forecasts, ledgers, journals, title policies, customer and supplier lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (including sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business and the Purchased Assets in each case whether or not in electronic form.

"Environmental Law" means all Applicable Laws in effect on the date hereof relating to the environment, natural resources, health and safety or the protection thereof, including any applicable provisions of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, the Clean Air Act, 42 U.S.C. 7401 *et seq.*, the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*, the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.*, and the regulations promulgated pursuant thereto, and all analogous state or local statutes.

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment or damage to the environment or failure to comply with the Environmental Laws in connection with the prior or ongoing ownership or operation of the Business, including Liabilities related to: (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Materials or waste; (ii) the Release of Hazardous Materials or waste; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Laws with respect to the Business; and (v) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under Applicable Law as a result of any of the matters identified in clauses (i) – (iv) of this definition.

"Excluded Contracts and Leases" means collectively, Excluded Franchise Agreements, Excluded Other Leases, Excluded Other Contracts and Excluded Real Property Leases.

"Excluded Franchise Agreements" means all franchise agreements OTHER THAN those described on **Exhibit "A-3"** to this Agreement.

"Excluded Other Leases" means all equipment, personal property and intangible property leases, rental agreements, licenses, contracts, agreements and similar arrangements OTHER THAN those described on **Exhibit "A-2"** to this Agreement, including any lease, rental agreement, contract, agreement, license or similar arrangement terminated or expired prior to the Closing Date in accordance with its terms or in the ordinary course of the Business.

"Excluded Other Contracts" means all other contracts, leases, orders, purchase orders, licenses, contracts, agreements and similar arrangements OTHER THAN those described on **Exhibit "A-4"** to this Agreement, including any lease, rental agreement, contract, agreement, license or similar arrangement terminated or expired prior to the Closing Date in accordance with its terms or in the ordinary course of the Business.

"Excluded Real Property Leases" means all real property leases, subleases, licenses, concessions and other agreements (written or oral) and all amendments, modifications, extensions, renewals, guarantees and other agreements with respect thereto, including the right to all security deposits and other amounts and instruments deposited by or on behalf of

any Seller thereunder, pursuant to which a Seller holds a leasehold or subleasehold estate in, or is granted the right to use or occupy, a Leased Facility, OTHER THAN those described on **Exhibit "A-1"** to this Agreement, including any lease, rental agreement, contract, agreement, license or similar arrangement terminated or expired prior to the Closing Date in accordance with its terms or in the ordinary course of the Business.

"GAAP" means United States generally accepted accounting principles as in effect during the time period of the relevant financial statement.

"Governmental Authority" means an entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to United States or foreign, federal, state or local government, any governmental authority, agency, department, board, commission or instrumentality or any political subdivision thereof, and any tribunal or court or arbitrator(s) of competent jurisdiction, and shall include the Bankruptcy Court.

"Hazardous Materials" means all substances defined as "hazardous substances," "hazardous wastes," "hazardous materials," "pollutants," "toxic wastes," "toxic substances," or "contaminants" or otherwise regulated under Environmental Laws or with respect to which liability or standards of conduct are imposed under Environmental Laws.

"Intellectual Property" means and includes all of the following in any jurisdiction throughout the world used in the Business: (i) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, divisionals, extensions and reexaminations thereof, (ii) trademarks including "Souper Salad" and "Souper Brands" (collectively, the "Names"), service marks, designs, trade dress, logos, slogans, trade names, internet domain names, corporate names, all applications, registrations and renewals in connection therewith and all translations, adaptations, derivations and combinations of any of the foregoing, together with all goodwill associated with any of the foregoing; (iii) copyrights, mask works and copyrightable works and all applications, registrations and renewals in connection therewith, (iv) trade secrets and confidential information (including formulations, ideas, research, recipes and development, information, know-how, inventions, technology, formulas, compositions, manufacturing and production processes and techniques, technical data, financial and marketing plans, customer and supplier lists and information, designs, drawings, plans, proposals and specifications), (v) computer software and systems (including source code, executable code, data, databases and related documentation), websites, URLs, email addresses and telephone numbers, (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium and (vii) other proprietary and intellectual property rights.

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other requirement enacted, promulgated, issued or entered by a Governmental Authority.

"Leased Facility" means any land, buildings, structures, improvements, fixtures or other interest in real property which any Seller has the right to use, and which is used or

intended to be used by any Seller or used or intended to be used in, or otherwise related to, the Business.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Authority.

"Liabilities" means any and all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses in connection therewith (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

"Lien" means any lien, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement or encumbrance or any other restriction or limitation whatsoever.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice during the one month period prior to the date of this Agreement, and without regard to store closures and liquidations.

"Permits" means any approvals, authorizations, consents, licenses, franchises, permits or certificates and/or certifications and all rights to all data and records of Sellers held by such permitting, licensing and certifying agencies.

"Permitted Liens" means:
(a) With respect to any real property and to the extent that they do not materially interfere with the ownership, occupancy, use or operation of the affected Real Property Leases in the manner and for the purposes heretofore used by Sellers in connection with the Business, easements, restrictive covenants, and rights-of-way on, over or in respect of any Real Property Lease, servitudes, permits, surface leases and other rights with respect to surface operations;
(b) All rights reserved to or vested in any Governmental Authority to control or regulate the Property and all obligations and duties under all Applicable Laws or under any permit issued by any Governmental Authority;

(c) Statutory Liens for current Taxes not yet delinquent or the amount or validity of which is being contested in good faith;

(d) Any Lien that pursuant to section 363(f) of the Bankruptcy Code will be released from the Property upon entry of the Sale Order; and

(e) Other Liens that will be released on or prior to Closing at no cost or expense to Buyer.

"Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

"Receivables" means and includes accounts and notes receivable (whether current or non-current) in respect of goods shipped, products sold or services rendered in or with respect to the operation of the Business by any of the Sellers prior to the Closing Date. For the avoidance of doubt, Receivables will specifically include all credit card receivables received on or after the Closing Date and any promissory notes between Sellers and any of its franchisees.

"Release" means any release, spill, emission, discharge, migration, leaking, pumping, injection, deposit or disposal of Hazardous Materials into or through the environment.

"Remedial Action" means any investigation, response, corrective action, monitoring or remedial action required under any Environmental Law or by a Governmental Authority to address a Release or threatened Release of Hazardous Materials.

"Representatives" of a Person means its officers, directors, managers, employees, attorneys, investment bankers, accountants and other agents and representatives.

"Restaurants" means Sellers' domestic non-franchised "Souper Salad" restaurant locations.

"Tax" means all federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments( including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority.

"Tax Returns" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

"Taxing Authority" means any Governmental Authority exercising any authority to impose, regulate, levy, assess or administer the imposition of any Tax.

Other Definitional and Interpretative Provisions:

(a)     The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)     The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".

(d)     Any reference in this Agreement to "$" shall mean United States dollars.

(e)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(f)     Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or state as from time to time amended, modified or supplemented including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.

(g)     All Article and Section references herein are to the Articles and Sections of this Agreement, unless otherwise specified.

(h)     All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

0059/69794-001 current/25799634v3